UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

AMERICAS BULK TRANSPORT LTD.

                                :

        Plaintiff,                  :

    - against -                 :      08 CV 6970 (AKH)

IMT SHIPPING AND CHARTERING GmbH   :

        Defendant.           :
------------------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE/MOTION TO VACATE THE EX PARTE ORDER OF MARITIME ATTACHMENT, OR ALTERNATIVELY, TO REDUCE THE EX PARTE ORDER OF MARITIME ATTACHMENT

LENNON, MURPHY & LENNON, LLC
Attorneys for Defendant
IMT SHIPPING AND CHARTERING GmbH
The GrayBar Building
420 Lexington Avenue, Suite 300
New York, New York 10170
Telephone:   (212) 490-6050
Facsimile:   (212) 490-6070
Charles E. Murphy (CM2125)
Patrick F. Lennon (PL2162)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

ARGUMENT...........................................................................................................................4

POINT ONE
IT IS PLAINTIFF'S BURDEN TO SHOW CAUSE WHY THE ATTACHMENT
SHOULD NOT BE VACATED...............................................................................................4

POINT TWO
THE ATTACHMENT ORDER AS AGAINST INTER-MARINE TRANSPORTATION
GMBH AND INTER-MARINE TRANSPORTATION, LTD. MUST BE VACATED ..................5

POINT THREE
PLAINTIFF HAS FAILED TO ALLEGE A PRIMA FACIE VALID MARITIME
CLAIM UNDER ENGLISH LAW AND THE ATTACHMENT MUST
THEREFORE BE VACATED .................................................................................................6

POINT FOUR
ALTERNATIVELY, PURSUANT TO SUPPLEMENTAL ADMIRALTY RULE E(6)
THE COURT SHOULD REDUCE THE ATTACHMENT FROM
$4,946,170.13 TO $1,324,804.71 ........................................................................................14

POINT FIVE
IF THE COURT DECLINES TO VACATE THE ATTACHMENT,
IMT RESERVES ITS RIGHTS PURSUANT TO ADMIRALTY RULE E(7)(a) ..........................20

CONCLUSION .....................................................................................................................21

## PRELIMINARY STATEMENT

Defendant, IMT Shipping & Chartering GmbH (hereinafter "IMT" or "Defendant"), by

its undersigned counsel, Lennon, Murphy & Lennon, LLC, submits the within Memorandum of

Law in Support of its Order to Show Cause/Motion to Vacate, or alternatively, reduce the Ex

Parte Order of Attachment ("Order") obtained by Plaintiff, Americas Bulk Transport Ltd.

(hereinafter "ABTL" or "Plaintiff"), pursuant to Rules E(4)(f) and E(6) of the Supplemental

Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure

("Admiralty Rules").

On or about August 5, 2008, ATBL filed its Verified Complaint in this action. See

Accompanying *McFadyen Declaration, Exhibit 3 (hereinafter "McFadyen Decl. ")*. In addition

to IMT, Plaintiff named as "also known as" or "a/k/a" defendants: "IMT Dusseldorf," "Inter-

Maritime Transportation GmbH" and "Inter-Maritime Transportation, Ltd."

Also at ABTL's request, on August 5, 2008 the Court issued the Order against IMT's

property in the sum of $3,138,130.34. To date, IMT has received a notice from Plaintiff's

counsel dated August 19, 2008 that it has attached $650,034.45 in the hands of garnishee

Wachovia Bank N.A. within the district, funds purportedly belonging to IMT. Additionally,

IMT has received a notice from Plaintiff's counsel that it purportedly attached an additional

$55,661.32 in the hands of garnishee HSBC Bank. IMT counsel in New York and London have

advised Plaintiff's counsel that these funds do not belong to IMT and that they should be

immediately released, although it is unknown if Plaintiff has done so.

Although Plaintiff can be given points for creativity in formulating its claim, in the end,

despite such creativity, the claim is utterly meritless under English law. More particularly,

Plaintiff's claim is totally unsupported by the terms of the charter party contract under which it

1

claims. Accordingly, because Plaintiff cannot establish a *prima facie* valid claim, the attachment must be vacated pursuant to Supplemental Admiralty Rule E(4). Furthermore, Plaintiff's claim is grossly overstated based on its use of inaccurate accounting and inaccurate charter market rates for the Vessel. Accordingly, should the Court deny the motion to vacate, it should nevertheless modify and reduce it pursuant to Supplemental Admiralty Rule E(6).

For these reasons, and for the reasons explained in the accompanying Declaration of Edward Laurence McFadyen, the August 5, 2008 Ex Parte Order should be vacated or, alternatively, reduced because: (1) Plaintiff's cannot establish a *prima facie* valid maritime claim; and (2) Plaintiff's alleged damages of $3,138,130.34 are grossly exaggerated

## STATEMENT OF FACTS

The Plaintiff's claim is subject to Arbitration in London, England and is governed by English law. *McFadyen Decl.* ¶ 6.4. Despite the representations of Plaintiff's counsel that Plaintiff intended to "shortly" commence arbitration, it has failed to do so despite its having attached property of IMT in this action. *McFadyen Decl.* ¶ 52.

The Plaintiff's "claim" arises under a charter party contract dated April 4, 2008 ("charter party"), pursuant to which the vessel was chartered by the ABTL to IMT. *McFadyen Decl.)* ¶ 6. The following provisions in the charter party are relevant and critical to the Plaintiff's claim: "1 time charter trip trading via safe berth/s safe port/s safe anchorage/s . . . always within institute warranty limits via China with cargo of steels and harmless generals"; Vessel to be placed at the disposal of the Charterers, on dropping outward pilot Xingang, any time day/night . . . "; and "That the Charterers shall pay for the use and hire of the said vessel at the rate of USD24,500 daily including overtime for the 1st 50 days and thereafter USD28,000 for the balance days . . .

2

redelivery . . . on dropping last outward seapilot 1 safe port Brazil. . . ." *McFadyen Decl.* ¶¶ *6.1 – 6.3.*

Plaintiff's Verified Complaint at Paragraph alleges "*[t]he rate of hire was based and contingent upon Defendant's representations the trip would be between two load ports in China and two discharge ports in Brazil, with the trip's overall duration thus expected to be approximately 70 – 80 days.*" *McFadyen Decl.* ¶ *10, Exhibit 3.* The fixture recap and the charter party contain no provisions limiting the number of load and discharge ports to which IMT was permitted to direct the Vessel. *McFadyen Decl.* ¶ *12.* The charter party simply states that loading will be via China and redelivery will be on dropping the last outward sea pilot, Brazil. *Id., Exhibit 2.*

Paragraph 5 of the Verified Complaint also alleges that the overall duration of the charter was expected to be approximately 70 – 80 days. As with the discharge ports, the charter party contract contains no such limitations and without question does not include a limitation as to the number of days the trip was to cover or even an approximation thereof. *McFadyen Decl.* ¶ *13.* Thus, the length of the charter is determined by the trip or voyage agreed. In actual fact, the governing terms of the charter party provided that the agreed place of loading was "*via China*" and the discharging place was Brazil. Those were in fact the only two loading and discharging areas that the vessel called. *McFadyen Decl.* ¶ *16.*

The charter party contained a hire escalation clause (Clause 4), indicating that the parties were aware of the volatility of the charter market and that they were unaware of the precise duration of the charter. Hence they agreed that after a period of 50 days a hire escalation would apply, providing Plaintiff with increased compensation for the period covered by the trip beyond 50 days. *McFadyen Decl.* ¶ *19.*

3

IMT had wide trading limits under this charter and could order the vessel anywhere within

those limits, per line 14 of the charter. *McFadyen Decl. ¶ 40.*

For additional facts, the Court is respectfully referred to the McFadyen Declaration and

the exhibits attached thereto, which is incorporated herein by reference.

## ARGUMENT

### POINT I

### IT IS PLAINTIFF'S BURDEN TO SHOW CAUSE
### WHY THE ATTACHMENT SHOULD NOT BE VACATED

As Plaintiff in this maritime attachment action, ABTL has the burden at the post-

attachment hearing to prove *inter alia* that "it has a valid prima facie admiralty claim against the

defendant." *See Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd.*, 460 F.3d 434, 445 (2d Cir.

2006). Supplemental Admiralty Rule E(4)(f) of the Federal Rules of Civil Procedure provides:

> Whenever property is arrested or attached, any person claiming an interest in it
> shall be entitled to a prompt hearing at which the plaintiff shall be required to
> show why the arrest or attachment should not be vacated or other relief granted
> consistent with these rules.

Fed. R. Civ. P., Supp. Adm. R. E(4)(f); see also *Aqua Stoli*, 460 F.3d at 445. It is the plaintiff's

burden to prove that the attachment is proper. The Second Circuit Court of Appeals commented

on Rule E(4)(f) in *Aqua Stoli* and explained the following standard:

> [A] district court must vacate an attachment if the plaintiff fails to sustain his
> burden of showing that he has satisfied the requirements of Rules B and E. We
> also believe vacatur is appropriate in other limited circumstances. While, as we
> have noted, the exact scope of a district court's vacatur power is not before us, we
> believe that a district court may vacate the attachment if the defendant shows at
> the Rule E hearing that 1) the defendant is subject to suit in a convenient adjacent
> jurisdiction; 2) the plaintiff could obtain in personam jurisdiction over the
> defendant in the district where the plaintiff is located; or 3) the plaintiff has
> already obtained sufficient security for the potential judgment, by attachment or
> otherwise. n5.

4

n.5 Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rule B and E. Although Rule E does not explicitly mention a district court's equitable power to vacate an attachment or who bears such a burden, former Local Rule 12 required the defendant to establish any equitable grounds for vacatur, and we believe that defendants still bear that burden under the Supplemental Rules.

*Aqua Stoli*, 460 F.3d at 445.

Former Local Rule 12, provided as follows:

Where property is arrested or attached, any person claiming an interest in the property arrested or attached may, upon showing of any improper practice or a manifest want of equity on the part of the plaintiff, be entitled to an order requiring that plaintiff to show cause why the arrest or attachment should not be vacated or other relief granted, consistent with theses rules or the supplemental rules.

*Aqua Stoli*, 460 F.3d at 445.

Here, ABTL must demonstrate that the August 5, 2008 Ex Parte Order was properly

issued and to rebut. For the reasons set forth below and in the supporting Declaration of Edward

Laurence McFadyen, ABTL will not be able to carry's its burden and, accordingly, the

attachment must be vacated, or at the very least substantially reduced in the alternative.

## POINT II

### THE ATTACHMENT ORDER AS AGAINST INTER-MARITIME TRANSPORTATION GMBH AND INTER-MARITIME TRANSPORTATION, LTD. MUST BE VACATED

Plaintiff's Verified Complaint identifies in the caption that the defendants are IMT and

various other "a/k/a" or "also known as" entities. IMT has denied any relationship with the

"a/k/a" entities. *McFadyen Decl.* ¶ 1-5. Undersigned counsel brought to Plaintiff's counsel's

attention that fact that IMT is not known by the names "Inter-Maritime Transportation GmbH or

"Inter-Maritime Transportation, Ltd.," that they were unrelated, independent third party entities

and requested that the attachment order be amended to dismiss these third parties from this

5

matter or that Plaintiff's counsel offer a good faith basis for having named them as "also known as" entities. To date, Plaintiff's counsel has failed and refused to respond to this request.

As set forth above, it is Plaintiff's burden to allege a *prima facie* maritime claim against the defendant(s). Here, other than the caption, Plaintiff's Verified Complaint is devoid of any allegation showing a basis for its naming Inter-Maritime Transportation GmbH and Inter-Maritime Transportation, Ltd. as defendants. Accordingly, the August 5, 2008 Ex Parte Order should be vacated as against Inter-Maritime Transportation GmbH and Inter-Maritime Transportation, Ltd.

## POINT III

### PLAINTIFF HAS FAILED TO ALLEGE A PRIMA FACIE VALID MARITIME CLAIM UNDER ENGLISH LAW AND THE ATTACHMENT MUST THEREFORE BE VACATED

Decisions that have vacated attachments obtained to secure frivolous claims are instructive in this case because in both instances the attachments were unfair and initiated for improper or abusive purposes. In *Rolls Royce Industrial Power, (INDIA) v. M.V. FRATZIS*, 1996 U.S. Dist LEXIS 4907 (S.D.N.Y. April 15, 1996), Judge Haight held that the appropriate three-part analysis to be undertaken by the Court in such situations is as follows:

[T]here are three questions which arise out of the authorities cited [including Admiralty Rule F(4)(f), Admiralty Rule E(6) and former Local Admiralty Rule 12] and others, to which I will come...

The first: Is the plaintiffs' claim so lacking in merit as to be characterized as frivolous?

If that question is answered in the negative, then one comes to the second question which is: In obtaining the attachment at issue, have the plaintiffs engaged in improper practices to such a degree, or do the circumstances reveal a want of equity so manifest, as to require that the attachment be vacated in its entirety?

6

And the third question, if that be answered in the negative, is this: Is the amount attached excessive or is it reasonably necessary to secure the plaintiffs claims?

*Rolls Royce Industrial Power, (INDIA),* 119 AMC at 397.

Similarly, in *Bay Casino, LLC v. M/V ROYAL EMPRESS*, 1999 U.S. Dist. LEXIS 22357 (S.D.N.Y. 1999), in the context of a defendant's challenge to a maritime attachment, and where the plaintiff had furnished the court with misleading information regarding projected profits and actual costs, the court held that "plaintiff's lost profits claim is frivolous and, therefore, improperly included as part of the security." *Id.*, 1999 U.S. Dist. LEXIS 22357 at *3-4. The *Bay Casino* court further held that the claim was frivolous because the very existence of the damages were uncertain, *i.e.*, where profits were speculative at best, and that recovery was unwarranted where the plaintiff could not potentially prove loss to a reasonable certainty standard. "It is well-settled that in an attachment proceeding, the plaintiff need not prove its damages with exactitude but the court must be satisfied that the plaintiff's claims are not frivolous." *Id.* at *3 citing *Donghu Express Co. v. Navios Corp.*, 944 F. Supp. 235 (S.D.N.Y. 1996). Addressing New York law, the court rejected the plaintiff's lost profits claim and partially vacated the attachment because allowing security for a frivolous claim would have put the plaintiff in a better position than it otherwise would have been without the defendant's involvement. The *Bay Casino* court held as follows:

Several grounds for such a finding [that the claim was frivolous] were apparent in both the parties' pleadings and in their representations to the Court in the hearing on this matter.

\*\*\*

While the plaintiff has a much lighter burden of proof in this [Rule E(4)(f)] proceeding than at trial, the Court can find no basis in law or in fact to find plaintiff's claim non-frivolous...

7

Additionally, neither in their pleadings, nor in their representations to this Court has plaintiff provided the Court with an evidentiary basis for historical profits that would indicate plaintiff's claims for lost profits constitutes anything more than bald speculation. Absent this, especially in consideration of the fact that plaintiff's are marketing…a consumer driven, highly volatile venture [,] plaintiff cannot potentially prove loss to a reasonable certainty.

\*\*\*

Defendants cite *Rolls Royce v. Fratzis M*, 1996 AMC 393, 396 (S.D.N.Y. 1995) in heralding the Court's responsibility to address the question of:

> In obtaining the attachment…have the plaintiffs engaged in improper practices to such a degree or do the circumstances reveal a want of equity so manifest, as to require the attachment to be vacated in its entirety.

In reducing security, this Court is mindful of its discretion under both law and equity. Since plaintiffs will not be able to prove a claim for lost profits based solely on questionable projections, unsupported by historical profits, the Court declines to secure the claim…Considering the facts at bar, this Court considers that clear guidance in determining plaintiff's lost profits claim is frivolous. Thus, plaintiff's claim for lost profits will not be considered in calculating an appropriate security.

*Bay Casino*, 1999 U.S. Dist. LEXIS 22357 at \*4-7.

In *Expert Diesel, Inc. v. Yacht FISHIN FOOL*, 627 F. Supp. 432 (S.D. Fla. 1986), the court refused to grant the defendants' request for countersecurity, stating "the court is reluctant to compel Plaintiff to post a bond in light of Defendant's damage claims of a general rather than a precisely detailed, nature." *Id.* at 433.

In *U.S. Maritime Services Inc. v. Trade Ventures Inc.*, No. CIV A. 98-0499, 1998 U.S. Dist. LEXIS 10608, (E.D. La. July 8, 1998), the defendants counterclaimed for damages arising over a lost charter party. *Id.* at \*6. In denying the defendant's motion for countersecurity, the court ruled that the counterclaim was too speculative and insufficiently supported to justify an order directing the posting of counter-security.

> The defendant's claim for the alleged lost charter is too speculative to sustain an
> order for countersecurity. Unlike plaintiff's claim which is based on past events
> reasonably able to be ascertained and quantified, defendant's losses due to a 'road
> not taken' cannot be so readily ascertained and quantified. The Baldwin affidavit
> is insufficient by itself to determine what the defendants estimated actual loss is
> after expenses and other items are deducted, even assuming the voyage would
> have occurred but for the plaintiff's alleged broken agreement.

*Id.* (emphasis added).

In similar circumstances, courts have concluded that it is inappropriate to permit security

for highly speculative damage claims, even when under a certain sets of facts such damages

could be theoretically awarded on the underlying action. *Sea Transp. Contrs., Ltd. v. Indus.*

*Chemiques Du Senegal,* 411 F. Supp. 2d 386, 396 (S.D.N.Y. 2006)(reducing security sought as

even though contract could theoretically run interminably, notwithstanding the merits of the

claim under English law and finding that this was not enough to support a claim for damages).

In *Sea Transp. Contractors,* the plaintiff sought security for a contract, which if not breached,

could have been renewed interminably. Thus, as the contract could theoretically have been

renewed forever, plaintiff requested security for loss of profits over 30 years! While this was

theoretically possible, the court found it highly improbable. As the security sought was in

respect of damages that were highly speculative and remote, the court denied the claimants

request for security.

Here, ABTL's claim for damages due to the length of the "trip" under the "trip time

charter" is belied by the very wording of the charter party contract. As is set for the in the

accompanying McFadyen Declaration, ABTL's novel claim has no merit whatsoever under

English law. In fact, the available analogous cases he cites in his Declaration all show that

Plaintiff's claim is insufficient as a matter of law.

More particularly, the charter party contract makes no provision for the charter period at all and therefore the length of the charter is determined by the trip or voyage agreed. This was one of the issues decided by the House of Lords in *Temple Steamship Company –v- V/O Sovracht* [1945/46] Vol. 79 where there was similarly no period stated in the charter. *McFadyen Decl.* ¶¶ *13-14 . Exhibit 4.* In that case, the Court held that: " . . . the effect of the insertion of the words "one round voyage to the Kara Sea" was to make that voyage the paramount feature of the whole contract (the payment of hire being determined by the length of time occupied by that voyage); that the technical meaning found by the umpire for the words "one round voyage to" was not inconsistent with the remainder of the charter-party and controlled the trading limits provisions of the charter-party. *See also* Cresswell J in The Kalma [1999] 2 Lloyd's Rep 374 at 379: [1] *McFadyen Decl.* ¶ *15 . Exhibit 5.* This was again confirmed by Donaldson J in The Aragon [1975] 1 Lloyd's Rep 628 when he accepted the submissions of Mr Coleman (at page 633) that the charterer was entitled to order the vessel to proceed anywhere within trading limits which was not inconsistent with the underlying nature of the charter party, which in that case was a trip via safe port(s) East Canada, returning to China. *McFadyen Decl.* ¶ *15 , Exhibit 6.*

Moreover, Plaintiff's claim is further belied by the absence of any provision in the charter party limiting the duration of the trip period and the inclusion of a hire escalation clause that proves the parties were aware of the volatility of the market and unaware of the duration of the charter. *McFadyen Decl.* ¶ *19, Exhibit 2, Escalation Clause 4.* Hence they agreed that after a period of 50 days there would be a hire increment.

---

[1] *"It has become a frequent practice to time charter for a period measured by the duration of a certain voyage instead of a stated number of months or days. The voyage is then not merely the measure of the duration of the charter, but becomes the subject matter of the contract, so that the charterers must send the ship on that particular voyage..."*

10

The lack of merit in Plaintiff's claim is further exposed by the well accepted principle that it is the charterer (here IMT) that gives the orders as to employment and they were entitled to order the vessel to any of the discharge ports by whatever route they choose. *See McFadyen Decl.* ¶ 20, The Hill Harmony [2001]1 Lloyd's Rep 147, per 156. "What might be described as the scheduling of the vessel is of critical importance to the charterer so that obligations to others can be fulfilled, employment opportunities not missed and flexibility maintained. *Id.* Thus, there is no basis in the charter party contract nor under governing English law to support Plaintiff's claim that the during the loading leg of the trip is vessel should not have called at Shanghai. *McFadyen Decl.* ¶¶ 20-28 .

The greatest fallacy in the Plaintiff's claim is its suggestion that the employment of the Vessel ordered by IMT exceeded what constitutes a "trip." If the Plaintiff had wanted to limit the 'trip' in the way it is suggesting (to two load and two discharge ports in strict geographical rotation) it could have, and should have, negotiated to include such a provision in the charter. The fact that it chose not do so gave IMT unfettered discretion as to the number of load and discharge ports to which it was entitled to order the vessel.

There is no English authority that states that a trip time charter constitutes two load and two discharge ports or any lesser number. There is also no authority that prescribes any limit to the number of load and discharge ports. If there is no such limitation on the number of ports at which the vessel can call within the geographical limits provided for, the Plaintiff's only argument can be in respect of the period that the vessel has taken at the load and discharge ports and hence 'delay' on the voyage. However, a recent London Arbitration 25/07, was reported in Lloyd's Maritime Law Newsletter 731, on 28th November 2007, where the Tribunal dismissed a claim by the vessel owner for damages for delay under a similar trip time charter. In the report

11

the Tribunal discusses the possible expectations of the parties and in particular discuss the

number of possible ports of call:

> If the parties wanted a temporal obligation they could agree a period charter; or
> special provisions as to changes in hire rates if the actual period exceeded certain
> duration. In the absence of such provisions they took the risk that what each
> expected at the outset might not manifest.
>
> In that respect, the two parties might have very different initial expectations.
> Based on his previous experience, an owner might think that, with a fixture such
> as the present, the charterer was going to load at Kohsichang and discharge at one
> or two West African ports at which the owner anticipated a certain amount of
> delay. The charterer, in contrast, might actually intend to discharge at one South
> African port and to do so very quickly; or to discharge at one West African port
> where he happened to be able to arrange very quick despatch; or at five West
> African ports at each of which he anticipated exceptional delays because he had
> particular information as to the situations in those ports.

*McFadyen Decl. ¶¶ 29-33, Exhibit 8.* The Tribunal in that case expressed no concern over the

possibility of the charterer ordering the vessel to six discharge ports.

Finally, there is no merit to Plaintiff's claim at Paragraph 7 of the Verified Complaint that

IMT traded the vessel "in and out of geographical rotation" and that it was not entitled to do so.

There are two material defects with this assertion. First, the charter party is silent as to

geographical rotation. Indeed, in the London Arbitration award referred to above (*McFadyen*

*Decl. ¶¶ 34-35 , Exhibit 8*), the vessel had proceeded "*back and forth*" along the African coast

and that drew no criticism from the Tribunal. There was no obligation on the Defendants to

proceed in geographical rotation and without such a provision, the Plaintiff was required to

comply with the Defendant's legitimate orders. *McFadyen Decl. ¶ 35.* Secondly, when the

vessel was delivered into charter, she had to bunker because the Plaintiff had mis-described the

quantity of diesel oil on board. In doing so, when the vessel was ordered from Xingang to

Fancheng she was also ordered to call at Hong Kong, as per the Plaintiff's request, to stem diesel

oil. From there she continued on passage to Fangcheng, the first load port, and thereafter in

12

geographical rotation along the Chinese coast, to complete loading in Xingang. The vessel then proceeded by way of the usual route[2] (via the Cape of Good Hope) to Itaqui in Brazil, which was the first discharge port. She then proceeded south, discharging cargo in geographical rotation, with redelivery at Paranagua, which is expected next week. Thus the vessel, once at her first port of loading and first port of discharge did proceed in geographical rotation to each load and discharge port. *McFadyen Decl.* ¶¶ *35-37.*

Also in the London Arbitration 25/07 referred to above (*McFadyen Decl. Exhibit 8, page 3*), the Tribunal dismissed a claim by the vessel owner for damages for delay under a similar trip time charter. In that case the delay was 10 months. The Tribunal was "comforted" by *Nagusina Naviera v. Allied Maritime* [2002] EWCA Civ 1147, a decision of the English Court of Appeal in which the issue was whether charterers under a trip time charter with no duration were under any obligation as to the time within which discharge of the cargo was to be effected and if so what the nature of that obligation was. The court called this submission by the vessel owner, an *"unusual contention that Charterers are under such an obligation under such a charter." McFadyen Decl. Exhibit 8, page 4.* The point this arbitration emphasises is that here ABTL cannot seek to imply a term into the charter that the vessel should have been redelivered within a specific period, or indeed any period save where the delay is of a frustrating nature. Such a proposition is totally untenable under the express terms of the charter party contract and, more importantly, is without merit under governing English law. In sum, IMT had wide trading limits under the charter party contract and could order the vessel anywhere within those limits, per line 14 of the charter. See also *Temple Steamship Company –v- V/O Sovracht. McFadyen Decl.* ¶¶ *39-40, Exhibit 4.*

---

[2] Although the distance from Xingang to Itaqui via the Panama Canal is shorter than via the Cape of Good Hope, the delay and transit time of the Panama Canal together with the expense make the longer voyage more cost effective.

Accordingly, because Plaintiff's claim is not cognizable under governing English law, *a*

*fortiori* it has failed to allege a *prima facie* valid maritime claim – and the August 5, 2008 Ex

Parte Order must therefore be vacate

Where the alleged claim does not square with the facts, it should be deemed frivolous and

dismissed, as shown in the following excerpt from *North Offshore AS v. Rolv Berg Drive:*

> "The premise that countersecurity will not be required on the basis of frivolous counterclaims is a sound one," *Finecom Shipping*, 2005 U.S. Dist. LEXIS 25761, at *3-4, and a court "should not require countersecurity where the counterclaim is frivolous or so lacking in merit that the court can only conclude that the counterclaim was advanced solely to secure a negotiating advantage over the complainant," *Titan Navigation, Inc. v. Timsco, Inc.*, 808 F.2d 400, 404 (5th Cir. 1987). Mindful that the "ability to understand the merits of a dispute at an early stage is limited," *Finecom Shipping*, 2005 U.S. Dist. LEXIS 25761, at *4, the Court nonetheless finds that [claimant] RBD's counterclaim is highly speculative -- relating to its alleged lost profits from the failure to obtain continued use of the ALDOMA -- and RBD has provided no rebuttal to North Offshore's position that the claim is without merit. Those deficiencies weigh against directing North Offshore to post countersecurity. *See Ythan Ltd. v. Americas Bulk Transport Ltd.*, 336 F. Supp. 2d 305, 309 (S.D.N.Y. 2004) (rejecting motion for countersecurity where the counterclaim was "highly contingent"); *U.S. Maritime Services, Inc. v. Trade Ventures, Inc.*, No. 98-0499 Section "C", 1998 U.S. Dist. LEXIS 10608, at *6 (E.D. La. July 8, 1998) (denying countersecurity because defendants' counterclaim was too speculative -- "[u]nlike plaintiff's claim which is based on past events reasonably due to be ascertained and quantified, defendants' losses due to a 'road not taken' cannot be so readily ascertained and quantified").

2007 U.S. Dist LEXIS 87648, *8-9.

Like in *North Offshore*, the factual deficiencies in ABTL's claim (as well as the patent legal

deficiencies) mandate vacatur of the August 5, 2008 Ex Parte order.

## POINT IV

## ALTERNATIVELY, PURSUANT TO SUPPLEMENTAL ADMIRALTY RULE E(6) THE COURT SHOULD REDUCE THE ATTACHMENT FROM $4,946,170.13 TO $1,324,804.71

Alternatively, IMT moves pursuant to Supplemental Admiralty Rule E(6) for a reduction

of the August 5, 2008 Ex Parte Order to $1,324,804.71. IMT moves on the basis that ABTL's

damage claim is grossly exaggerated. Supplemental Admiralty Rule E(6) provides that

"Whenever security is taken the court may, on motion and hearing, for good cause shown, reduce

the amount of security given...." *Id.* The Court "has power, pursuant to Supplemental

Admiralty Rule E(6) to reduce the amount of the attachment when good cause is shown." *See*

*Sea Transp. Contractors, Ltd.,* 411 F. Supp. 2d 386, 396 (S.D.N.Y. 2006).

In *Flame Maritime Ltd. v. Hassan Ali Rice Export Co.,* 07 Civ. 4426 (WHP) 2007 U.S.

Dist. LEXIS 64470, *5 (S.D.N.Y. August 31, 2007), the Court recently held as follows:

> "Because pre-judgment attachments are usually based upon reasonable estimates
> and not precise facts, parties often attach amounts which are later deemed
> excessive in light of changes in circumstances." *Dongbu Express Co., Ltd. v.
> Navios Corp.,* 944 F. Supp. 235, 237 (S.D.N.Y. 1996). As such, "a reduction in
> security is 'freely granted upon a showing that the [attachment] is excessive.'"
> *Dongbu,* 944 F. Supp. at 237 (quoting 7A James W. Moore et al., Moore's
> Federal Practice P E14 (2d ed. 1996)); see also Fed. R. Civ. P. Supp. Rule
> E(6)("Whenever security is taken, the court may, on motion and hearing, for good
> cause shown reduce the amount of security given."); *Mardas,* 2007 WL 2229058,
> at *3 (same); *Transportes Navieros y Terrestes v. Fairmount Heavy Transp. N.V.,*
> 07 Civ. 3076 (LAP), 2007 WL 1989309, at *4 (S.D.N.Y. July 6, 2007)(same).

*Flame Maritime Ltd.,* 07 Civ. 4426 (WHP), 2007 U.S. Dist. LEXIS 64470 at *5. The Court may

find "good cause" to reduce the attachment where the amount of security requested, although

possibly recoverable in the underlying action, runs contrary to the contract and/or facts upon

which the damages are based. Thus, when finding a defendant has shown "good cause" to

reduce the attachment, the court is not required to take a position on the substantive merits of the

case, or as to the recovery available under applicable foreign law. *See Sea Transport

Contractors, Ltd. v. Industries Chemiques Du Senegal,* 411 F. Supp. 2d 386, 396 (S.D.N.Y.

2006); *See also, Daeshin Shipping Co. Ltd. v. Meridian Bulk Carriers,* 2005 U.S. Dist LEXIS

224, *5 (S.D.N.Y. 2005)(where the plaintiff's estimate of damages has been challenged, the

court may use its discretion to apply a reasonable estimate of those damages). As held by Judge

15

Scheindlin, where a "[plaintiff's] claims cannot be deemed frivolous, they should be reduced to account for estimated savings" and that "in an attachment proceeding, the plaintiff need not prove its damages with exactitude" but "the court must be satisfied that plaintiff's claims are not frivolous." *Dongbu Express Co. Ltd. v. Navios Corp.,* 944 F.Supp. 235, 237-238 (S.D.N.Y. 1996).

The *Sea Transport Contractors, Ltd.* case is illustrative. There, the plaintiff maintained that it was entitled to over 75 million dollars in damages because the contract under which its claim arose was to run "interminably" and thus, such damages could be recoverable under English Law. The court declined to take a position on plaintiff's claim under English law but found that good cause had been shown that the attachment should be reduced as it appeared that the damages requested were not in accord with the contract's provisions and the relevant facts. Judge Casey reduced the amount of the attachment to a level that he viewed as reasonable and held:

> A district court has the inherent authority to vacate an attachment "upon a showing of 'any improper practice' or a 'manifest want of equity on the part of the plaintiff.'" *Blake Mar., Inc. v. Petrom S.A.,* 2005 U.S. Dist. LEXIS 26310, No. 05 Civ. 8033, 2005 WL 2875335, at 2 (S.D.N.Y. Oct 31, 2005)(quoting Southern District of New York Former Local Civil Rule 12 (1986)). The Second Circuit has held that the "inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district judge." *Greenwich Marine, Inc. S.S. Alexandria,* 339 F.2d 901, 905 (2d Cir. 1965).

*Sea Transport Contractors, Ltd.,* 411 F.Supp. 2d at 391. Judge Casey held that "good cause" existed per Rule E(6) to reduce the amount of the attachment where the complaint did not accurately allege the amount of damages.

More recently, Judge Preska examined the standard for reducing an excessive attachment under Rule E(6) in *Transportes Navieros y Terrestes v. Fairmount Heavy Transport N.V.,* 07 Civ. 3076 (LAP), 2007 U.S. Dist. LEXIS 50260 (S.D.N.Y. July 6, 2007). In *Transportes*

*Navieros y Terrestes*, the court reduced the level of a maritime attachment from nearly

$1,300,000 to $15,000 where Defendant showed good cause why $15,000 was the outside

amount for which it might potentially be held liable to plaintiff in the underlying foreign

proceeding. Specifically, Judge Preska held as follows:

> Alternatively, FIIT has moved pursuant to Rule E(6) for a reduction of security, i.e., the release of the majority of the $ 1,256,352.84 under attachment. FHT so moves on the basis that TNT's damages "are either non-existent or grossly exaggerated." (See FHT Memo at 22.) Supplemental Admiralty Rule E(6) provides that "[w]henever security is taken the court may, on motion and hearing, for good cause shown, reduce the amount of security given . . . ." Fed. R. Civ. P. Supp. Rule E(6). The district court may determine what "good cause" is as the Court of Appeals has held that "[t]he inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district judge sitting as an admiralty judge . . . ." *Greenwich Marine, Inc. v. S.S. Alexandra*, 339 F.2d 901, 905 (2d Cir. 1965).
>
> In *Dongbu Express Co. v. Navios Corp.*, 944 F. Supp. 235 (S.D.N.Y. 1996), the vessel charterer sued the vessel owner and obtained a maritime attachment in the Southern District of New York as well as in South Korea in support of a London arbitration. The owner of the vessel moved the district court for a partial release of the funds attached in New York on the basis that the New York attachment was duplicative of the Korean attachment. Id. Judge Shira A. Scheindlin found that the charterer was oversecured and ordered a partial release of the New York attachment pursuant to Rule E(6) because the amount restrained in New York exceeded the difference between the charterer's provable damages and the amount of the Korean attachment. Id. Judge Scheindlin held that "in an attachment proceeding, the plaintiff need not prove its damages with exactitude" but noted that "the court must be satisfied that plaintiff's claims are not frivolous." Id. at 237 (citations omitted).
>
> Similarly, in *Daeshin Shipping Co. Ltd. v. Meridian Bulk Carriers, Ltd.*, No. 05-7173, 2005 U.S. Dist. LEXIS 22409, 2005 WL 2446236 (S.D.N.Y. Oct. 3, 2005), Judge Naomi R. Buchwald granted the defendant's motion for a reduction in the amount of security under Rule E(4)(f) and Rule E(6) where the plaintiff had failed to produce evidence to the court to justify the total amount of the attachment. Judge Buchwald ordered the release of the amount that was in excess of the funds for which there was sufficient evidence to justify attachment. 2005 U.S. Dist. LEXIS 22409, [WL] at *2. *See also Sea Transport Contractors Ltd. v. Industries Chemiques du Senegal*, 411 F. Supp. 2d 386 (S.D.N.Y. 2006) (finding "good cause" pursuant to Rule E(6) to reduce the amount of a maritime attachment where the complaint did not accurately allege the amount of damages as evidenced by the parties' underlying contract).

17

\* \* \*

The Court accepts that TNT has met the prima facie standard for proving that it has a viable maritime attachment that can withstand a motion to vacate. However, the Court also accepts the undisputed fact that TNT failed to take any step to lift the arrest for some six months. On the basis of this undisputed fact the Court concludes that because TNT failed to act reasonably promptly upon being informed of the arrest of the Vessel by FHT, it failed in its duty to mitigate its damages, including damages it knew it would be exposed to upon its entering into the Con-Dive Charter Party after the arrest had been effected. Thus, FHT has demonstrated good cause for a reduction in the amount of the attachment pursuant to Rule E(6). Accordingly, the order of maritime attachment is modified to reflect the amount for which FHT may be potentially held responsible to TNT, which the Court estimates at $15,000, the outside amount that might be attributable to legal fees required to lift the wrongful arrest.

*Transportes Navieros y Terrestes v. Fairmount Heavy Transport N.V.*, 2007 U.S. Dist. LEXIS 50260 at \*20.

The above authorities stand for the proposition that it is a plaintiff's burden to reasonably estimate its damages so that the court may be satisfied that the damages alleged are reasonable. Here, Plaintiff has not reasonably estimated, and in fact has greatly overstated, its damages. If, the Court denied the Motion to Vacate, then for the following reasons the August 5, 2008 Ex Parte Order should be reduced to $1,160,000 on ABTL's principal claim.

At paragraph 8 of the Verified Complaint ABTL alleges a claim in damages for the breaches alleged. In analyzing ABTL's damages, the Court must take account of the period that the charter would take in any event. Despite Plaintiff's claims, the Vessel would only be four days ahead of her current schedule had she not called at Shanghai and Vitoria. *McFadyen Decl.* ¶¶ *41-44*. Moreover, the vessel has not yet completed discharge at Rio de Janeiro and will be departing from there for Paranagua where discharge will be completed. *McFadyen Decl.* ¶ *43*. However, it was known at the time of fixing that the vessel would call at both of these ports and

18

therefore it cannot be seriously contested that they were not part of the "trip." *McFadyen Decl.* ¶ 43.

The Court has no information before it in respect of Rio de Janeiro or Paranagua. Therefore, Plaintiff's opposition to this motion must justify the damages claimed. However, it is patently premature for Plaintiff to make any claim for delays at these ports since the Vessel has not completed discharge operations there. In any event the additional period of four days remains within a reasonable period for the performance of the trip and thus no damages would be recoverable. *McFadyen Decl.* ¶ 44.

 Even if the Court was of the view that it should not engage in an analysis of the merits of the Plaintiff's claim and that it should only look at the claim based on the period that the voyage would have taken to perform, even if all went well, then it would be a minimum of 89 days. From delivery of the vessel on April 5 to July 2, 2008. The current market rate for this vessel as of July 1, 2008 is indicated at around $48,000/day. That is based on Route No. HS3, (East coast South America to the European Continent, which would usually mean a forty day charter (40 days would include the loading, passage and discharge time)) and would be the applicable route for this vessel being redelivered at Paranagua. The rates are published by the Baltic Exchange in London which were prevailing on that date. *McFadyen Decl.* ¶ 46, *Exhibit 9 annexed hereto.*

Under the fixture note and charter party, the current charter rate being paid for this vessel is $28,000/day and so the time charter rate differential is $20,000/day, even assuming Plaintiff's claim is *prima facie* valid, which is denied. *McFadyen Decl.* ¶¶ 47-48, *Exhibit 2.* The expected date for redelivery of the Vessel by IMT to ABTL is around August 30, 2008 and so 58 days at the charter rate difference of $20,000 gives ABTL a maximum principal damage claim of $1,160,000. *McFadyen Decl.* ¶ 48. Setting aside for the moment the fact that the charter period

19

to the Continent would only be around 40 days and once redelivery took place, the vessel would

have to be refixed at the rates prevailing on the Continent for this type of vessel, which would be

much lower, around $30,000/day for the balance of the period claimed of 18 days.

Accordingly, should the Court deny the Motion to Vacate, then for the foregoing reasons the

August 5, 2008 Ex Parte Order should nonetheless be reduced to a maximum principal damage

claim $1,160,000.

## POINT V

### IF THE COURT DECLINES TO VACATE THE ATTACHMENT, IMT RESERRVES ITS RIGHTS PURSUANT TO ADMIRALTY RULE E(7)(a)

Should the Court deny IMT's Motion to Vacate the August 5, 2008 Ex Parte Order, IMT

reserves its right to assert a counterclaim in this action and to demand countersecurity pursuant

to Supplemental Admiralty Rule (7)(a) that states:

> When a person who has given security for damages in the original action asserts a
> counterclaim that arises from the transaction or occurrence that is the subject of
> the original action, a plaintiff for whose benefit the security has been given must
> give security for damages demanded in the counterclaim unless the court, for
> cause shown, directs otherwise. Proceedings on the original claim must be stayed
> until this security is given, unless the court direct otherwise.

*Id.*

## CONCLUSION

For the foregoing reasons, the Court should vacate the August 5, 2008 Ex Parte

Attachment Order pursuant to Admiralty Rule E(4)(f). In the alternative, the Court should

reduce the August 5, 2008 Ex Parte Order to provide a maximum of $1,160,000.00 on Plaintiff's

principal damage claim.

Dated: August 25, 2008
New York, NY

Respectfully submitted,

The Defendant,
IMT SHIPPING AND CHARTERING GmbH,

By: _____

Patrick F. Lennon (PL 2162)
Charles E. Murphy (CM 2125)
LENNON MURPHY & LENNON, LLC
The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 (phone)
(212) 490-6070 (fax)
pfl@lenmur.com
cem@lenmur.com

## AFFIRMATION OF SERVICE

I hereby certify that on August 25, 2008, a copy of the foregoing Memorandum of Law

was served upon Garth S. Wolfson, Esq., Mahoney & Keane, LLP, 11 Hanover Square, Tenth

Floor, New York, New York 10005

By: _____

Charles E. Murphy