UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
AMERICAS BULK TRANSPORT LTD.

                                 :

             Plaintiff,                 :

        - against -                :        08 CV 6970 (AKH)

IMT SHIPPING AND CHARTERING GmbH    :

             Defendant.              :
------------------------------------------------------------X

## DECLARATION OF EDWARD LAURENCE MCFADYEN

Pursuant to 28 United States Code section 1746 I, Edward Laurence McFadyen, of 24 Alie Street London, hereby declare as follows:

1.    I have been asked by Counsel acting for IMT SHIPPING AND CHARTERING GmbH to give my opinion on certain matters of English law, as set out below. I am a solicitor of the Supreme Court and a Partner of Sach Solicitors in London. I was admitted on 15th January 1991. My practice specialises principally in shipping law, with a special emphasis on the law relating to charterparties. Since I commenced practice in 1991, I have represented Clients in charterparty cases (and other shipping cases) before the English High Court (primarily in the Commercial Court). However, the majority of my practice concerns representing Clients before London arbitrators appointed under charterparty arbitration clauses

2.    In this matter, I act for IMT SHIPPING AND CHARTERING GmbH.

### Parties to the Proceedings

3.    The present dispute is under a charter party dated 4th April 2008, between AMERICAS BULK TRANSPORT LTD of Monrovia and IMT SHIPPING AND CHARTERING GmbH of Düsseldorf. However I note that the proceedings have been commenced against IMT a/k/a IMT Düsseldorf a/k/a IMT Shipping and

Chartering GmbH a/k/a Inter-maritime Transport GmbH a/k/a Inter-Maritime Transport Limited.

4.  I have made enquiries with Alex Kiepe, the managing director of IMT SHIPPING AND CHARTERING GmbH, and he has confirmed to me that his company, its Directors and its shareholders have no financial interest or involvement of any kind, of which he is aware, in any of the other companies which have been joined as Defendants in these proceedings.

5.  I also, despite having acted for Mr. Kiepe for over 25 years, initially when he was an employee and later on setting up his own company IMT SHIPPING AND CHARTERING GmbH, have no knowledge of any connection, shareholding or otherwise, between the other companies joined as Defendants in these proceedings.

6.  I note at paragraph 3 of the Affidavit of Garth S. Wolfson, submitted in support of Plaintiff's motion for the Ex Parte Order of maritime attachment and garnishment, that he says that he has made an investigation and been informed of the other companies listed and that they are companies that are 'also known as' IMT SHIPPING AND CHARTERING GmbH, but he adduces no evidence to support his belief. *See Exhibit 1 annexed hereto*

7.  I further note that Garth S. Wolfson makes no mention of having carried out even the most basic of company searches on the companies he has joined, to determine whether there is any connection such as he alleges, which would lead him to the reasonable belief that those companies are *'also known as'* IMT SHIPPING AND CHARTERING GmbH.

8.  I believe all of the Defendant parties joined in these proceedings, save for IMT SHIPPING AND CHARTERING GmbH, have been wrongly joined.

## The Claim

9.  This claim arises under a Charterparty dated April 4th 2008, by which the vessel was chartered by the Plaintiff ("Plaintiff") to IMT SHIPPING AND CHARTERING GmbH ("Defendant"). The following terms are relevant:

Line 14 *"1 time charter trip trading via safe berth/s safe port/s safe anchorage/s ... always within institute warranty limits via China with cargo of steels and harmless generals"*

Line 18 *"Vessel to be placed at the disposal of the Charterers, on dropping outward pilot Xingang, any time day/night ..."*

Clause 4 *"That the Charterers shall pay for the use and hire of the said vessel at the rate of USD24,500 daily including overtime for the 1st 50 days and thereafter USD28,000 for the balance days ...redelivery ....on dropping last outward seapilot 1 safe port Brazil ...."*

10. Clause 17 *"That should any dispute arise between Owners and the Charterers the matter in dispute shall be referred to two persons at London one to be appointed by each of the parties hereto, and and Umpire by the two so chosen; their decision or that or of the Umpire shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men. . . .* **See Fixture Recap and Charter Party, Exhibit 2 annexed hereto.**

### The verified Complaint

11. Although the Verified Complaint raises issues concerning the number of ports to which the vessel was ordered to load and discharge, their real complaint is that the vessel took longer to complete the trip than they had expected. *See Exhibit 3 annexed hereto.*

12. Of course, what the Plaintiff expected is irrelevant because any claim they have has to be based on and supported by the terms of the contract agreed, in this case the charterparty.

13. I shall deal initially with the Verified Complaint.

14. According to paragraph 5 of the Verified Complaint *"The rate of hire was based and contingent upon Defendant's representations the trip would be between two load ports in China and two discharge ports in Brazil, with the trip's overall*

duration thus expected to be approximately 70 – 80 days." *See Exhibit 3 annexed hereto.*

15.   The Verified Complaint does not proffer any support for its assertion that two load and two discharge ports were agreed. *See Exhibit 3 annexed hereto.*

16.   The attached fixture recap and the (unsigned) charterparty, which I believe reflects the terms agreed, contain no clause stating the number of load and discharge ports. The charterparty simply states that loading will be via China and redelivery will be on dropping the last outward sea pilot, Brazil. *See Exhibit 2 annexed hereto.*

17.   Paragraph 5 of the Verified Complaint also asserts that the overall duration of the charter was expected to be approximately 70 – 80 days. Again, this bare assertion is unsupported by the terms of the charterparty . The charter makes no provision for the charter period at all and therefore the length of the charter is determined by the trip or voyage agreed. This was one of the issues decided by the House of Lords in *Temple Steamship Company –v- V/O Sovracht* [1945/46] Vol. 79 where there was similarly no period stated in the charter. *See Exhibit 4 annexed hereto.*

18.   The Court held that: "…*the effect of the insertion of the words "one round voyage to the Kara Sea" was to make that voyage the paramount feature of the whole contract (the payment of hire being determined by the length of time occupied by that voyage); that the technical meaning found by the umpire for the words "one round voyage to" was not inconsistent with the remainder of the charter-party and controlled the trading limits provisions of the charter-party; See Exhibit 4 annexed hereto.*

19.   *See also* Cresswell J in The Kalma [1999] 2 Lloyd's Rep 374 at 379: [1] *(See Exhibit 5 annexed hereto).* This was again confirmed by Donaldson J in The Aragon [1975] 1 Lloyd's Rep 628 when he accepted the submissions of Mr Coleman (at page 633) that the charterer was entitled to order the vessel to proceed

---

[1] "*It has become a frequent practice to time charter for a period measured by the duration of a certain voyage instead of a stated number of months or days. The voyage is then not merely the measure of the duration of the charter, but becomes the subject matter of the contract, so that the charterers must send the ship on that particular voyage…*"

anywhere within trading limits which was not inconsistent with the underlying nature of the charterparty, which in that case was a trip via safe port(s) East Canada, returning to China. *See Exhibit 6 annexed hereto.*

20.  In our case, under the governing terms of the charterparty the agreed place of loading was '*via China*' and the discharging place was, if anywhere '*Brazil*'. Those were in fact the only two loading and discharging areas that the vessel called at. *See Exhibit 2, page 2 (*"REDLY DLOSP 1 SP BRAZIL . . .")*, and Charter Party line 25).*

21.  With the Plaintiff admitting that the contract included a minimum of two load ports in China and two discharge ports in Brazil and that such a number of ports comes within the definition of '*trip*' I see no reason why that definition is not wide enough to include the trip that in fact occurred, loading at three Chinese ports and discharging at four Brazilian ports

22.  There are two further reasons why the Plaintiff's case on duration lacks merit.

23.  The first is because the charterparty escalation clause 4 suggests that the parties were aware of the volatility of the market and that they were unaware of the duration of the charter. Hence they agreed that after a period of 50 days there would be a hire increment. That would suggest that the Plaintiff was considering that the voyage length would be far greater than 50 days and probably more like 100 days, but this is speculation on my part, since I do not know what the Plaintiff's expectations were. To the extent Plaintiff will claim that it's expectations are any different it would in any event be irrelevant as the parties' expressions of their intent in this regard are found in the hire escalation clause.

24.  In addition, the Plaintiff concedes that there would be at least two load ports in China and two discharge ports in Brazil. The load ports that were known by the time the vessel was being negotiated were Fangcheng and Xingang in China and Itaqui, Rio de Janeiro and Paranagua in Brazil. Although the vessel was delivered into charter on dropping her outward pilot at Xingang, it was known to the Plaintiff that Fangcheng had to be the first load port because of the railway lines that were to be loaded in the lower holds. It was therefore inevitable that having completed her

ballast passage, the vessel would then be loaded in a North bound geographical rotation along the Chinese coast. *See Exhibit 7 annexed hereto.* Indeed at this time the Charterers were considering ordering the vessel to proceed to Brazil via the Panama Canal. But the delay in waiting to pass through the Panama Canal, the transit time and the cost of the transit made it unviable. The slightly longer route via the Cape of Good Hope was therefore chosen. In any event, it is the Charterers that give the orders as to employment and they were entitled to order the vessel to any of the discharge ports by whatever route they choose. See the House of Lords decision in The Hill Harmony [2001] I Lloyd's Rep 147, per 156 *"What might be described as the scheduling of the vessel is of critical importance to the charterer so that obligations to others can be fulfilled, employment opportunities not missed and flexibility maintained."*

25. Hence, the complaint by the Plaintiff for the loading leg of the trip is that the vessel called at Shanghai, when she should not, although it is notable that there is no complaint or reservation by the Plaintiff when it asked for the itinerary for the vessel's call at Shanghai and Xingang on 15th April 2008.

26. Following bunkering in Hong Kong, the vessel proceeded to Fangcheng to load and also loaded at Shanghai and completed at Xingang. Thereafter, the vessel proceeded to Brazil for discharge at Itaqui,[2] Vitoria, Rio de Janeiro and Paranagua. The total steaming time required for the trip, to each port (assuming 13 knots) would be 58 days. *See Exhibit 7, page 1 annexed hereto.*

27. To the above steaming time has to be added the estimated port time. At the commencement of the voyage, this was estimated at 31 days, a total trip time if all went well of 89 days.[3]

28. Even if the trip went as scheduled, she would not be redelivered within the 70 days suggested by the Plaintiff, let alone 80 days.

---

[2] Itaqui had to be the first discharge port because the cargo was urgently required by the Receivers. In any event the difference in distance going from Xingang to Itaqui as compared with Xingang to Paranagua only added two days to the total passage time of 39.2 days.

[3] Fang Cheng -- 4 days; Shanghai -- 2 days; Xingang -- 7 days; Itaqui -- 5 days; Vitoria -- 2 days; Rio de Janeiro -- 3 days; Paranagua -- 8 days.

29. However, even assuming the vessel should only have called at Fangcheng and Xingang, the call at Shanghai only extended the passage north by three days, as the statement of facts for that port show. **Exhibit 7, page 8.** It was in fact the slow loading at Fangcheng and Xingang that caused the greatest delay to the voyage.

30. Itaqui was always going to be the first discharge port. If its geographical location is considered relevant because it is the furthest port from the Cape of Good Hope that only added two days to the total transatlantic voyage (compared with the passage time to Paranagua ).

31. The vessel completed discharge at Itaqui on 29th July, as evidenced by the statement of facts. **Exhibit 7, page 19** She thereafter proceeded to Vitoria, and was only one day alongside. She then proceeded to Rio de Janeiro and Paranagua. *See Exhibit ,7 page 20, annexed hereto.*

32. So, by the time the vessel departed from Vitoria on 6th August towards the last two scheduled ports, the vessel could <u>only</u> have been four days behind schedule because of the (alleged) additional ports at which the vessel had called, namely three days at Shanghai and a day at Vitoria.

What is a 'trip'?

33. The Verified Complaint suggests at Paragraph 7 (again without authority) that the employment ordered by the Defendant exceeded what constitutes a "trip". If the Plaintiff had wanted to limit the 'trip' in the way it is suggesting (to two load and two discharge ports in strict geographical rotation) they could have included a provision to that effect in the charter. The fact that they did not do so, gave the Charterers an unfettered discretion as to the number of load and discharge ports to which they could order the vessel.

34. There is no English authority which states that a trip time charter constitutes two load and two discharge ports or any lesser number. There is also no authority of which I am aware that prescribes any limit to the number of load and discharge ports, although I would accept that the number would have to be subject to one of reasonableness. But in this case, three load and four discharge ports is not in my

view a number which could raise a realistic argument that such a number of port calls is unreasonable.

35.   If, as I believe, there is no such limitation on the number of ports at which the vessel can call within the geographical limits provided for, the Plaintiff's only argument can be in respect of the period that the vessel has taken at the load and discharge ports and hence 'delay' on the voyage.

36.   A recent London Arbitration 25/07, was reported in Lloyd's Maritime Law Newsletter 731, on 28th November 2007. The Tribunal dismissed a claim by Owners for damages for delay under a similar trip time charter. In the report they discuss the possible expectations of the parties and in particular discuss the number of possible ports of call:

*If the parties wanted a temporal obligation they could agree a period charter; or special provisions as to changes in hire rates if the actual period exceeded a certain duration. In the absence of such provisions they took the risk that what each expected at the outset might not manifest.*

*In that respect, the two parties might have very different initial expectations. Based on his previous experience, an owner might think that, with a fixture such as the present, the charterer was going to load at Kohsichang and discharge at one or two West African ports at which the owner anticipated a certain amount of delay. The charterer, in contrast, might actually intend to discharge at one South African port and to do so very quickly; or to discharge at one West African port where he happened to be able to arrange very quick despatch; or at five West African ports at each of which he anticipated exceptional delays because he had particular information as to the situations in those ports. **See Exhibit 8 annexed hereto.***

37.   The Tribunal expressed no concern over the possibility of the charterer ordering the vessel to six discharge ports. I accept that London Arbitrations are not binding on other London Arbitrators, but it is of note that professionals in the business have a view that is clearly diametrically opposite to that of the Plaintiff in this case.

### Geographical Rotation

38.  I would add by way of completeness, the point raised in the latter part of Paragraph 7 of the Verified Complaint, which alleges that the Defendant traded the vessel "in and out of geographical rotation" and that it was not entitled to do so. *See Exhibit 3 annexed hereto ¶ 7.*

39.  The Plaintiff has two problems with this assertion. First, the charter party is silent as to geographical rotation – clearly not a term which needs to be implied to give the contract business efficacy, and the Plaintiff offers no authority for their novel argument. Indeed, in the London Arbitration referred to above, the vessel had proceeded '*back and forth*' along the African coast and that drew no criticism from the Tribunal. There was no obligation on the Defendants to proceed in geographical rotation and without such a provision, the Plaintiff was required to comply with the Defendant's legitimate orders.

40.  Secondly, when the vessel was delivered into charter, she had to bunker because the Plaintiff had misdescribed the quantity of diesel oil on board. In doing so, when the vessel was ordered from Xingang to Fancheng she was also ordered to call at Hong Kong, as per the Plaintiff's request, to stem diesel oil. From there she continued on passage to Fangcheng, the first load port, and thereafter in geographical rotation along the Chinese coast, to complete loading in Xingang. The vessel then proceeded by way of the usual route[2] (via the Cape of Good Hope) to Itaqui in Brazil, which was the first discharge port. She then proceeded south, discharging cargo in geographical rotation, with redelivery at Paranagua, which is expected next week.

41.  Thus the vessel, once at her first port of loading and first port of discharge did proceed in geographical rotation to each load and discharge port.

---

[2] Although the distance from Xingang to Itaqui via the Panama Canal is shorter than via the Cape of Good Hope, the delay and transit time of the Panama Canal together with the expense make the longer voyage more cost effective.

**Delay on Passage**

42.  In the London Arbitration 25/07 referred to above, *(see **Exhibit 8, page 3 annexed hereto**)*, the Tribunal dismissed a claim by the vessel owner for damages for delay under a similar trip time charter. In that case the delay was 10 months. The Tribunal were 'comforted' by *Nagusina Naviera v. Allied Maritime* [2002] EWCA Civ 1147, a decision of the Court of Appeal in which the issue was whether Charterers under a trip time charter with no duration were under any obligation as to the time within which discharge of the cargo was to be effected and if so what the nature of that obligation was. The Court called this submission by the vessel owner, an *'unusual contention that Charterers are under such an obligation under such a charter'. (**Exhibit 8, page 4**)*. The Owner's application to the Court for leave to appeal the arbitrator's award was refused.

43.  The point this arbitration emphasises is that the Plaintiff here cannot seek to imply a term into the charter that the vessel should have been redelivered within a specific period, or indeed any period save where the delay is of a frustrating nature.

44.  The above disposes of the Plaintiff's argument that the charter took longer than anticipated because of the 'greater distances' that the vessel covered. The Defendant had wide trading limits under this charter and could order the vessel anywhere within those limits, per line 14 of the charter. See also *Temple Steamship Company –v- V/O Sovracht.[5] **Exhibit 4 annexed hereto.**

**Damages**

45.  Paragraph 8 of the Verified Complaint alleges the Plaintiff has a claim in damages for the breaches alleged. For the reasons already stated, I do not believe the Plaintiff can succeed with its claim.

---

[5] "... *the trading clause was a limiting and not an enabling clause fit prescribed limits outside which the ship might not go; it did not give liberty to neglect the prescribed adventure provided trading was confined within the limits mentioned)...*" *Steamship Company –v- V/O Sovracht.*

46.  However, even if I am wrong on that point, in construing what the charter party
     period ought to have been, the Court must take account of the period that the
     charter would take in any event.

47.  As stated in paragraph 32 above, the vessel would only be four days ahead of her
     current schedule had she not called at Shanghai and Vitoria; the vessel has not yet
     completed discharge at Rio de Janeiro and will be departing from there for
     Paranagua where discharge will be completed. However, it was known at the time
     of fixing that the vessel would call at both of these ports and therefore it cannot be
     seriously contested that they were not part of the 'trip'.

48.  This Court has no information before it in respect of Rio de Janeiro or Paranagua
     and therefore I believe it entirely premature to make any determination of possible
     delay at those ports. In any event the additional period of four days remains within
     a reasonable period for the performance of the trip and thus no damages would be
     recoverable.

49.  Even if the Court was of the view that it should not engage in an analysis of the
     merits of the Plaintiff's claim and that it should only look at the claim based on the
     period that the voyage would have taken to perform, even if all went well, then as
     stated at paragraph 27 above, it would be a minimum of 89 days. From delivery of
     the vessel on 5th April, takes the date to 2nd July 2008.

50.  The current market rate for this vessel as at 1st July 2008 is indicated at around
     USD48,000/day. That is based on Route No. HS3, (East coast South America to
     the European Continent, which would usually mean a forty day charter (40 days
     would include the loading, passage and discharge time)) and would be the
     applicable route for this vessel being redelivered at Paranagua. The rates are
     published by the Baltic Exchange in London which were prevailing on that date.
     *See Exhibit 9 annexed hereto.*

51.  Under the fixture note and charter party, the current charter rate being paid for this
     vessel is USD28,000/day and so the time charter rate differential is
     USD20,000/day. *See Exhibit 2 annexed hereto.*

52. The expected redelivery date is around 30th August and so 58 days at the charter rate difference of USD 20,000 gives a maximum damages claim of USD1,160,000.

53. We leave aside for present purposes the fact that the charter period to the Continent would only be around 40 days and once redelivery took place, the vessel would have to be refixed at the rates prevailing on the Continent for this type of vessel, which would be much lower, around USD 30,000/day for the balance of the period claimed of 18 days.

54. Accordingly, if the Court is minded not to vacate the attachment, then for the foregoing reasons the attachment order should nonetheless be reduced to a maximum principal damage claim USD 1,160,000.

55. It is accepted that English proceedings award the successful party interest on their damages, but if the security is by way of a cash deposit in an escrow account held on terms agreed by London solicitors (the most common form of security agreement) then interest will accrue on those funds. Thus, no additional sum need be added to the security ordered. Accordingly, if the Court is minded not to vacate the attachment, then the attachment order should be further reduced to eliminate the interest component Plaintiff has claimed.

**London Arbitration**

56. Paragraph 14 of the Verified Complaint states that the Plaintiff will 'shortly' commence arbitration . The Verified Complaint is dated 5th August 2008. The Defendant, when informed of the Rule B attachment commenced arbitration immediately by appointing William Robertson as their arbitrator and called upon the Plaintiff to appoint there arbitrator. Despite their conformation to the Court and the passing of 16 days, the Plaintiff has still not appointed their arbitrator. It is apparent therefore that despite its verified representations, the Plaintiff never intended to appoint an arbitrator "shortly" and has abusively obtained the ex parte attachment order solely to obtain settlement leverage over the Defendant for a claim that is, for the reasons set forth herein, spurious.

57.   To the best of my knowledge and ability, the contents of this affidavit are a true
statement of the law of England on the topics considered.

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed this 22nd day of August 2008 at London, England.

EDWARD LAURENCE MCFADYEN
Sach Solicitors
24 Alie Street
London
E1 8DE

Signed:...............................................

EXHIBIT 1

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
AMERICAS BULK TRANSPORT LTD.,

           Plaintiff,

       -against-

IMT a/k/a IMT DUSSELDORF a/k/a
IMT SHIPPING & CHARTERING GmbH
a/k/a INTER-MARITIME TRANSPORTATION
GmbH a/k/a INTER-MARITIME
TRANSPORTATION, LTD.,

          Defendant.
------------------------------------X

08 Civ. _6970 (AKH)_

AFFIDAVIT IN
SUPPORT OF PRAYER
FOR ATTACHMENT
AND GARNISHMENT

STATE OF NEW YORK   :
                : SS.:
COUNTY OF NEW YORK  :

    GARTH S. WOLFSON, being duly sworn, deposes and says:

    1.    I am a member of the bar of this Honorable Court and an associate with the firm of MAHONEY & KEANE, LLP, attorneys for Plaintiff herein. I am familiar with the circumstances of the Complaint filed in this action and the underlying cause of action.

    2.    I make this Affidavit in support of Plaintiff, AMERICAS BULK TRANSPORT LTD's ("ABT") prayer for the issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the Supplemental Admiralty Rules of the Federal Rules of Civil Procedure [hereinafter "Rule B"].

    3.    I have made an investigation and am informed and believe based upon the results of this investigation, that IMT

- 1 -

a/k/a IMT DUSSELDORF a/k/a IMT SHIPPING & CHARTERING GmbH ("IMT") a/k/a INTER-MARITIME TRANSPORTATION GmbH a/k/a INTER-MARITIME TRANSPORTATION, LTD., is a foreign corporation or other foreign business entity which cannot be "found" within the district for the purposes of an attachment under Rule B.

4. In support of this position, deponent has conducted the following investigation:

5. I have contacted the office of the Secretary of State, Division of Corporations on August 4, 2008, through its information data base and there were no current listings for Defendant.

6. I have reviewed the current telephone directories, for the areas over which this District, the United States District Court for the Southern District of New York, has jurisdiction, specifically New York (Manhattan) Borough, Bronx Borough, Dutchess, Westchester, Rockland, Sullivan, Orange, and Putnam Counties:

(a) No listings for Defendant were found;

(b) Deponent is unaware of any general or managing agent within the Southern District of New York for Defendant;

(c) No papers held by Plaintiff, and reviewed by this deponent indicate any presence of Defendant in or around the District;

(d) A search of the internet, or worldwide web, using

- 2 -

search engine Google, failed to demonstrate any presence of Defendant in or about the District.

7. Based upon the foregoing, your deponent submits that Defendant cannot be "found" within this district for the purpose of an attachment or garnishment under Rule B.

8. I submit that Defendant cannot be found within this District within the meaning of Rule B including, inter alia, the continuous or systematic conduct of business in this district.

9. Upon information and belief, Defendant has or will have during the pendency of this action, tangible and intangible property within the District in the hands of Bank of America, Bank of New York Mellon, Citibank, HSBC Bank USA NA, J.P. Morgan Chase, Standard Chartered Bank, Wachovia Bank N.A., Deutsche Bank AG, ABN AMRO Bank N.V., American Express Bank Ltd., Bank of China, UBS and/or other financial institutions found within the Southern District of New York.

10. The reason Plaintiff is moving for an order of attachment rather than regular motion is the urgency of this matter.

11. No application for this or similar relief has been sought in this district.

WHEREFORE, Plaintiff respectfully requests that the Court authorize the issuance of process in the form of a Writ of Maritime Attachment and Garnishment seeking attachment and garnishment of Defendant's tangible and intangible property within this district, including, _inter alia_, such property in the hands of Bank of America, Bank of New York Mellon, Citibank, HSBC Bank USA NA, J.P. Morgan Chase, Standard Chartered Bank, Wachovia Bank N.A., Deutsche Bank AG, ABN AMRO Bank N.V., American Express Bank Ltd., Bank of China, UBS and/or other financial institutions found within the Southern District of New York.

GARTH S. WOLFSON (GW 7700)

Sworn to before me this
5th day of August, 2008

Notary Public

JORGE RODRIGUEZ
NOTARY PUBLIC
State of New York No. 02RO6128023
Qualified in New York County
Term Expires 06/06/2009

- 4 -

EXHIBIT 2

From :    Lightship chartering<flash@lightship.dk>
To :      chartering@intermarbelgium.be
Date   :  Fri, 4 Apr 2008 16:00:17 +0200
Subject : ENGIN KAPTANOGLU/IMT


FRM: LIGHTSHIP CHARTERING A/S, GENTOFTE
     PHONE: +45 45460777 / FAX +45 45460770 WWW.LIGHTSHIP.DK
     CHART: FLASH@LIGHTSHIP.DK / OPS: OPSFLASH@LIGHTSHIP.DK


Ref: 080404-CB166 - Lightship Chartering / Handymax Dept., Copenhagen.

LEO-GUY/CLAUS

CC/OWNERS

REF ENGIN KAPTANOGLU/IMT
-
PLSD TO CONFIRM THAT WE HVE FIXED CLEAN WITH CP DTD 04.04.08 ASF:

M/V ENGIN KAPTANOGLU
TURKISH FLAG, 1981 BLT, SDSTRC, DWT 40.750 ON 11.365 M SWAD
GRT/NRT 23077/15986, LOA/BM/M.DEPTH 182.08/29.00/16.00 M
5X15 TS CRANE, MC GREGOR HACOVERS, GR/BL 1704983/1653246 CBFT.
TPC : 45
L.R.CLASS, PANDI CLUB U.K.MUTUAL(BERMUDA)LTD


CUBIC BREAKDOWN:
        GRAIN / BALE
HO.1  310.009  299.595  CBFT
HO.2  352.249  340.161  CBFT
HO.3  352.098  340.256  CBFT
HO.4  354.375  342.647  CBFT
HO.5  336.252  330.567  CBFT

TANK TOP STRENGTHS:
HO.1/3/5 21.5 TS/M2
HO.2/4   16.5 TS/M2

TANK TOP DIMS:                  HATCH DIMS :
HO.1  F 8.20XA22.60XL25.60     HA.1 16.38X12.80 M
HO.2  F22.60XA22.60XL25.60     HA.2 16.38X12.80 M
HO.3  F22.60XA22.60XL25.60     HA.3 16.38X12.90 M
HO.4  F22.60XA22.60XL25.60     HA.4 16.38X12.80 M
HO.5  F22.60XA14.40XL25.60     HA.5 16.38X12.90 M

SPEED AND CONSUMPTION :
ABT 13K ON ABT 27MT IFO 180 CST PLUS 2.0 MT MGO AT SEA AND PORT
IDLE AND ABT 3.5 MT MGO WHEN ALL GEARS WORKING

ALL DETAILS ABOUT


SPEED AND CONSUMPTION WARRANTY GIVEN UNDER GOOD WEATHER CONDITIONS I.E.
BEAUFORT 4 AND DSS 3 WITH NO NEGATIVE INFLUENCE OF SWELLS AND/OR ADVERSE
CURRENTS

FOR:

-ACC IMT, DÜSSELDORF

-DELY DOP XINGANG, ATDNSHINC

-LAYCAN 3/5 APR

-1TCT TRADING VIA SBS SPS SAS AAAA AWIWL VIA CHINA WITH CARGO OF STEELS AND
  HARMLESS GENERALS

-HIRE USD 24,500 DIOT FOR 1ST 50 DAYS AND THEREAFTER
          USD 28,000 FOR BALANCE DAYS

-REDLY DLOSP 1SP BRAZIL, ATDNSHINC

-BUNKERS:
  BOD ABT 650/750 MT IFO AND ABT 35/45 MT MGO
  ROR ABT SAME AS ON DELY
  PRICES BENDS USD 500/900 PMT IFO/MGO

-ILOHC USD 5,000 LMSM EXCL DUN/DEB REM/DIS

-C/V/E USD 1,300 P/M PRO RATA

-6,25 PCT TTL INCL 3.75 ADD + 1.25 TO INTERMARE + 1.25 TO LIGHTSHIP

-OWISE FURTHER TERMS DETS AS PER OWS BTB CP LOGICALLY AMENDED AS PER ABOVE
  M/T

END//

MANY THANKS LEADING TO ABOVE CLEAN FIXTURE

BRGDS/
CLAUS BJARNESTED
DIR: +45 4546 0790
AOH: +45 4814 4855
MOB: +45 2094 0602



intermar n.v.
E-mail: chartering2intermar.abcglobn.com

Magnussion 3
Branch Geralion (Antwerp)          Phone: (03) 605 02 24
Belgium                            Telex: (03) 605 02 22

5319/GV.

## ☰ Time Charter

### GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party,** made and concluded in *Antwerp, 4th* ........................................... day of *April* ................................... 19 *2008*

2  Between *AMERICAS BULK TRANSPORT LTD, MONROVIA - LIBERIA as Disponent* .....................................................

3  Owners of the good *Turkish* ............................................. Steamship/Motorship *"ENGIN KAPTANOGLU"* ................................ of .........

4  ...of........................................... ~~tons gross register, and~~ .......................... ~~tons net register, having engines of~~ .......................... indicated have a power

5  and with hull, machinery and equipment in a thoroughly efficient state, and classed *see* *Clause 29* *(vessel's description)*

6  in ....................................... ~~of about~~ .............................. ~~cubic feet bale capacity, and about~~ .............................. ~~tons of 2240 lbs.~~

7  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,

8  allowing a minimum of fifty tons) on a draft of .......................... ~~feet~~ .......................... ~~inches on~~ .......................... ~~summer freeboard, inclusive of permanent bunkers,~~

9  which are of the capacity of about ............................................................................ ~~tons of fuel, and capable of steaming, fully laden, under good weather~~

10  conditions about ................................ ~~knots on a consumption of about~~ .............................. ~~tons of best Welsh coal – best grade fuel oil – best grade Diesel oil,~~

11  now ........................................................................................................................................................................................................

12  .......................................... and *IMT-SHIPPING & CHARTERING GMBH* .......................... Charterers of the City of *DUESSELDORF* ..........

13  **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14  abt. *1 timecharter trip trading via safe berths, safe port/s, safe anchorage/s, always afloat, always accessible,*

15  *always within Institute Warranty Limits via China with cargo of steels and harmless generals* within below mentioned

16  trading limits.

Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17  the fulfilment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners'*
*obligation hereunder.*

18  Vessel to be placed at the disposal of the Charterers, at *on dropping outward pilot XINGANG, any time, day/night, Sundays and*

19  *holidays included* .......................................................................................................................................................................

20  in such dock or at such wharf or at place (unless she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as

21  the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 6. Vessel on her delivery to be

22  ready to receive *any permissible* cargo *under this Charterparty* with clean-swept holds *(see Clause 59)* and tight, staunch, strong and

23  in every way fitted for the service, having water ballast, ~~winches~~ *cranes* and

24  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

25  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

26  dise, including petroleum or its products, in proper containers, excluding *as per Clause 55,* ..........................................................................

27  (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

28  all necessary fittings and other equipments to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North

29  America, and/or United States of America, and/or Central America, and/or Continent between Bordeaux and/or Gulf of Mexico, and/or
.......................................... West-Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or
Mexico, and/or South America, .......................... and/or Europe

30  ~~and/or~~ ~~Africa,~~ ~~and/or~~ ~~Asia,~~ ~~and/or~~ ~~Australia,~~ ~~and/or~~ ~~Tasmania,~~ ~~and/or~~ ~~New~~ ~~Zealand,~~ ~~but~~ ~~excluding~~ ~~Magdalena~~ ~~River,~~ ~~River~~ ~~St.~~ ~~Lawrence~~ ~~between~~
31  ~~October~~ ~~31st~~ ~~and~~ ~~May~~ ~~15th,~~ ~~Hudson~~ ~~Bay~~ ~~and~~ ~~all~~ ~~unsafe~~ ~~ports;~~ ~~also~~ ~~excluding~~ ~~when~~ ~~out~~ ~~of~~ ~~season~~ ~~White~~ ~~Sea,~~ ~~Black~~ ~~Sea~~ ~~and~~ ~~the~~ ~~Baltic,~~
32  *safe berths, safe anchorage/s, always afloat, always within INL except n.a.a.b.s.a. as per Clause 6, see also*
33  *Clause 52 and 54.* ......................................................................................................................................................................
34
35  as the Charterers or their Agents shall direct, on the following conditions:
36  1.   That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew *and all other*
         *charges relating to the Master, Officers and crew* ; shall pay for the
37  Insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water *also for garbage removal,*
         *lubricating oil and domestic/galley fuel* and maintain her class and keep
38  the vessel in a thoroughly efficient state in hull, *cargo spaces*, machinery and equipment for and during the service *with all inspection*
         *certificates necessary to comply with current regulations at ports of call for and during the service.*
39  2.   That the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory* Pilotages, Agencies,
         Commissions,
40  Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  illness of the crew to be for Owners account. Fumigations because of cargoes carried or ports visited while vessel is employed under this
43  charter to be for Charterers account. ~~All~~ ~~other~~ ~~fumigations~~ ~~to~~ ~~be~~ ~~for~~ ~~Charterers~~ ~~account,~~ ~~unless~~ ~~vessel~~ ~~has~~ ~~been~~ ~~on~~ ~~charter~~ ~~for~~ ~~a~~ ~~continuous~~ ~~period~~
44  ~~of~~ ~~six~~ ~~months~~ ~~or~~ ~~more.~~
45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47  for dunnage, they making good any damage thereto.
48  3.   ~~That~~ ~~the~~ ~~Charterers,~~ ~~at~~ ~~the~~ ~~port~~ ~~of~~ ~~delivery,~~ ~~and~~ ~~the~~ ~~Owners,~~ ~~at~~ ~~the~~ ~~port~~ ~~of~~ ~~re-delivery,~~ ~~shall~~ ~~take~~ ~~over~~ ~~and~~ ~~pay~~ ~~for~~ ~~all~~ ~~fuel~~ ~~remaining~~ ~~on~~
49  ~~board~~ ~~the~~ ~~vessel~~ ~~at~~ ~~the~~ ~~current~~ ~~price~~ ~~in~~ ~~the~~ ~~respective~~ ~~ports,~~ ~~the~~ ~~vessel~~ ~~to~~ ~~be~~ ~~delivered~~ ~~with~~ ~~not~~ ~~less~~ ~~than~~ ................................ ~~tons~~ ~~and~~ ~~not~~ ~~more~~ ~~than~~   *See Clause 42.*
50  ................................ ~~tons~~ ~~and~~ ~~to~~ ~~be~~ ~~re-delivered~~ ~~with~~ ~~not~~ ~~less~~ ~~than~~ ..................................... ~~tons~~ ~~and~~ ~~not~~ ~~more~~ ~~than~~ ................................ ~~tons~~ ~~and~~ ~~not~~ ~~more~~ ~~than~~
51  4.   That the Charterers shall pay for the use and hire of the said Vessel at the rate of US-$ 24,500,- *daily including overtime for the*
52  *1st 50 days and thereafter US-$ 28,000,- for balance days in* United States Currency per *day or pro rata for any part of a*
         *day* ~~for~~ ~~an~~ ~~vessel's~~ ~~total~~ ~~deadweight~~ ~~carrying~~ ~~capacity~~ ~~including~~ ~~bunkers~~ ~~and~~
53  ~~stores,~~ ~~etc.~~ .................................... ~~on~~ ~~summer~~ ~~freeboard,~~ ~~per~~ ~~Calendar~~ ~~Month,~~ commencing on and from the day *and time* of her delivery, as aforesaid, and at
54  and after the same rate for any part of a *day* month, hire to continue until the hour of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) at *on dropping last outward seapilot 1 safe port BRAZIL, any time,*
56  *day/night, Sundays and holidays included* unless otherwise mutually agreed. Charterers ~~to~~ ~~give~~ ~~Owners~~ ~~not~~ ~~less~~ ~~than~~ ........................ ~~days~~
57  notice of vessels expected date of re-delivery, and probable port. *See Clause 56.*
58  5.   Payment of said hire to be made in New York in cash in United States Currency, *every 15 days* semi-monthly in advance, and for the last
         *15 days* ~~half-month~~ or
59  part of same rate of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61  hire *(see also Clause 31)* ~~or~~ ~~bank~~ ~~guarantee,~~ ~~or~~ ~~on~~ ~~any~~ ~~breach~~ ~~of~~ ~~this~~ ~~Charter~~ ~~Party,~~ the Owners shall be at liberty to withdraw the vessel from the
         service of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. *First hire and value of bunker to be paid*
         *within 3 banking days after vessel's delivery.* Time to count from *vessel's delivery.* ~~7~~ ~~a.m.~~ on ~~the~~ ~~working~~ ~~day~~

63 following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they
64 to have the privilege of using vessel in such, such time went to count as hire.
65        Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66 to 2 1/2% commission and such advances shall be disbursed from the hire. The Charterers, however, shall in no way be responsible for the application
67 of such advances.

68        6.    That the cargo or cargoes be laden and/or discharged in any dock or at any wharf *or anchorage* or place that Charterers or their Agents may
69 direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely
70 lie aground.

71        7.    That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73 tackle, apparel, furniture, provisions, stores and fuel.    *No passengers allowed.* Charterers have the privilege of passengers as far as

74 paying Owners. ................................................... but day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are
75 incurred in the consequence of the carrying of passengers. Charterers are to bear such risk and expense.

76        8.    That the Captain (although appointed by the Owners), shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment, and
78 agency; and Charterers are to load, stow, and trim *and discharge* the cargo at their expense under the supervision *and responsibility* of the
79 Captain, who is to sign *or is to authorize Charterers or their Agents in writing to sign* Bills of Lading for
80 cargo as presented, in conformity with Mate's or Tally Clerks receipts.

81        9.    That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
82 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

83        10.    That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
84 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
85 rate of $1.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
86 Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling *as per Clause 72.*

87        11.    That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
88 Captain shall keep a full and correct *deck and engine* Log *in English* of the voyage or voyages, which are to be patent to the Charterers or their
89 Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the consumption of fuel. *The Master upon request to hand over deck and engine log for copying and said logs to be placed*
90 *on board prior to departure.*

91        12.    That the Captain shall use diligence in caring for the ventilation of the cargo.

92        13.    That the Charterers shall have the option of continuing this charter for a further period of ................................................................................

93 ..........................................................................................................................................................................................................................................................
94 on giving written notice thereof to the Owners or their Agents ...................... days previous to the expiration of the first-named term, or any declared option.

95        14.    That if required by Charterers, time to commence before *3rd April 2008* ................................................................................. and should vessel
96 not have given written notice of readiness on or before *5th April 2008* ........................................................................ but not later than 4 p.m. Charterers or
97 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

98        15.    That in the event of the loss of time from deficiency, *sickness, strike, accident or default of Master, Officers or crew of*
99 men or *deficiency of* stores, fire, breakdown or damages to hull, machinery or equipment,
grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
preventing the full *use of the vessel to the Charterers* working of the vessel, the payment of hire shall cease for the time thereby lost *and all*
*extra expenses directly including bunkers consumed during period of suspended hire shall be for Owners'*

100   *account,* and if upon the voyage the speed be reduced by
101   defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
102   thereof, and all extra expenses shall be deducted from the hire.
103   16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
104   returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
105   Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
106   The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
107   purpose of saving life and property.

108   17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to *two* three persons at *London* ~~New~~
~~York,~~
one to be appointed by each of the parties hereto, and *and Umpire* the-third by the two so chosen; their decision or that *or* of *the Umpire* ~~any two~~
~~of them,~~ shall be final, and be final.

109   the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men. *Any dispute to be*
*referred to English High Court in London, English law to apply. For claims upto UK-$ 50,000,- the Small*
*Claims Procedure to apply in accordance with L.M.A.A. rules.*

110   18. That the Owners shall have a lien upon all cargoes, and all sub-freights, *hire and sub-hires* for any amounts due under this Charter,
including General Aver-
111   age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112   deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113   might have priority over the title and interest of the owners in the vessel.
114   19. That all demised and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115   Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15 inclusive, 17 to 22 inclusive, and Rule F of
116   York-Antwerp Rules 1924 *1974 as amended 1994 or any amendments thereto in London,* ~~at-such-port-or-place-in-the-United~~
~~States-as-may-be-selected-by-the-carrier,~~ and as to matters not provided for by these

117   Rules, according to the laws and usages at the port of *London.* ~~New-York.~~ ~~In-such-adjustment-disbursements-in-foreign-currencies-shall-be-exchanged~~
~~into~~
118   ~~United-States-money-at-the-rate-prevailing-on-the-date-made-and-allowances-for-damage-to-cargo-claimed-in-foreign-currency-shall-be-converted-at~~
119   ~~the-rate-prevailing-on-the-last-day-of-discharge-at-the-port-or-place-of-final-discharge-of-such-damaged-cargo-from-the-Ship.-Average-agreement-or~~
120   ~~bond-and-additional-security,-as-may-be-required-by-the-carrier,-must-be-furnished-before-delivery-of-the-goods.-Such-cash-deposit-as-the-carrier~~
121   ~~or-his-agents-may-deem-sufficient-as-additional-security-for-the-contribution-of-the-goods-and-for-any-salvage-and-special-charges-thereon,-shall-if~~
122   ~~required,-be-made-by-the-goods,-shippers,-consignees-or-owners-of-the-goods-to-the-carrier-before-delivery.-Such-deposit-shall,-at-the-option-of-the~~
123   ~~carrier,-be-payable-in-United-States-money-and-be-remitted-to-the-adjuster.-When-so-remitted-the-deposit-shall-be-held-in-a-special-account-at-the~~
124   ~~place-of-adjustment-in-the-name-of-the-adjuster-pending-settlement-of-the-General-Average-and-refunds-or-credit-balances,-if-any,-shall-be-paid-in~~
125   ~~United-States-money.~~
126   ~~In-the-event-of-accident,-danger,-damage,-or-disaster,-before-or-after-commencement-of-the-voyage,-resulting-from-any-cause-whatsoever,~~
127   ~~whether-due-to-negligence-or-not,-for-which,-or-for-the-consequence-of-which,-the-carrier-is-not-responsible-by-statute,-contract,-or-otherwise,-the~~
128   ~~goods,-the-shipper-and-the-consignee,-jointly-and-severally,-shall-contribute-with-the-carrier-in-general-average-to-the-payment-of-any-sacrifices,~~
129   ~~losses,-or-expenses-of-a-general-average-nature-that-may-be-made-or-incurred-and-shall-pay-salvage-and-special-charges-incurred-in-respect-of-the~~
130   ~~goods.-If-a-salving-ship-is-owned-or-operated-by-the-carrier,-salvage-shall-be-paid-for-as-fully-and-in-the-same-manner-as-if-such-salving-ship-or~~
131   ~~ships-belonged-to-strangers.~~ *Charter hire not to contribute to General Average.*

132   Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.
133   20. Fuel used by the vessel whilst off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the
134   cost of replacing same, to be allowed by Owners.
135   21. *See Clause 60.* ~~That-as-the-vessel-may-be-from-time-to-time-employed-in-tropical-waters-during-the-term-of-this-Charter,-Vessel-is-to-be~~
~~docked-at-a~~
136   ~~convenient-place,-as-soon-as-circumstances-permit,-and~~ cleaned and painted whenever Charterers and Captain think necessary, at-least once in every six months, reckoning from

137  time of fast painting and payment of Calc line is to be suspended until she is again in proper state for the service.
138

139
140  22.  Owners shall maintain the gear of the ship to be fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also
141  providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
142  same, otherwise heavier equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *power and electric*
      *lights sufficient for night work in all holds simultaneously free of expense to Charterers (see Clause 29)* lantoms and
      oil for
143  night-work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
144  Charterers to have the use of any gear/*grabs* on board the vessel.
145
      23.  Vessel to work night and day, if required by Charterers, and all *cranes/grabs* winches to be at Charterers' disposal during loading and
      discharging.
146  Steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,
147  deck-hands and dockeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rates of the
148  port, or labor unions, prevent occur from having winches shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
149  insufficient power to operate winches, Owners to pay for time actually so engaged in discharge, or required, and pay any loss of time occasioned
150  thereby.
151
152  24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
153  in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
154  etc." in respect of all cargo shipped under this Charter to or from the United States of America. It is further subject to the following clauses, both
155  of which are to be included in all bills of lading issued hereunder.
156                                         *U. S. A. Clause Paramount*
157  This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
158  16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
159  any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
160  be repugnant to said Act to any extent such term shall be void to that extent, but no further.
161                                         *Both-to-Blame Collision Clause*
162  If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
163  Master, Mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
164  hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
165  or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other non-car-
166  rying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her
167  owners as part of their claim against the carrying ship or carrier.
168  25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
169  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
170  port or to get out after having completed loading or discharging.
      26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171  navigation of the vessel, *acts of pilots or tugboats*, insurance, crew, and all other matters, same as when trading for their own account.
172      27.  A commission of *1.25 % 2 1/2* per cent is payable by the Vessel and Owners to
      *INTERMAR N.V., ANTWERP + 1.25% to LIGHTSHIP CHARTERING A/S, DENMARK* ..................................................
173
174  on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175  28.  An address commission of *3.75 % 2 1/2* per cent payable to *Charterers* ........ on the hire earned and paid under this Charter.

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A.) Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or and user as appropriate and not by the author.

*Additional Clauses 29 to 87 both inclusive as well as Standard Clauses and Owners protective Clause, us attached, are deemed to be fully incorporated in this Charterparty.*

THE OWNERS :

THE CHARTERERS :

Ingaigeamsmasser - n. v.
phone, +32(0)3 605 (0) 24
fax: +32(0)3 605 02 00
E-mail: chartering/dankervoorbelgium.com

 **intermar n.v.**

## ADDITIONAL CLAUSES TO CHARTERPARTY FOR

### MV „ENGIN KAPTANOGLU", DATED ANTWERP 4TH APRIL 2008.

Clause 29 : Vessel's Description
---------------

M/V ENGIN KAPTANOGLU
TURKISH FLAG, 1981 BLT, SDSTBC, DWT 40.750 ON 11.365 M
SWAD, GRT/NRT 23077/15986, LOA/BM/M.DEPTH 182.08/29.00/16.00 M
6X15 TS CRANE, MC GREGOR HACOVERS, GR/BL 1704983/1653246 CBFT,
TPC : 45, L.R.CLASS, PANDI CLUB U.K.MUTUAL(BERMUDA)LTD

CUBIC BREAKDOWN:
       GRAIN / BALE
HO.1  310.009   299.595   CBFT
HO.2  352.249   340.161   CBFT
HO.3  352.098   340.256   CBFT
HO.4  354.375   342.647   CBFT
HO.5  336.252   330.587   CBFT

TANK TOP STRENGTHS:
HO.1/3/5  21.5 TS/M2
HO.2/4    16.5 TS/M2

TANK TOP DIMS:                    HATCH DIMS :
HO.1  F 8.20XA22.60XL25.60        HA.1 16.38X12.80 M
HO.2  F22.60XA22.60XL25.60        HA.2 16.38X12.80 M
HO.3  F22.60XA22.60XL25.60        HA.3 16.38X12.90 M
HO.4  F22.60XA22.60XL25.60        HA.4 16.38X12.80 M
HO.5  F22.60XA14.40XL25.60        HA.5 16.38X12.90 M

SPEED AND CONSUMPTION :
ABT 13K ON ABT 27MT IFO 180 CST PLUS 2.5 MT MGO AT SEA AND PORT
IDLE AND ABT 3.5 MT MGO WHEN ALL GEARS WORKING
SPEED AND CONSUMPTION WARRANTY GIVEN UNDER GOOD WEATHER CONDITIONS
I.E. BEAUFORT 4 AND DSS 3 WITH NO NEGATIVE INFLUENCE OF SWELLS
AND/OR ADVERSE CURRENTS

Vessel cannot do alternate loading nor take heavy ballast and has
no floodable hold .
If due to cargo/port situations, Owners/Master will co-operate to
their best ability, to assist Chrtrs with reference to the above
alternate holds/flood/heavy ballast, and Charterers' requests not
to be unreasonable withheld.

all details about/w.o.g.

./..

**intermar n.v.**

MV "ENGIN KAPTANOGLU" - C/P DD 04/04/2008 - PAGE 2 OF 30

Clause 30 : Deleted.
------------

Clause 31 : On/Off-Hire Clause
------------

Referring to lines 60 and 61, where there is any failure to make
"punctual and regular payment" due to oversight or negligence or error
or omission of Charterers' employees, bankers or Agents, Charterers
will have three banking days to rectify the failure. Where so
rectified the payment shall stand as punctual and regular payment.

Clause 32 :
------------

Charterers to have the right to withhold from Charter hire during
the period of this Charter amounts due to off-hire and Owners'
disbursements, but properly substantiated. Charterers to have the
right to withhold from last hire payments Owners' estimated advances
and disbursements, including any fines and other accounts for
Owners' account and also the value of the estimated quantity of
bunkers on redelivery with proper substantiations.

Clause 33 :
------------

In the event of the vessel being boycotted by I.T.F. delayed or
rendered in-operative by strikes, labour stoppages or by any other
difficulties due to vessel's flag, ownership, crew terms of
employment of Officers or crew, or any other vessel under the same
ownership, all time lost is to be considered as off-hire and
expenses directly incurred thereby to be for Owners' account.

Clause 34 :
------------

Should the vessel be seized by any authority or arrested at the suit of
any party having or purporting to have a claim against or any interest
in the vessel, hire shall not be payable in respect of any period
during which the vessel is not fully at Charterers' use and all extra
expenses incurred by Charterers during off-hire period which is proven
by Charterers shall be for Owners' account, unless such seizure or
arrest is occasioned by any personal act or omission or default of the
Charterers or their Agents, or by reason of cargo carried.

./..

 **intermar n.v.**

Clause 35 :
-----------
Any delay, expense and/or fines incurred on account of smuggling
to be for Charterers' account if caused by Charterers or by
Charterers' servants and to be for Owners' account if caused by
Master, Officers, crew or Owners' servants.

Clause 36 :
-----------
Charterers to have the option to add any off-hire to the Charter
period.

Clause 37 :
-----------
Any time lost due to lack or proper documentation or equipment as
per Clauses 45, 46, 47 and 48 or any breach of said clauses shall be
treated as off-hire and all expenses incurred directly resulting
from such failure shall be for Owners' account by reason of non-
compliance with such regulations.

Clause 38 : Hire
-----------
Owners' bank account details:
BANK OF BERMUDA LTD
HM-08 HAMILTON HM 08, BERMUDA
BERMUDA
SWIFT CODE: BEDABMHM
ACCOUNT NO: 010-097574-501
BENEFICIARY: ALLSEAS LOGISTICS LTD
CORRESPONDING BANK: HSBC BANK
REFERNCE : ENGIN KAPTANOGLU - COM BULF000075 - CLIENT 403

Clause 39 :
-----------
If stevedores, longshoremen or other workmen are not permitted to
work due to failure of the Owners to comply with Clause 46, or
because of lack of said certificate(s), any time so lost shall be
treated as off-hire and all extra expenses incurred directly
resulting from such failure shall be for Owners' account.

./..

**intermar n.v.**

Clause 40 :
-----------

Should the vessel deviate or put back during a voyage contrary to the order or direction of the Charterers, or as permitted by this Charter, the hire is to be suspended from the time of her deviating or putting back until she is again in the same or equidistant position from the destination and the voyage resumed therefrom. All fuel used by the vessel while off-hire shall be for Owners' account.

Clause 41 :
-----------

In addition to Master rendering all usual and customary services with ship's crew and boats, not limited to, the following services are included in hire and shall be rendered by Officers and crew any time day or night, without Charterers paying for such services:

> a. Raising and lowering of cranes and/or gangways in
>    preparation for loading and discharging.
>
> b. Opening and closing of hatches in connection with loading
>    and discharging, if port regulations permit.
>
> c. Closing and opening of hatches in the event of adverse
>    weather conditions which may affect the condition of
>    cargo carried on board during loading and discharging, if
>    port regulations permit.
>
> d. Arranging for and preparing/stowing, rigging/unrigging of
>    cargo equipment including grabs.
>
> e. Supervision and responsibility for loading and
>    discharging and everything related thereto.
>
> f. Maintaining sufficient electric power on all cranes
>    whilst loading and discharging.
>
> g. Shifting vessel during loading and discharging and
>    shifting berths, however linesmen/pilotage/tugs, if any,
>    to be for Charterers' account.
>
> h. Docking and undocking in connection with
>    loading/discharging cargo or bunkering.

./..

**intermar n.v.**

<u>MV "ENGIN KAPTANOGLU" - C/P DD 04/04/2008 - PAGE 5 OF 30</u>

41. Continuation :
-------------------

   i. Bunkering.

   j. Officers and crew to shape up vessel's hatches and cranes
    as much as possible prior to arrival at loading and/or
    discharging places so as to permit immediate commencement
    of loading and/or discharging operations if weather
    permits.

   k. not applicable


Clause 42 : Bunkers
-------------

Bunkers on delivery about 650/750 metric tons IFO and about 35/45
metric tons MGO.
Bunkers on redelivery about same as on delivery.
Prices both ends : US-$ 500,- per metric ton for IFO and
US-$ 900,- per metric ton for MGO

Charteres to supply fuel with following specifications :
IFO 180 CST ISO 8217 RME 25 SG 0,991 MAX EXCEPT SOUTH AFRICA WHERE
RMF IS ACCEPTABLE MARINE GAS OIL DMA EXCEPT CHINA WHERE LIGHT
DIESEL OIL ACCEPTABLE
Bimco Sulphur Contents Clause to apply.


Clause 43 :
------------

Charterers to have the privilege to bunker vessel prior delivery,
provided the bunkering does not interfere with Owners' operations.
Similar privilege is granted to Owners prior redelivery. Charterers
will endeavour to bunker the vessel with bunker specifications as
given.


Clause 44 :
-----------

Owners warrant the vessel is eligible and equipped to bunker in
the U.S.A. its territories and possessions and in all countries to
which vessel is allowed to trade under this Charter.

                   ./..

**intermar n.v.**

Clause 45 :
-----------

The Owners are to provide and keep on board valid deratisation
exemption or fumigation certificates throughout the Charter
period. Deratisation shall always be for Owners' account, except
for cargo.

Clause 46 :
-----------

Throughout the period of the Charter vessel to be in possession of
all necessary valid equipment and certificates to comply with
safety and health regulations, national and international
regulations and all current requirements at all ports of call,
Panama and Suez Canal included.

Clause 47 : deleted
-----------

Clause 48 :
-----------

Vessel is suitable for grab discharge and no cargo to be loaded in
places inaccessible to grabs or in deeptanks. Charterers to have
the privilege of using bulldozers in vessel's holds, however unit
weight of bulldozers will not exceed vessel's tanktop strengths
and her operation always under Master's supervision and
satisfaction.

Clause 49 : Cargo Claims/P & I Club
-----------

Owners guarantee that the vessel is entered and shall remain
entered in a Protection and Indemnity Association which is a
member of the Group of International P & I Clubs for the duration
of this Charter Party. Entry shall include, but not be limited
to, ordinary cover for cargo claims.

Charteres are not responsible for any accident or damage to or on
board the vessel which is normally covered with Owners' hull and
machinery policy.

                                                            ./..

**intermar n.v.**

49. Continuation :
-------------------

In the case of damage to and/or loss of cargo carried on the
vessel in which Owners' and/or Charterers' liability could be
involved under the terms of this Charter Party as the case may be,
the Owners and/or the Charterers shall be asked to grant time
extension for suit in each and every occurrence which should not
be unreasonably withheld.  The so granted extensions shall not
prejudice the ultimate responsibility of both parties.

Liability for cargo claims as between Owners and Charterers shall
be apportioned as specified by the Interclub New York Produce
Exchange Agreement effective from 1996 and its subsequent
amendments. Owners' P & I Club:  U.K. MUTUAL (BERMUDA) LTD

Oil Pollution
Owners guarantee to provide and maintain during the entire time
charter   period, at their expense and carry onboard the vessel a
valid U.S. Certificate of Financial Responsibility.  Owners also
guarantee to have secured current  certificates for other
countries/federal states or municipal or other division or
authority thereof, where guarantees are required.  All such
certificates to be  valid throughout the entire timecharter
period.

The Charterers shall in no case be liable for any damages as a
result of the Owners' failure to obtain the aforementioned
certificates. Time lost by non-compliance to be considered as off-
hire and may be deducted from hire and  Owners hold Charterers
harmless against any consequential losses, damages or expenses.

Clause 50 : deleted
-------------

Clause 51 :
-------------

In the event of outbreak of war between any of the following
countries: United States of America, the country of vessel's flag,
C.I.S., The People's Republic of China, United Kingdom, Japan,
France, Turkey, Germany both Charterers and Owners have the option
of cancelling this Charter Party, provided no cargo on board.

./..

**intermar n.v.**

<u>MV "ENGIN KAPTANOGLU" - C/P DD 04/04/2008 - PAGE 8 OF 30</u>

51. Continuation :
--------------------

It is understood that war means direct war between these nations
and does not include local hostilities or civil war where any of
the above countries support opposing sides. Owners shall not
unreasonably take advantage of this Clause in case of limited
local conflict.

Clause 52 :
-------------

The normal war risk insurance premium on the vessel's hull and
machinery value are for Owners' account. But extra war risk
insurance to be for Charterers' account including war bonus to the
Master, Officers and crew to be for Charterers' account, which
shall not exceed current London scale at time of respective
shipments and payable only against presentation of original
invoice from underwriter.

Clause 53 :
-------------

This Charter is subject to the New Jason Clause, New Both-to-Blame
Collision Clause, P & I Club Bunkering Clause, Conwartime Clause,
General Paramount Clause as attached, which are endeavoured to be
incorporated in all Bills of Lading issued under this Charter.

Above Clauses as attached.

All Bills of Lading issued under this Charter will incorporate the
General Paramount Clause as attached.

Clause 54 : Trading Limits
-------------

Vessel to be employed in lawful trades for the carriage of lawful
merchandise only between good and safe berths, safe anchorages,
ports or areas where vessel can safely lie always afloat (except
NABSAA as per line 69) and within International Navigation Limits
(except where Charterers may break Institute Warranty Limits as
per Clause 51) specially excluding :

./..

**intermar n.v.**

54. Continuation :
-------------------

Alaska, Abkjazia, Cuba, Eritrea, Somalia, Libya, southern Cyprus,
Angola , Oman, north or south Yemen, Nigeria, North Korea,
Cambodia, Haiti and all it's islands, all republics of ex
Yugoslavian countries but Montenegro, Croatia and Slovenia
allowed, Russian North Pacific c.i.s. ports, Iraq, Albania,
Lebanon, Sri Lanka, Zaire, Sierra Leone, Bissau, and all
countries/areas where U.N. imposes trade sanctions from time to
time and all countries where war and war like situations exist.
vessel not to trade port(s) / area(s) having ice or ice-like
condition. Charterers are not allowed to send vessel from Taiwan
to mainland China, unless calling an intermediate port neither in
Taiwan nor in mainland China, unless vessel is in ballast.

Charterers hereby hold Owners/vessel harmless and indemnify
Owners/vessel against all claims, losses and damages which may be
made to or suffered by Owners by reason of Charterers trading the
vessel as above.
Furthermore, Charterers to be responsible for any/all consequences
and/or liabilities resulting/arising therefrom and also for
any/all losses/damages sustained by Owners in case of any breach
of above by Charterers.

If the war/warlike zone having been declared by vessel's
underwriters and/or P & I Club after cargo has already been loaded
on board, subsequently, the war risk clause of Owners' P & I Club
to apply and Charterers are fully responsible to pay for all
additional war risk premium upon demand of vessel's underwriters
and/or P & I Club with all risks/consequences to be for
Charterers' account.

In the event of a change in circumstances that would safely allow
the vessel to trade to any excluded area, Charterers to have the
right to trade there subject to Owners' approval which is not to
be unreasonably withheld.

Vessel has not traded Cuba, Israel and C.I.S. Far East ports.

Owners grant the option to call Yemen providing:

- Owners not responsible for cargo claims, shortage or whatsoever,
vessel remaining on hire  until redelivery without interruption
due to any such claims.

./..



intermar n.v.

54. Continuation :
------------------

- owners not responsible of giving out guarantees by them or by
their P & I club to release the vessel   (PandI letter or cash
whatever required is Charterers' responsibility)

- vessels hatches will be sealed at load and will be unsealed at
discharge port at Charterers' expense.

- if owners/their PandI agree there was vessels fault and seawater
damage etc happened during voyage,

-  any reimbursement by Owners' PandI will be Charterers/their
PandI benefit.


Clause 55 : Cargo Exclusions
------------

All cargoes are to be carried in accordance with the imo code of
safe practise and following cargoes are specificly excluded from
carriage under this Charterparty:
amonium sulphate, nitrate of all kind, cement, cement clinker,
sulphur, salt, saltcakes , yellow phosprous, hbi, all kinds of
copra, acids, asphalt, aggregates, pitch in bulk, asbestos,
bitumen, bones, borax, charcoal, calcium carbides, calcium
hypochlorite, caustic potash, creosoted goods, carbide, clay in
bulk, caustic soda, soda ash in bulk, corrosives, charcoal ,
cotton , direct reduced iron and its products, hbi and all
explosive and/or combustible material, radioactive and/or nuclear
products, and/or their wastes, ferrosilicon, fishmeal, flourspar,
caseous coal, hides, logs, milled rice in bulk, mineral sands,
tatnium slags and all inflammable and injurious cargoes,
limestone, livestock of any description, motor blocks, motor
spirit, naphtha, technical urea , tar and its products, oily
pieces, petroleum, petroleum derivatives  and all its products but
petcoke is a permitted cargo under this Charterparty, quebrocho,
radiosotopes, sulphate in bulk, sunflower seed expellers and other
expellers, sponge iron, hot briquetted iron, turnings, turpentine,
arms, ammunitions, detonators, TNT, dynamite, bombs, black powder,
rockets, blasting cabs and all war material,  zinc ashes, granite
blocks and all cargoes of prohibited carriage by IMO.

Please also refer to protective Clauses at the end of this
document.

./..

intermar n.v.

Clause 56 : Delivery/Redelivery Notices
------------
7/5 days approximate notice and 5/3/2/1 days definite notice.


Clause 57 :
------------
A joint on hire survey will be held at port of loading.
Charterers to appoint an independent surveyor acceptable to Owners
who shall conduct a joint on-hire survey on vessel's condition and
bunkers, the time to be for Owners' account, but cost to be
equally shared by Owners and Charterers.

At port of redelivery Charterers and Owners to appoint one
independent surveyor who shall conduct a joint off-hire survey on
vessel's condition and bunkers.  Such time used to be for
Charterers' account, the cost to be equally shared by Charterers
and Owners.
Charterers may at any time during the currency of this Charter
Party conduct any surveys on board and Master/crew shall render
assistance.


Clause 58 : Drydock Clause
------------
Owners under their obligation to maintain the vessel in a
thoroughly efficient state and to maintain vessel normal speed  No
drydocking except in case of emergency.


Clause 59 : Cargo Holds
------------
On arrival at load port, first voyage only, vessels holds to be
clean swept, washed down by fresh water and dried up so as to
receive Charterers intended cargo in all respects free of salt,
loose rust scale and previous cargo residues to satisfaction of
the independent surveyors.
If the vessel fails then the vessel to be placed off-hire from
failure of inspection until vessel if fully accepted and any extra
directly related/duly supported expenses incurred due to
inspection failure to be for Owners' account.

                                                              ./..

**intermar n.v.**

Clause 60 : Ballasting Clause
-----------

Charterers have the right to instruct Master to utilise the
vessel's maximum water ballast capacity and eventually to flood
the only one ballast hold in order to bring down vessel's height
to get into position under loading and/or discharging appliances,
however always in conformity to free board, stability and/or
safety requirements.

Clause 61 :
-----------

All references to time understood to be in G.M.T.  Clause headings
are inserted for convenience of reference only and shall be
ignored in the interpretation of this Charter Party.

Clause 62 :
-----------

The Charterers may use their own Bills of Lading.  With reference
to lines 78/79 of the Charter Party, upon request to Owners and/or
Master the Charterers and/or their Agents are hereby authorised by
the Owners to sign on Owners' behalf all Bills of Lading as
presented in strict conformity with Mate's and Tally Clerk's
receipts.  In case original Bill(s) of Lading are unavailable at
discharging port prior to vessel's arrival, Owners/Master are
instructed to release entire cargo against Charterers' single
Letter of Indemnity on Owners' P & I form/wording signed by
Charterers only, submitted to the Master or Owners that the
Owners, Owners' vessel, Owners' servants and Agents are not to be
responsible for any consequences resulting from such discharge.
Any time lost due to problems occurred during such practice to be
for Charterers' account.

Clause 63 : Double Banking Clause
-----------

(a)  The Charterers shall have the right, where and when it is
customary and safe for vessels of similar size and type to do so,
to order the Vessel to go, lie or remain alongside another vessel
or vessels of any size or description whatsoever or to order such
vessels to come and remain alongside at such safe dock, wharf,
anchorage or other place for transhipment, loading or discharging
of cargo and/or bunkering.

./..

**intermar n.v.**

63. Continuation :
-------------------

(b) The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

(d) The Owners shall be entitled to insure any deductible under the vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the vessel's Underwriters and/or the cost of insuring any deductible under the vessel's hull policy.

(e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

Clause 64 : Deleted
-----------

Clause 65 :
-----------

The Owners will maintain the vessel's hatchcovers water and weathertight. All hatches are to be carefully tendered by crew to prevent leakage. Should Master require ramneck or similar tape, then same to be for Owners' account.

Clause 66 : Hold Cleaning Clause
-----------

Charterers have the option to redeliver the vessel without cleaning holds by paying Owners lumpsum US-$ 5.000,- excluding dunnage/debris removal/disposal.

./..

**intermar n.v.**

66. Continuation :
--------------------

In the event that national/state regulations at discharge port do not
allow vessel to dispose of dunnage/debris at sea, then Charterers to
remain responsible for all dunnage/debris disposal/ removal.

Clause 67 :
------------

Charterers not to be responsible for stevedore damage to the
vessel unless Charterers or their Agents are notified in writing
or by cable by the Master within 24 hours from time of occurrence
of damage or as soon as practicable thereafter, depending on when
damage is discovered.
In the case of hidden damage, same is to be reported as soon as
discovered but latest prior sailing respective load/dischargeport.
Master is to co-operate with Charterers in giving prompt notice of
claim in writing to stevedores or other party causing damage.

If on redelivery any damage remains outstanding for which
Charterers are liable, the vessel may be repaired by Owners at any
convenient time/ place after redelivery. Charterers undertake to
reimburse Owners with the cost of such repairs as ascertained by a
surveyor who is to be mutually appointed by both parties or
against production of relevant dockyard repair bills.

In the event of damage affecting vessels seaworthiness and/or cargo
worthiness, the vessel is to be repaired immediately at Charterers
time/expense and vessel is to remain on full hire until such repairs
are completed to the satisfaction of Owners or Owners surveyor.

Clause 68 :
-----------

In the event of a disabled crane(s) and/or power to drive them and
shore crane(s) required, Charterers have the option to hire same
for Owners' account, vessel to remain on hire while shore crane
operating. Owners are granted upto 9 hours for repairing before
Charterers can exercise their option. Vessel to remain pro-rated
off-hire until shore crane available and operating.

Clause 69 : Deleted - not applicable
------------

./..

**intermar n.v.**

<u>MV "ENGIN KAPTANOGLU" - C/P DD 04/04/2008 - PAGE 15 OF 30</u>

Clause 70 :
-----------
If the vessel's crew or vessel are caught smuggling narcotics then
this to be for Owners' responsibility. If the Charterers' Agents
or servants are caught smuggling narcotics then this to be the
Charterers' responsibility.


Clause 71 : Liabilities for Cargo
-----------
Liability to third parties for cargo claims shall be shared by the
Owners and the Charterers in accordance with Inter Club New York
Produce Exchange Agreement dated February 20th 1970 or any
amendments thereto.
Any cargo claim should be immediately referred to the other party
with supporting documents for negotiation.


Clause 72 : Entertainment
-----------
The Charterers to pay US-$ 1.300,- per month or pro-rata for all
victualling, entertainment and communication expenses.


Clause 73 :
-----------
Cargoes or shore watchmen arranged/ordered by Charterers or their
Agents to be for Charterers' account, otherwise to be for Owners'
account.


Clause 74 :
-----------
Charterers' Agents to handle ship's minor routine matters at cost
without payment of fee by Owners except where such fees are
compulsory, but Owners when necessary will appoint their own
Agents at port of call to attend major Owners' matters.


Clause 75 :
-----------
Any taxes and/or dues on vessel and/or cargo and/or hire
(including any income tax levied on freight/hire by authorities at
load or discharge port(s) to be for Charterers' account.

./..

**intermar n.v.**

Clause 76 :
-----------
Owners warrant that the vessel has not traded Israel and is not
blacklisted by Arab countries and that the vessel is eligible for
bunkers in the United States of America, its territories and
possessions in accordance with U.S. Department of Commerce, Office
of International Trade, Directive No. 705.


Clause 77 : deleted - not applicable.
-----------


Clause 78 :
-----------
Charterers to have the option of terminating this Charter in the
event of vessel remaining off-hire for 30 days consecutive or more
and may redeliver the vessel to Owners at any port or anchorage
within trading limits.
No liability whatsoever shall attach to Charterers in the event of
their exercising their option to terminate this Charter, provided
the off-hire caused due to Owners'/vessel's faults.


Clause 79 : Redelivery - See Lines 55/56.
-----------


Clause 80 : ISM Clause
-----------
From the date of coming into force of the International Safety
Management (ISM) Code in relation to the vessel and thereafter
during the currency of this Charter Party, the Owners shall
procure that both the vessel and "the Company" (as defined by the
ISM Code) shall comply with the requirements of the ISM Code.
Upon request the Owners shall provide a copy of the relevant
Document of Compliance (DOC) and Safety Management Certificate
(SMC) to the Charterers.  Should Owners be unable to provide same
ISM Certificates within 5 days of request, then Charterers have
the option of cancelling the Charter unless the vessel already has
cargo on board.

./..

**intermar n.v.**

80. Continuation :
-------------------
Except as otherwise provided in this Charter Party, loss, damage,
expense or delay caused by failure on the part of the Owners or
"the Company" to comply with the ISM Code shall be for the Owners'
account.


Clause 81 : Speed and Consumption Clause
-----------
Charterers are allowed to nominate an internationally recognised
routing service to supply routes advice to the Master during
voyages specified by the Charterers. The Master to comply with the
routing procedures of the routing services.  In the event of any
dispute over apparent speed and consumption warranty, then the
findings of the routing service shall be deemed final and binding.
It is expressly understood that the speed and consumption given is
considered up to and including Beaufort 4.


Clause 82 :
-----------
Owners have the option to sell the vessel during the currency of
this Charter to first class owners.


Clause 83 : deleted - not applicable.
-----------


Clause 84 :
-----------
"Year 2000 conformity" shall mean that neither performance nor
functionality of computer systems, electronic and electro-
mechanical or similar equipment will be affected by dates prior to
or during the year 2000.

Without prejudice to their other rights, obligations and defenses
under this Charter Party including, where applicable, those of the
Hague or Hague-Visby Rules, Owners and Charterers, and in
particular the Owners in respect of the vessel, shall exercise due
diligence in ensuring year 2000 conformity in so far as this has a
bearing on the performance of this Charter Party.

./..

**intermar n.v.**

<u>MV "ENGIN KAPTANOGLU" - C/P DD 04/04/2008 - PAGE 18 OF 30</u>

84. Continuation :
-------------------

The vessel, the Owners, the management and the registration are in
compliance with the "Year 2000 Clause" throughout the duration of
the whole Charter and at any port of call.


Clause 85 :
------------

Owners guarantee that vessel's hatchcovers are to be watertight
all throughout this Charter period and if any hatchcover found
defective, same to be rectified at Owners' time and expense to
Charterers' satisfaction.  Charterers also have the right to carry
out hose test on all hatches at any time during this Charter.


Clause 86 :
------------

Charterers may load cargo on deck subject to the approval of the
Master of the vessel, which act to be unreasonably withheld,
without Owners'/Master liability for loss and/or damage howsoever
caused, that cargo is being loaded in such manner so as to affect
the vessel's stability or exceed the permissible strength of the
deck, however, always at Charterers risk and expenses including
supply of loose lashing fittings as required in accordance with
the vessel's Cargo Securing Manual approved by her Classification.
Bills of Lading covering deck cargo to be marked "carried on deck
at Shippers risk without responsibility for loss or damage
howsoever caused."


Clause 87 :
------------
Conwartime 1993 to apply - please see below.


---------ooooOoooo---------

**intermar n.v.**
phone: +32(0)3 505 00 24
fax: +32(0)3 605 02 90
E-mail: chartering@intermarbelgium.com


intermar n.v.

### BIMCO - ISPS Clause for Time Charter Parties

(a) (i) From the date of coming into force of the International
Code for the Security of Ships and of Port Facilities and the
relevant amendments to Chapter XI of SOLAS (ISPS Code) in
relation to the Vessel and thereafter during the currency of
this Charter Party, the Owners shall procure that both the
Vessel and "the Company" (as defined by the ISPS Code) shall
comply with the requirements of the ISPS Code relating to the
Vessel and "the Company". Upon request the Owners shall
provide a copy of the relevant International Ship Security
Certificate (or the Interim International Ship Security
Certificate) to the Charterers. The Owners shall provide the
Charterers with the full style contact details of the Company
Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss,
damage, expense or delay, excluding consequential loss, caused
by failure on the part of the Owners or "the Company" to
comply with the requirements of the ISPS Code or this Clause
shall be for the Owners' account.

(b) (i) The Charterers shall provide the CSO and the Ship Security
Officer (SSO)/Master with their full style contact details
and, where sub-letting is permitted under the terms of this
Charter Party, shall ensure that the contact details of all
sub-charterers are likewise provided to the CSO and the
SSO/Master. Furthermore, the Charterers shall ensure that all
sub-charter parties they enter into during the period of this
Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full
style contact details and, where sub-letting is permitted
under the terms of the charter party, shall ensure that the
contact details of all sub-charterers are likewise provided
to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss,
damage, expense or delay, excluding consequential loss, caused
by failure on the part of the Charterers to comply with this
Clause shall be for the Charterers' account.

Case 1:08-cv-06970-AKH    Document 10-3    Filed 08/27/2008    Page 29 of 39



**intermar n.v.**

### ISPS Clause : continuation

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

### P & I BUNKERING CLAUSE

The vessel in addition to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter and there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks, deeptanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.



**intermar n.v.**

## NEW BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved
while performing this Charter Party falls to be determined in
accordance with the laws of the United States of America, the
following clause shall apply:

### BOTH TO BLAME COLLISION CLAUSE

If the ship comes into collision with another ship as a result of
the negligence of the other ship and any act, neglect or default
of the Master, Mariner, Pilot or the   servants of the carrier in
the navigation or in the management of the ship, the Owners of the
goods carried hereunder will indemnify the carrier against all
loss or liability to the other or non-carrying ship or her Owners
in so far as such loss or liability represents loss of or damage
to or any claim whatsoever of the Owners of the said goods, paid
or payable by the other or non-carrying ship or her Owners to the
Owners of the said goods and set off, recouped or recovered by the
other or non-carrying ship or her Owners as part of their claim
against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners,
Operators or those in charge of any ship or ships or objects other
than, or in addition to, the colliding ships or objects are at
fault in respect to a collision or contact.

and the Charterers shall procure that all Bills of Lading issued
under this Charter Party shall conta
in the same clause.

### NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or
after the commencement of the voyage, resulting from any cause
whatsoever whether due to negligence or not, for which or for the
consequence of which the carrier is not responsible by statute,
contract or otherwise, the goods, shippers, consignees or owners
of the goods shall contribute with the carrier in general average
to the payment of any sacrifices, losses or expenses of a general
average nature that may be made or incurred and shall pay salvage
and special charges incurred in respect of the goods.

 intermar n.v.

## NEW JASON CLAUSE: continuation

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## GENERAL CLAUSE PARAMOUNT

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by sea which incorporates the rules relating to Bills of Lading contained in the International Convention dated Brussels, 25th August, 1924 and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this clause incorporated, such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the carrier of any statutory protection or exemption from, or limitation of, liability.

## BIMCO Standard War Risk Clauses for Time Charters 1993

### Code Name "CONWARTIME 1993"

1. For the purpose of this Clause the words:

(a) "Owners" shall include the shipowners, bareboat Charterers, disponent Owners, managers or other operators who are charged with the management of the vessel and the Master and



**intermar n.v.**

### CONWARTIME 1993 : continuation

(b) "War Risks" shall include any war (whether actual or
threatened), act of war, civil war, hostilities, revolution,
rebellion, civil commotion, warlike operations, the laying of
mines (whether actual or reported), acts of piracy, acts of
terrorists, acts of hostility or malicious damage, blockades
(whether imposed against all vessels or imposed selectively
against vessels of certain flags or ownership, or against
certain cargoes or crews or otherwise howsoever), by any person,
body, terrorist or political group or the government of any
state whatsoever which, in the reasonable judgement of the
Master and/or the Owners, may be dangerous or are likely to be
or to become dangerous to the vessel, her cargo, crew or other
persons on board the vessel.

2. The vessel, unless the written consent of the Owners be first
obtained, shall not be ordered to or required to continue to or
through any port, place, area or zone (whether of land or sea) or
any waterway or canal, where it appears that the vessel, her
cargo, crew or other persons on board the vessel, in the
reasonable judgement of the Master and/or the Owners may be, or
are likely to be, exposed to war risks. Should the vessel be
within any such place as aforesaid which only becomes dangerous or
is likely to be or to become dangerous after her entry into it,
she shall be at liberty to leave it.

3. The vessel shall not be required to load contraband cargo, or
to pass through any blockade, whether such blockade be imposed on
all vessels or is imposed selectively in any way whatsoever
against vessels of certain flags or ownership or against certain
cargoes or crews or otherwise howsoever, or to proceed to an area
where she shall be subject, or is likely to be subject to a
billigerents right of search and/or confiscation.

4.

   (a) The Owners may effect war risks insurance in respect of the
   hull and machinery of the vessel and their other interests
   (including but not limited to loss of earnings and detention,
   the crew and their Protection and Indemnity risk) and the
   premiums and/or calls therefor shall be for their account.

**intermar n.v.**

## CONWARTIME 1993 : continuation

(b) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the vessel is within or is due to enter and remain within any area or areas which are specified by such Underwriters as being subject to additional premiums because of war risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

5. If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6. The vessel shall have liberty:

(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any other way whatsoever which are given by the government of the nation under whose flag the vessel sails, or other government to whose laws the Owners are subject, or any other government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(b) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supernational body which has the right to issue and give the same and with national laws aimed at enforcing the same to which the Owners are subject and to obey the orders and directions of those who are charged with their enforcement;

(d) to divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier.

**intermar n.v.**

### CONWARTIME 1993 : continuation

(e) to divert and call at any other port to change the crew or
any part thereof or other persons on board the vessel when there
is reason to believe that they may be subject to internment,
imprisonment or other sanctions.

7. If in accordance with their rights under the foregoing
provisions of this Clause the Owners shall refuse to proceed to
the loading or discharging ports or any one or more of them, they
shall immediately inform the Charterers. No cargo shall be
discharged at any alternative port without first giving the
Charterers notice of the Owners' intention to do so and requesting
them to nominate a safe port for such discharge.  Failing such
nomination by the Charterers within 48 hours of the receipt of
such notice and request, the Owners may discharge the cargo at any
safe port of their own choice.

8. If in compliance with any of the provisions of sub-clause (2)
to (7) of this Clause anything is done or not done, such shall not
be deemed a deviation, but shall be considered as due fulfillment
of this Charter Party.

### U.S.A. CLAUSE PARAMOUNT

Bills of Lading are to include the following clause:

This Bill of Lading shall have effect subject to the provisions of
the Carriage of goods by Sea Act of the United States, approved
April 16, 1936, which shall be deemed to be incorporated herein, and
nothing herein contained shall be deemed a surrender by the  Carrier
of any of its rights or immunities or an increase of any of its
responsibilities or liabilities under said Act. If any term of this
Bill of Lading be repugnant to said Act to any extent, such term
shall be void to that extent, but no further.

 intermar n.v.

### CANADIAN CLAUSE PARAMOUNT

Bills of Lading are to include the following clause:

"This Bill of Lading, so far as it relates to the carriage of
goods by water, shall have effect, subject to the provisions of
the Carriage of Goods by Water Act, 1970, Revised Statutes of
Canada, 237 Chapter C-15, enacted by the Parliament of the
Dominion of Canada, or any statutory re-enactment thereof, which
shall be deemed to be incorporated herein, and nothing herein
contained shall 238 be deemed a surrender by the carrier of any of
its rights or immunities or an increase of any of its
responsibilities or liabilities under the said Act. If any term of
this Bill of Lading be repugnant to said 239 Act to any extent,
such term shall be void to that extent, but no further.

### War Risk Insurance and Crew Bonus Clause

War risk insurance and crew bonus for worldwide trading to be for
Owners account. In the event Charterers employ the vessel in a
trade for which there is additional war risk insurance premium
Charterers to pay such additional premium as actually paid by
Owners, less usual rebate, based on the hull and machinery
valuation but not to exceed the scale from time to time published
by the Institute of London Underwriters. Any increase in crew war
bonus after delivery caused by the trade in which vessel is
engaged to be for Charterers account.



## Owners' following Standard Protective Clause to apply:

### Concentrates

A) Before commencement of loading Charterers/Shippers to provide
with laboratory analysis/certificate evidencing that both the flow
moisture point and transportable moisture limit of such cargo are
within the limit as set out by IMO.

B) Such cargo to be loaded, stowed, trimmed and discharged
strictly according to latest IMO and/or any other latest
regulations/rules applicable to such cargo.

C) After loading Charterers undertake to arrange for special extra
trimming and/or levelling of the cargo to satisfaction of Master
and independent surveyors appointed by Charterers/Shippers at
their expense and time.

D) Any directly related extra expenses resulting
therefrom/incurred thereby (such as hold cleaning to Masters
satisfaction/hold survey etc.) and any detention through any of
above causes to be for Charterers account.

### Petroleum Coke

A) Petroleum coke mentioned herein is only limited to the type of
non hazardous, non dangerous green delayed type and/or calcined
type and metalurgical type.

B) If Charterers exercise such option, Charterers undertake to
use holds as less as possible, provided vessels stability/trim and
stress permit.

C) Such cargo to be loaded, stowed, trimmed, discharged strictly
in accordance to latest IMO and/or any other latest regulations/
rules applicable to such cargo.

D) Should any additional/special washdown of holds before loading
be reasonably recommended proposed required by Master, Charterers
undertake to arrange the same at their time/expense.

E) After discharge Charterers to arrange at their expense/time of
any additional/special washdown of holds carrying such cargo by
chemical as Master reasonably considers it necessary.

F) Any directly related extra expenses resulting therefrom/
incurred thereby (such as hold cleaning to Masters satisfaction/
hold survey etc.) and any detention through any of the above
causes to be for Charterers' account.

G) Such cargo not be last cargo.



intermar n.v.

## Scrap

A) The scrap mentioned herein only limited to HMS 1+2 and/or shredded scrap specifically excluding motor blocks and turnings and also metal borings and cuttings.

B) Charterers undertake that loading of first layer of scrap not to be released until touching tanktop and not to be dumped/dropped during loading. First layer of scrap to be loaded at height and to be evenly stowed/trimmed to satisfaction of Master before loading balance of cargo.

C) Charterers undertake to supply on board at their expense, dunnages and/or other materials which are necessary to provide safe protection from damage by loading scrap.

D) Prior to loading scrap, hold condition survey to be conducted by an independent surveyor appointed by Charterers in Charterers' time and costs split 50/50 between Charterers and Owners, and same to be done immediately after completion of discharge.

E) In case of any damage to the vessels Australian hold ladders and any other parts/places of the vessel caused by loading such scrap cargo (except for damage to hold plate which to be considered fair wear and tear), Charterers to be responsible for upgrading/repairs to bring Australian hold ladders and other parts/places to same condition as prior to loading scrap before commencement of next voyage in case needed.

F) Any directly related extra expenses resulting therefrom/ incurred thereby (such as hold cleaning to Masters satisfaction/ hold survey etc.) and any detention through any of above causes to be for Charterers account.

## Salt

Salt may be loaded provided it does not require whitewashing/ limewashing and is industrial salt or similar quality of its moisture contents.

## Pig iron

A) Charterers undertake to use holds as few as possible, provided vessels stability and strengths permitting.

B) Charterers undertake that loading of first layer of pig iron not to be released until touching tanktop and not to be dumped/ dropped during loading, so as to provide a cushion flooring for the balance of cargo under the Master's supervision and his reasonable satisfaction.

C) Charterers undertake to supply onboard, at their expense, dunnage and/or other materials which Master considers necessary to provide safe protection from damage by loading pig iron.

**intermar n.v.**

D)   Such cargo not to be the last cargo prior to redelivery.
E)   If any dispute arises between Charterers/Master an independent
Surveyor should be appointed jointly by Owners/Charterers and his
decision should be final.
F)   In case during en route from loading to discharging port,
cargo was found to shift which may affect the seaworthiness or
safety of the vessel, Owners have the right to call at nearest
port for necessary cargo trim, all time/expenses incurred to be
for Charterers account and vessel to remain on hire for period.

### Cement and cement clinker

(A) Should an additional/special washdown of holds before loading
be required/ recommended by independent surveyors appointed by
Charterers at their expense, such washdown to be arranged by
Charterers at their expense;

(B) Charterers have the option to cut holes in vessel's
hatchcovers for loading bulk cement on following conditions:
1)   All cutting and restoring of the holes to be fully
supervised/attended/approved by vessel's classification surveyor
with written documents.
2)   Holes not to be cut within the same frame space with the
existing grain feeding holes and to be cut at the suitable place
of hatchvover in accordance with vessel's builder's specification.
Well protection to bilge well of all holds is strictly necessary
to keep smooth suction while discharging hold washing water by
using gum tapes (plaster) or so. When restoring cement holes ,
chill plates or similar material deemed necessary by Master/
surveyor to be fitted for complete welding in order to reinstate
the hatch-covers back to their original condition.
3)   After completion of restoring holes, Owners' option to have
hose test carried out in presence with vessel's classification
surveyor and test result should be upto his satisfaction,
otherwise Charterers have obligation to rectify the situation
until and when satisfied by the vessel's classification surveyors.
4)   Charterers indemnify Owners of all possible cargo solid
fiction due to hold sweating which it is impossible to avoid by
proper operation of existing natural ventilation system.
5)   All time for preparing cutting and restoring upto
classification surveyor's satisfaction as well as all expenses
including classification surveyor's fees and expenses shall be for
Charterers' account.

intermar n.v.

(C) After loading Charterers undertake to arrange at their
expenses any special/extra trimming and/or levelling of cargo to
Master's reasonable satisfaction and also Charterers to give
reasonable time to allow for the cargo to settle and any air to
escape before vessel's departure from loading berth/port;

(D) Charterers are to wash all holds by fresh water immediately
after completion of discharging and thoroughly remove residues and
cement dust in holds at Charterers time and expenses to Master's
satisfaction. Bilge water not to be pumped through ship's bilge
lines but to be pumped overboard by submerge pump supplied by
Charterers if same not on board.
Crew to perform such cleaning if requested by Charterers and if
permitted by local regulations, but Charterers still have to be
responsible for the removal of the dirty water after hold
cleaning.

(E) Any extra expenses resulting therefrom/incurred thereby and
any detention through any of above causes to be for Charterers'
account.

(F) Intermediate hold cleaning USD _____ per hold. The liberty
granted to Charterers herein is subject to Charterers' guarantee
that the above-mentioned commodities will not be carried in
consecutive shipments/voyages. Owners have right to withdraw the
liberty granted to Charterers herein in case of any breach of
above by Charterers.
Charterers have the option to use holdblock instead of normal
limewash or whitewash.

Owners allow to load bulk harmless (fertilizer grade) ammonium
nitrate / excl Holds no. 5) which owners P+I/ Class issue
'APPENDIX B' Certificate however issuing of certificate and its
related costs even borne under owners instruction to be paid in
full by Charterers.

EXHIBIT 3

JUDGE HELLERSTEIN UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK  
------------------------------------X
AMERICAS BULK TRANSPORT LTD.,

                                                    08 Civ. _____
                    Plaintiff,

              -against-                                   VERIFIED
                                                         COMPLAINT
IMT a/k/a IMT DUSSELDORF a/k/a
IMT SHIPPING & CHARTERING GmbH
a/k/a INTER-MARITIME TRANSPORTATION
GmbH a/k/a INTER-MARITIME
TRANSPORTATION, LTD.,

                    Defendant.
------------------------------------X

        Plaintiff, AMERICAS BULK TRANSPORT LTD. ("Plaintiff" or

"ABT"), by its attorneys, MAHONEY & KEANE, LLP, as and for a

Verified  Complaint  against  Defendant,  IMT  a/k/a  IMT

DUSSELDORFF a/k/a IMT SHIPPING & CHARTERING GmbH a/k/a INTER-

MARITIME  TRANSPORTATION  GmbH  a/k/a  INTER-MARITIME

TRANSPORTATION, LTD.  ("Defendant" or "IMT"), alleges, upon

information and belief, as follows:

        1.    This is a case of admiralty and maritime jurisdiction

within the meaning of Rule 9(h) of the Federal Rules of Civil

Procedure.  Jurisdiction is based upon 28 U.S.C. § 1331 and 28

U.S.C. § 1333, as well as the Court's pendent, supplementary

and ancillary jurisdiction.

        2.    Plaintiff is a legal entity duly organized and

existing pursuant to the laws of a foreign country with a

business address in Monrovia, Liberia.

                            - 1 -

3. Defendant, IMT, is a business entity organized and existing pursuant to the laws of a foreign country with an address at Furstenwall 146, D-40217 Dusseldorf, Germany.

4. Plaintiff, as disponent owner, and Defendant, as charterer, entered into a charter party, by fixture recap dated April 3, 2008, for one time charter trip of the M/V ENGIN KAPTANOGLU.

5. The rate of hire was based and contingent upon Defendant's representations the trip would be between two load ports in China and two discharge ports in Brazil, with the trip's overall duration thus expected to be approximately 70-80 days.

6. The vessel was delivered into the service of Defendant, accordingly.

7. The employment ordered by the Defendant exceeded what constitutes a "trip." Further, the Defendant had materially misrepresented its intentions for the vessel, and Defendant breached its contractual undertakings to Plaintiff, by exceeding what constitutes a "trip," by arranging for a load port rotation incorporating greater distances and ports than originally called for, and by employing the vessel in trading between more ports of loading and discharging, in both China and Brazil, in and out of geographical rotation.

8. As a consequence, Defendant is presently utilizing the vessel for a period of time far in excess of that which was contemplated by the charter party, all of which gives rise to a claim under English law for damages at prevailing charter hire

- 2 -

rates.

9.    Defendant    breached    the    parties'    contract    and wrongfully failed to pay to Plaintiff its damages, calculated by the difference between market and charter rates of hire from the time vessel should have been redelivered up to actual redelivery.

10.    As a result of the foregoing, Plaintiff has incurred and will continue to incur damages, costs and expenses for which Defendant is liable under the terms of the agreement between the parties and otherwise at law.

11.    Defendant has also been unjustly enriched by its conduct as aforesaid, and plaintiff is entitled to the quantum meruit value of the vessel's service to defendant.

12.    Plaintiff has placed Defendant on notice of its claim that Defendant has breached the referenced agreement.

13.    Despite Plaintiff's demands, Defendant has failed to pay the amounts due and owing to Plaintiff under the agreement.

14.    Pursuant to the agreement, disputes are to be settled by arbitration in London, and Plaintiff will shortly commence arbitration with Defendant, accordingly.

15.    Under the rules of such arbitration, interest, costs, and attorneys' fees are routinely awarded to the prevailing party.

16.    As a result of Defendant's breach of the agreement, Plaintiff has sustained damages, and, as best as can now be estimated, Plaintiff expects to recover the following amounts by way of arbitral award:

| | |
|---|---|
| Principal Claim | $2,364,135.88 |
| Interest (for a period of 3 yrs at 8.0%) | $613,994.46 |
| Attorneys' and Expert's Fees, Arbitration Expenses | $160,000.00 |
| Total | $3,138,130.34 |

17.   Plaintiff sues on its own behalf and as agent and trustee on behalf of any other party who may now have or hereinafter acquire an interest in this action.

18.   All conditions precedent required of Plaintiff in the aforesaid agreement have been performed.

19.   Defendant cannot be found, within the meaning of Rule B of the Federal Rules of Civil Procedure Supplemental Rules for Certain Admiralty and Maritime Claims, within this District, but, upon information and belief, Defendant has or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court held in the hands of garnishees including, but not limited to, Bank of America, Bank of New York, Citibank, HSBC Bank USA NA, J.P. Morgan Chase, Standard Chartered Bank, Wachovia Bank N.A., Deutsche Bank AG, ABN AMRO Bank N.V., American Express Bank Ltd., Mellon Bank and/or UBS, which are believed to be due and owing to Plaintiff.

20.   For the purpose of obtaining personal jurisdiction over Defendant and securing Plaintiff's claim as described above, Plaintiff seeks and order from this Court directing the

- 4 -

Clerk of the Court to issue process of maritime attachment and garnishment pursuant to Rule B of the Federal Rules of Civil Procedure Supplemental Rules for Certain Admiralty and Maritime Claims and the Federal Arbitration Act, 9 U.S.C. § 1 et seq., restraining and attaching any assets, cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit freights, sub-freights, charter hire, sub-charter hire, and/or other assets belonging to, due or for the benefit of Defendant, including but not limited to such assets as may be held, received or transferred in its own name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking institutions including but not limited to the aforesaid garnishees and/or any other garnishee upon whom a copy of the Process of Maritime Attachment and Garnishment may be served.

WHEREFORE, Plaintiff prays:

A.    That process in due form of law issue against Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint;

B.    That, since Defendant cannot be found in this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, the Court direct the Clerk of the Court to issue an order, pursuant to Rule B of the Federal Rules of Civil Procedure Supplemental Rules for Certain Admiralty and Maritime Claims and the Federal Arbitration Act, 9 U.S.C. § 1 et seq., restraining and attaching all tangible or intangible property in whatever form or any other funds held by

- 5 -

any garnishee, including but not limited to the Bank of America, Bank of New York, Citibank, HSBC Bank USA NA, J.P. Morgan Chase, Standard Chartered Bank, Wachovia Bank N.A., Deutsche Bank AG, ABN AMRO Bank N.V., American Express Bank Ltd., Mellon Bank, UBS and/or any other garnishee upon whom a copy of the Process of Maritime Attachment and Garnishment may be served, in the amount of $3,138,130.34 to secure Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and answer the matters alleged in the Complaint;

      C.   That the Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof.

      D.   That Plaintiff has such other and further relief as this Honorable Court may deem just and proper.

Dated:    New York, New York
          August 5, 2008

                  Respectfully submitted,

                  MAHONEY & KEANE, LLP
                  Attorneys for Plaintiff

By:

                  Garth S. Wolfson (GW 7700)
                  11 Hanover Square, Tenth Floor
                  New York, New York 10005
                  (212) 385-1422
                  File No. 12/3629/B/08/7

<u>ATTORNEY VERIFICATION</u>

STATE OF NEW YORK   :
                  : SS.:
COUNTY OF NEW YORK  :

1.   My name is GARTH S. WOLFSON.

2.   I am over 18 years of age, of sound mind, capable of making this Verification and fully competent to testify to all matters stated herein.

3.   I am the attorney for Plaintiff, AMERICAS BULK TRANSPORT LTD., and I am fully authorized to make this Verification on their behalf.

4.   I have read the foregoing Complaint and the contents thereof are true and accurate to the best of my knowledge, information and belief.

5.   The reason that this Verification was made by me and not the Plaintiff is that the Plaintiff is a corporation none of whose officers are present in this District.

6.   The source of my knowledge is information and records furnished to me by the Plaintiff and its counsel, all of which I believe to be true and accurate.

Dated:   New York, New York
       August 5, 2008

_____
GARTH S. WOLFSON (GW 7700)

EXHIBIT 4

# LLOYD'S LIST
# LAW REPORTS

### Edited by H. P. HENLEY

Of the Middle Temple, Barrister-at-Law

Vol. 79.  No. 1]    TUESDAY, DECEMBER 4, 1945.    [By Subscription

## HOUSE OF LORDS.

July 9, 10, 11, 12, 1945.

### TEMPLE STEAMSHIP COMPANY, LTD. v. V;O SOVFRACHT.

Before Viscount SIMON (Lord Chancellor), Lord RUSSELL OF KILLOWEN, Lord MACMILLAN, Lord PORTER and Lord SIMONDS.

*Charter-party — Mixed time and voyage charter—Alterations to printed form of time charter—Effect—" One round voyage to "—Customary meaning—Repugnancy— Charter of ship to be delivered at a Bristol Channel bunkering port " for a period of one round voyage to the Kara Sea. . . . To be employed in lawful trades . . . between good and safe ports or places within the following limits: United Kingdom, Continent, South Africa, Baltic, White Sea, Murmansk; Mediterranean not east of Greece (excluding Spain and Spanish possessions) and Igarka, Yenissei River, Kara Sea, with liberty to call at ports or places en route and including Spitzbergen (Borentsburg and Grumant City) and Dikson. . . . To be redelivered . . . at an ice-free port in charterers' option in South Africa Cape Town/Lourenco Marques range "—Ship sent in ballast to Igarka—Timber cargo loaded, ship sailing for Durban on Sept. 1, 1939 — Ordered by U.S.S.R. authorities while still in Russian waters to put into Murmansk and discharge her cargo—Arrival at Murmansk on Sept. 9 —Discharge completed by Sept. 29—Ship unable to obtain immediate clearance from Russian authorities—Evidence of negotiations between British and Russian government authorities as to release of ships in Russian waters—Loading of pit-props commenced on Nov. 8 and completed on Nov. 17, ship then sailing for Durban— Arrival at Garston, on Dec. 15, ship being requisitioned by British Government after discharge—Claim by shipowners against charterers—Alleged breach in failing to order ship to proceed to South Africa*

*immediately after discharging at Murmansk and in sending the ship to Garston with a cargo of pitprops—Arbitration— Award that charterers were liable in damages — Measure of damages — Case stated.*

———*Held, by H.L., that the effect of the insertion of the words " one round voyage to the Kara Sea" was to make that voyage the paramount feature of the whole contract (the payment of hire being determined by the length of time occupied by that voyage); that the technical meaning found by the umpire for the words " one round voyage to " was not inconsistent with the remainder of the charter-party and controlled the trading limits provisions of the charter-party; that the trading clause was a limiting and not an enabling clause (it prescribed limits outside which the ship might not go; it did not give liberty to neglect the prescribed adventure provided trading was confined within the limits mentioned); that the charterers were in breach in sending the ship with cargo to Garston instead of direct to South Africa; that there was no waiver by the shipowners of such breach; and that the award of damages (£8060) made by the umpire, and based on a period of non-requisition, would be upheld— Decision of O.A., reversing ATKINSON, J., affirmed.*

———*" One round voyage to " — Meaning.*

*Per* Viscount SIMON, L.C.: *In order to avoid the possibility of future misuse of the material contained in this case, it is well to add that the evidence offered before the learned arbitrator (which was uncontradicted) and the conclusion reached by him as to the meaning of the phrase, " One round voyage to " a specified place in a time charter-party, ought not to be treated as an established definition in other cases; it is merely the interpretation which the arbitrator, on the material before him, felt it necessary to adopt in the present instance. If unassisted by evidence or findings on the subject, I confess that I should have thought that a somewhat different meaning might well have been attributed to the phrase.*

2—Vol. 79.]    LLOYD'S LIST LAW REPORTS.    [Dec. 4, 1945.

H.L.]    Temple Steamship Company, Ltd. v. V/O Sovfracht.    [H.L.

This was an appeal by V/O Sovfracht, charterers of the steamship *Temple Moat*, from a decision of the Court of Appeal (77 Ll.L.Rep. 267) allowing an appeal by the Temple Steamship Company, the owners of the vessel, from a judgment of Mr. Justice Atkinson (76 Ll.L.Rep. 192) in favour of the charterers, on an award in the form of a special case stated by Mr. C. T. Le Quesne, K.C., the umpire in an arbitration between the steamship company, the owners of the steamship *Temple Moat*, and the charterers of the vessel, V/O Sovfracht, of Moscow.

The shipowners had claimed damages for breaches of a charter-party dated July 6, 1939, for a period of one round voyage to the Kara Sea. The vessel was to be redelivered at a South African port, but in fact she ultimately carried a cargo of timber to Garston, in the United Kingdom, and was then requisitioned. The shipowners contended that there was a breach of the charter-party, and that if the vessel had been redelivered in South Africa her chance of a free life would have been enlarged and they would have made higher profit. The umpire made an award in favour of the shipowners, but Mr. Justice Atkinson set aside his award and upheld his alternative award in favour of the charterers.

The Court of Appeal, however, reversed his decision and upheld the umpire's award in the shipowners' favour.

The *Temple Moat* was chartered under a charter-party which provided (*inter alia*) as follows :—

1. Owners agree to let, and charterers agree to hire steamer for a period of one round voyage to the Kara Sea from the time . . . the steamer is delivered . . . at a Bristol Channel bunkering port . . . Steamer to be employed in lawful trades for the conveyance of lawful . . . merchandise . . . between good and safe ports or places within the following limits: United Kingdom, Continent, South Africa, Baltic, White Sea, Murmansk, Mediterranean not east of Greece (excluding Spain and Spanish possessions) and Igarka, Yenissei River, Kara Sea, with liberty to call at ports or places en route and including Spitzbergen (Barentsburg and Grumant City) and Dikson, where she can lie safely always afloat or safe aground where steamers of similar size and draft are accustomed to lie aground in safety.

5. Charterers to pay owners hire of 3s. 9d. per ton deadweight per calendar month in British currency from time of vessel's delivery until her re-delivery. . . . The charterers to pay owners a lump sum of £120 as compensation for the Kara Sea trading.

6. Steamer to be re-delivered on expiration of this charter in same good order as when delivered to charterers . . . at an ice-free port in charterers' option in South Africa Cape Town/Lourenco Marques range . . . Charterers to give owners not less than five days' notice at which port and on about which day steamer will be re-delivered.

19. Charterers to have the option of sub-letting steamer giving due notice to owners, but original charterers always to remain responsible to owners for due performance of this charter.

34. Owners to pay usual insurance premium only and charterers are to pay additional premium due to the vessel proceeding to a place outside the limits of the trading warranties. This is to be accomplished by charterers effecting insurance with approved underwriters for the voyage covered by this charter-party and owners suspending their existing insurance accordingly.

According to facts found by the umpire, the vessel was delivered at an English port on July 27, 1939, and sailed in ballast to Igarka, reaching there on Aug. 16. She there loaded a cargo of timber for Durban, and on Sept. 1 she left Igarka for Durban. Under an order given by a Russian Government Department on Sept. 3, the *Temple Moat* put into Murmansk on Sept. 9, where her cargo was discharged. Under Soviet law the Russian Government Department was empowered to give such orders, and it would have been illegal for the charterers not to comply with them. On Sept. 27 the master received a telegram from the British Ambassador in Moscow, at the request of the British Admiralty, instructing him to proceed to the United Kingdom.

The discharge at Murmansk was completed on or about Sept. 29.

After the cargo had been discharged in Murmansk, the vessel lay at anchor there until she began to load a cargo of pitprops on Nov. 8. During this time no orders were given by the charterers to the vessel. The umpire said that on the evidence before him he found it impossible to say why this long delay occurred. The shipowners contended that it constituted a breach of the charter-party. The parties negotiated during the discharge about re-delivery of the vessel at Murmansk after discharge, but these negotiations broke down before discharge was completed.

Representatives of the owners of the British vessels, including the *Temple Moat*, which were under charter to the charterers (or perhaps in some instances to some other Russian organisation) and which were then lying in Northern Russian waters, had met on Oct. 9 and considered the delay to their vessels in those waters. The charter-parties of most (if not all) of the vessels other than the *Temple Moat* provided for a return voyage from Russia to the United Kingdom, but it was made clear by the owners' representatives that the *Temple Moat* was chartered to proceed from the Kara Sea to

Dec. 4, 1945.]    LLOYD'S LIST LAW REPORTS.    [Vol. 79.—3

H.L.]    Temple Steamship Company, Ltd. v. V/O Sovfracht.    [H.L.

South Africa. The owners' representatives appointed a small committee, who met representatives of the British Government on the next day, Oct. 10. The object of these meetings was to consider how the departure of the vessels from Russian waters could best be arranged. Negotiations were carried on between the British and Soviet authorities in respect of the above British vessels and of some neutral vessels which also were under charter to the charterers and lying then in Russian waters, and these negotiations related for some time to a proposal that the charter-parties of the British vessels should be terminated by arrangement between the charterers and the owners of the vessels and that the vessels should then be chartered by their owners to the British Government to carry cargoes of timber to the United Kingdom. No agreement was reached on this basis, but an agreement to a different effect was made on Oct. 24 between the Ministry of Supply on the one hand and the Economic Department of the Trade Delegation of the Soviet Government in the United Kingdom on the other, viz., an agreement that certain of the above vessels, including the *Temple Moat*, should be sub-chartered to the Ministry of Supply on voyage charters to ports in the United Kingdom. In accordance with that agreement, the *Temple Moat* was sub-chartered to the Ministry of Supply and the vessel loaded a cargo of pitprops at Murmansk between Nov. 8 and Nov. 17 and carried it to Garston. There was no agreement between the parties to the effect that the vessel was to remain waiting for orders at Murmansk until the negotiations between the British and the Soviet Governments had been concluded.

As regards the attitude of the British Government on the question of the vessel proceeding to South Africa, the umpire said that it was not established by the evidence before him that the British Government prohibited her from proceeding or would not have allowed her to proceed to a South African port in ballast after the discharge of the cargo at Murmansk. He also found that it was not established by the evidence that the charterers after the discharge were or would have been prohibited by the Soviet Government from sending the vessel in ballast to South Africa. The voyage from Murmansk to a port in South Africa within the range of ports specified in the charter-party would have occupied about eight to ten weeks. The umpire further found that, if the vessel after the discharge at Murmansk had proceeded to South Africa, it was not likely that she would have been requisitioned there, but, if after such discharge she had proceeded to the United Kingdom, it was highly probable that she would have been requisitioned there.

The vessel arrived in Garston on Dec. 14. On Dec. 15, by a letter addressed to the owners, the Ministry of Shipping requisitioned the vessel " after the completion of the present voyage." The discharge was completed on

Jan. 9, 1940, and on that day the owners, for the purposes of the requisition, transferred the vessel to dry dock in Birkenhead. The charterers contended that the result of the requisition was that the charter-party was dissolved by frustration. No such frustration was alleged by either party to have resulted from any other of the matters arising in the case.

The umpire found that the sub-charter between the charterers and the Ministry of Supply was not entered into with the owners' authority or consent; further, that the owners did not afterwards consent to it or waive their right to contend that it amounted to a breach of charter-party or that they were entitled on that or on other grounds to claim damages for breach. The umpire said that the parties were at issue as to their respective rights and obligations under the charter-party. Furthermore, evidence was called by the owners for the purpose of establishing a customary meaning of the phrase " one round voyage to " a specified place in a time charter-party. He found such meaning established to the following effect, viz., that the vessel should proceed in ballast or with a cargo to a specified area or place; that having arrived there, and, if she had brought cargo for discharge there, after discharging it, she should there load another cargo to be discharged in the area specified as the area of re-delivery or at the port specified as the port of re-delivery, and that the charterer was not entitled to load another cargo after the discharge of the cargo loaded at the first-mentioned specified area or place. To the above extent the umpire found that the phrase had a customary meaning.

No notice of the sub-charter was given to the owners in accordance with Clause 19 of the charter-party, and they were not consulted or informed about the sub-charter either by the charterers or by the Ministry of Supply before it was made. They received their first information of it on Oct. 27.

The owners contended that, if the vessel had been despatched in ballast by the charterers to South Africa after the discharge of the cargo at Murmansk, she would have found employment in the carriage first of cargo from South Africa to India or Ceylon and then of cargo from India to the United Kingdom; that this employment would have lasted for a period of time extending beyond the date when discharge was completed at Garston and requisition took effect; and that it would have been more profitable than the employment which was in fact made of the vessel during that period.

The charterers submitted that if damages were payable by them for breach of charter-party, they should pay them on the basis of the difference in hire between the rate under the charter-party (2s. 6d.) and the rate if the charter-party had provided for redelivery in the United Kingdom (4s. 4½d.), and on

4—Vol. 79.]                    LLOYD'S LIST LAW REPORTS.                    [Dec. 4, 1945.

H.L.]                      Temple Steamship Company, Ltd. v. V/O Sovfracht.                      [H.L.

that basis the umpire said that he assessed them at £1348 13s.

The charterers admitted that they were liable to pay to the owners as hire the sum of £969 17s. 1d., and the Moscow Narodny Bank on behalf of the charterers sent a cheque for this sum to the owners' solicitors, but they returned the cheque.

Subject to the opinion of the Court upon the questions hereinafter stated, the umpire found that the charterers committed breaches of charter-party (1) by not giving orders to the vessel to proceed to South Africa after the discharge of the cargo at Murmansk, and (2) by sending the vessel with the cargo of pitprops from Murmansk to Garston; and he awarded that the charterers should pay to the owners the sum of £8000 as damages and their taxed costs of the reference and the costs of the award.

The questions for the opinion of the Court were:

(1) Whether upon the true construction of the charter-party dated July 6, 1939, and upon the facts as found the charterers had committed any breach of the charter-party.

(2) Whether, if the charterers had committed any such breach, the owners were entitled to be paid any sum as damages for such breach.

(3) Whether if the charterers had committed any such breach and if the owners were entitled to be paid some sum as damages, such damages were restricted to the sum of £1348 13s.

The umpire said that if the Court answered the first or the second question in the negative, then he awarded that the charterers should pay to the owners the sum of £969 17s. 1d. and the owners' taxed costs of the reference and the costs of the award.

The umpire further directed that if the Court should answer both the first and the second questions in the affirmative and as regards the third question (a) should pronounce for the sum of £8000, then his award should stand, but (b) if the Court should instead pronounce for the sum of £1348 13s., then the sum of £2318 10s. 1d. (being the total of the two above sums of £969 17s. 1d. and £1348 13s.) should be substituted for the sum of £8000, but otherwise his award should stand.

Mr. D. N. Pritt, K.C., and Mr. Patrick Devlin, K.C. (instructed by Messrs. Lawrence Jones & Co.), appeared for V/O Sovfracht, the appellant charterers; Sir Robert Aske, K.C., and Mr. A. J. Hodgson (instructed by Messrs. Hill, Dickinson & Co.) represented the Temple Steamship Company, Ltd., the respondent shipowners.

Mr. PRITT, for V/O Sovfracht, said that it was mentioned in the case stated by the umpire that representatives of the owners of British vessels, including the Temple Moat, were under charter to V/O Sovfracht or some

other Russian organisation and which were then lying in Northern Russian waters, met in October, 1939, and considered the delay to their vessels. There was a proposal that the charter-parties of the British vessels should be terminated and that the vessels should then be chartered by their owners to the British Government to carry cargoes of timber to the United Kingdom. No agreement was reached on that basis, but an agreement was made on Oct. 24 between the Ministry of Supply and the Trade Delegation of the Soviet Government in the United Kingdom that certain vessels, including the Temple Moat, should be sub-chartered by V/O Sovfracht to the Ministry of Supply, and it was in accordance with that agreement that the Temple Moat carried pitprops to Garston. There was no agreement between the parties to this appeal that the Temple Moat was to remain waiting for orders at Murmansk until negotiations between the British and Soviet Governments had been concluded, and the umpire found that the sub-charter was not entered into with the authority or consent of the owners of the Temple Moat. The umpire also found that the meaning of the phrase "one round voyage" to a specified place in a time charter-party was in this case that the Temple Moat, having arrived at the Kara Sea, should there load another cargo to be discharged in the area specified as the area of re-delivery.

Counsel said that the matter began with the sailing of the Temple Moat to Igarka and there loading and resailing. Nobody would suggest any breach up to that point. Then the vessel was ordered to go to Murmansk and went there, and it was found that that was not a breach. It was found also that discharge of the cargo at Murmansk was not a breach. Then there was the delay at Murmansk and there was no finding that that delay was due to any fault of his clients as charterers. There was, however, a breach found by the umpire because the charterers did not order the vessel to proceed to South Africa. The charterers did not admit that there was any breach in respect of the delay at Murmansk, nor was there any breach because of the sub-charter. It was in terms provided that the charterers had the option of sub-letting the vessel, giving notice to her owners. There was no pleading and no finding that sub-chartering or failure to give notice was a breach. In any case, the owners did get notice from the British Government. No protest was made by the owners.

Counsel submitted that the carrying of cargo to Garston could be justified under the charter-party. The agreement was to hire the Temple Moat for a period of one round voyage to the Kara Sea with liberty to call at ports and places en route within limits which included the United Kingdom. If the voyage were from the Kara Sea on to South Africa it was a reasonable way of performing that contract to carry cargo to the United

Kingdom. There was liberty under the contract to employ the ship in lawful trades between good and safe ports within limits which included the United Kingdom. A vessel going from the North Cape past the United Kingdom to South Cape might fairly call at the River Mersey.

Lord PORTER said that " calling " did not necessarily mean that there was a right to load or discharge cargo.

COUNSEL said that the charter-party permitted the ship to be employed in lawful trades at places within certain limits, and therefore the charterers were entitled to carry cargo to Garston. Assuming that putting this cargo on board the ship at Garston was a breach, then the shipowners would have been entitled to say that they would have nothing more to do with the contract and that they would sue for damages. But they made no sort of protest, and they collected the charter money right up to the very day on which the ship was taken over by the Ministry of Shipping. A period of one round voyage must refer to a certain lapse of time, which would presumably be the normal or average time for that voyage, and there was more than one opportunity to load and discharge cargo within the prescribed limits, provided they kept within that normal period. Even if there had been no requisitioning of the ship at Garston, Counsel assumed from the judgment of the Court of Appeal that that Court would still have found that the deviation to Garston was a breach of the contract. It might be that the arrival of the ship in South Africa was delayed for, say, a fortnight. Damages would then have to be assessed on the market value of the ship at that time, and in reference to any loss of profit thereby suffered by the owners.

It was necessary to see what was meant by the contract between the parties. The charter-party gave liberty to trade within limits which included the United Kingdom and the Continent. COUNSEL admitted that that could not be deemed to include liberty to go to any port along the whole European coast-line. It had to be borne in mind that the charterers must at all times be able to say that the vessel was going to South Africa, and he submitted that they were in that position. Garston was substantially en route to South Africa. Although the charter-party specified one round voyage to the Kara Sea, no objection had been taken to the vessel going to Igarka. It was true that Igarka could only be reached through the Kara Sea, but it was 350 miles up river. If that could be included in the Kara Sea, then Garston did not involve an undue deviation.

It was found by the umpire that the phrase " one round voyage to " a specified place (not " the period of one round voyage ") had a customary meaning that the vessel should proceed in ballast or with cargo to a specified area or place, and that having arrived there

she should then load cargo to be discharged in the specified area of re-delivery. COUNSEL's submission, however, was that the charter-party in this case was in essence a time charter-party for " a period of one round voyage to the Kara Sea," although the parties doubtless contemplated that the probable use of the vessel would be for a voyage to the Kara Sea and thence to the area of re-delivery and therefore found it convenient to define the period of the charter-party as the period which would normally be occupied by such a voyage. On this construction the customary meaning of " one round voyage " was relevant only to the ascertainment of the period of the voyage and could not import any obligations into the charter.

Lord SIMONDS said that if the umpire's finding as to the customary meaning of " one round voyage " was rejected he did not know what it did mean.

COUNSEL said that his conception was a time charter for " the period of one round voyage " with trading rights within certain limits. In this case that meant that the vessel was to be taken from a Bristol Channel port to the Kara Sea or to any place within the trading limits of the Kara Sea such as Igarka, calling at any port or ports en route for the purpose of trade or other purpose connected with the voyage, provided such ports were both within the trading limits mentioned in the charter-party and reasonably on the general course from the Bristol Channel to the Kara Sea. The ship was then to sail to South Africa, calling at ports in the same way as on the voyage from the Bristol Channel.

Sir ROBERT ASKE, for the Temple Steamship Company, said that the contract between the parties was that the ship was to be re-delivered in South Africa. She was not so re-delivered. Prima facie, therefore, the charter was broken and the shipowners were entitled to damages. The only way in which the charterers sought to avoid that responsibility was by saying that the ship was requisitioned at Garston and that thereby the contract was frustrated and it was made impossible to re-deliver the ship in South Africa. On the submission of the shipowners the position was that at all material times after discharging cargo at Murmansk the charterers were in breach. From the moment that cargo was taken from Igarka to Murmansk no orders were given by the charterers for a period of seven weeks, less two days.

Viscount SIMON, L.C., asked whether the discharge of cargo at Murmansk was a breach of contract.

Sir ROBERT ASKE said that it was not, because that discharge of cargo was ordered by the Soviet Government, and the charterers were not responsible for that. After that, however, the charterers were in breach because no orders were given to the ship as ordered to South Africa from Sept. 20, when discharge was completed, until Nov. 8, when loading

6—Vol. 79.]     LLOYD'S LIST LAW REPORTS.     [Dec. 4, 1945.

H.L.]     Temple Steamship Company, Ltd. v. V/O Sovfracht.     [H.L.

began. The learned umpire found—quite rightly in his submission—that that was a breach. The obligation of the charterers on any view of the charter was to give orders when discharge was complete for the vessel to proceed on her voyage. It was held in the Scottish Navigation Company, Ltd. v. Souter, [1917] 1 K.B. 222, at p. 245, that charterers had no right to lay up a ship. In his submission a ship was laid up when she was kept idle in port.

Viscount SIMON, L.C., asked whether, if it were not possible to get the proper cargo for the proper destination at the moment the first cargo was discharged at Murmansk, the charterers should have ordered the ship to sail to South Africa in ballast.

Sir ROBERT ASKE: Yes, that was the contract. The ordering of the ship to Murmansk and the discharge of the vessel's cargo there were misfortunes of the charterers, not their fault, but even so the obligation to go to South Africa remained. There was a further breach, in the shipowners' submission, in the vessel going to Garston at all, and another breach in taking a cargo to Garston. The vessel went to Garston on a voyage which was entirely outside the charter-party. No explanation or excuse was advanced for not giving orders for the ship to proceed to South Africa, and the learned umpire said that on the evidence before him he found it impossible to say why the long delay occurred.

The shipowners during the period of the charter-party had no responsibility for the movements of the ship. It was true that the master remained the servant of the shipowners, but control of the master and, through the master, control of the ship was in the hands of the charterers, so that the owners had nothing whatever to do with the prosecution of the voyage. There was failure without excuse or explanation to give any orders to the ship for a period of nearly seven weeks. If there had not been that delay the vessel would have been three-quarters of the way to South Africa by the time she began to load the cargo for Garston.

When the requisitioning of the ship took place the ship was where she would not have been if the charterers had carried out their contract. The ship was on an entirely new adventure and for that reason frustration could not be relied upon by the charterers. In fact, performance of the contract was not frustrated by the requisitioning. Performance of the contract was prevented by the wrongful act of the charterers in that they broke their contract by not ordering the ship to proceed to South Africa. A party who had caused the impossibility of performance of a contract could not take advantage of the doctrine of frustration.

Dealing with the expression "for a period of one round voyage to the Kara Sea," COUSENS said that it had been suggested that this charter-party might be construed as merely a measure of time, that it was merely fixing a period which a vessel might reasonably be expected to take to perform a voyage from the Bristol Channel to the Kara Sea and ultimately to South Africa. In his submission, that was an impossible construction when this charter-party was considered in all its terms. Commercial men endeavouring to arrange for the chartering of a vessel for a certain period would not fix it by the time likely to be taken by a hypothetical voyage when they could say at once that the vessel was likely to be wanted for four or five months. The charter-party should be read to mean that it was for the period which would be in fact occupied on the specified voyage. The clause relating to trading limits did not confer any liberty to touch at any port outside the ordinary course of the stipulated voyage or to touch at any port for any purpose other than one bona fide connected with the main object of the adventure, which was the voyage to the specified port. The Temple Maat had no right to call at Garston. Even if she had that right she had no right to carry cargo there, because it was a purpose wholly unconnected with a round voyage to the Kara Sea and South Africa.

Mr. PARTT, in reply, said that although the learned umpire said it was impossible to find on the evidence any reason for the delay at Murmansk, he did not find that that delay constituted a breach of the charter-party. It was suggested by Sir Robert Aske that it was the duty of the charterers as soon as the ship was empty at Murmansk to send her to South Africa in ballast if no cargo was available. His reply to that was that in the circumstances at the time, with the war four weeks old and the ship having unexpectedly to discharge her cargo at Murmansk, a situation which affected other British vessels, it would be reasonable to allow some time to look for another cargo. The owners knew that it was proposed to send the vessel to Garston. They could have told the charterers that that was entirely outside the charter-party, that it was dangerous from their point of view because the vessel might be requisitioned there, and they could have told the charterers that they insisted on the ship not being sent there. They could have communicated with the British Ambassador and asked him to insist that the vessel should be handed over to them. They did nothing of the sort. His submission was that the charterers had a right under the charter-party to send the vessel to a British port. It was provided that the ship might be employed in lawful trades within limits which included the United Kingdom. If they had a right to send the ship to a British port than there was a right to send her to Garston. The owners, without protest, allowed the master to take the ship to Garston, and they collected the money for hire of the vessel right up to the day on which she was requisitioned. The

Dec. 4, 1945.]  LLOYD'S LIST LAW REPORTS.  [Vol. 79.—7

H.L.]  Temple Steamship Company, Ltd, v. V/O Sovfracht.  [H.L.

owners therefore treated the charter-party as still in existence up to that time.

Damages of £12,000 were claimed by the owners on the footing that if the ship had been re-delivered in South Africa they could have found employment for her in the carriage of cargo to India or Ceylon and of cargo from India to this country. It was clearly on that basis of loss of market that the umpire awarded £8000. Damages of that nature could only be claimed if they were within the contemplation of the parties at the time when the contract was made. That was not the position here. All that the charterers could be said to have known was that if the charter-party had been for re-delivery in the United Kingdom the rate of hire would have been 4s. 4½d. per ton, as compared with 3s. 9d. for re-delivery in South Africa. If any damages were recoverable at all for loss of market they must be limited to the difference in those rates of hire, and that difference was only £1348.

Their LORDSHIPS reserved judgment.

———

Friday, October 26, 1945.

———

**JUDGMENT.**

Viscount SIMON, L.C.: My Lords, the difficulties in this case arise entirely from the fact that the parties took the well-known "Baltime" form of time charter-party and so altered it by insertions, omissions and alterations as to make it neither fish, flesh, fowl nor good red herring. We have to decide the questions in dispute upon this mutilated and re-written document as best we can, and our conclusions cannot possibly form a precedent for any other case.

The difficulties of interpretation of the combination of words found in the charter-party are so great that in the Court of Appeal Lord Justice Scott and his colleagues were reduced to deciding that some four or five lines specially inserted in the first clause must be omitted as quite meaningless. So drastic a treatment is not, however, necessary to reach the conclusion that the appeal should be dismissed, and I am greatly indebted to my noble and learned friend Lord Porter for his exposition, which I trust that the House will accept unanimously.

In order to avoid the possibility of future misuse of the material contained in the special case, it is well to add that the evidence offered before the learned arbitrator (which was uncontradicted) and the conclusion reached by him as to the meaning of the phrase, "One round voyage to " a specified place in a time charter-party, ought not to be treated as an established definition in other cases: it is merely the interpretation which the arbitrator, on the material before him, felt it necessary

to adopt in the present instance. If unassisted by evidence or findings on the subject, I confess that I should have thought that a somewhat different meaning might well have been attributed to the phrase.

I am authorised by my noble and learned friend Lord RUSSELL OF KILLOWEN, who is unable to be present, to say that he concurs in the motion that the appeal be dismissed.

Lord MACMILLAN: My Lords, I also concur.

Lord PORTER: My Lords, this is an appeal from a judgment of the Court of Appeal (Scott, Goddard and du Parcq, L.JJ.), dated Mar. 10, 1944, reversing a judgment of Atkinson, J., given on July 26, 1943, on the argument of a special case stated by the umpire in the arbitration. Atkinson, J., sitting in the Commercial Court, held that the appellants, who were respondents in the arbitration, had committed no breach of the charter-party, but the Court of Appeal upheld the award of the umpire which awarded to the claimants, the now respondents, £8000 damages for breach of charter-party.

The charter-party out of which the disputes arose was made on July 6, 1939, between the respondents as owners of the steamer Temple Meat and the appellants as charterers. It was made on the printed form of " Uniform Time Charter " of the Baltic and White Sea Conference which is commonly known as the " Baltime, 1920." The material parts of Clause 1 of the charter (the words typewritten in the charter-party being printed in italics below) are as follows:

1. Owners agree to let, and charterers agree to hire steamer for a period of one round voyage to the Kara Sea from the time . . . the steamer is delivered and placed at the disposal of the charterers . . . at a Bristol Channel bunkering port. . . .

Steamer to be employed in lawful trades . . . between good and safe ports or places within the following limits: United Kingdom, Continent, South Africa, Baltic, White Sea, Murmansk, Mediterranean not East of Greece (excluding Spain and Spanish possessions) and Igarka, Yenissei River, Kara Sea, with liberty to call at ports and places en route and including Spitzbergen (Barentsburg and Grumant City) and Dikson. . . .

By Clause 5 hire was to be payable at the rate of 3s. 9d. per ton deadweight per calendar month from time of vessel's delivery until her re-delivery, and an additional sum of £120 was to be paid as compensation for the Kara Sea trading.

By Clause 6 the steamer was to be re-delivered on expiration of the charter at a port in South Africa, Cape Town/Lourenco Marques range.

8—Vol. 79.]                LLOYD'S LIST LAW REPORTS.                [Dec. 4, 1945.

H.L.]                Temple Steamship Company, Ltd. v. V/O Sovfracht.                [H.L.

It was alleged by the respondents (claimants in the arbitration) at the arbitration and found by the umpire that the phrase " One round voyage to " a specified place in a time charter-party had a customary meaning as follows:

That the vessel should proceed in ballast or with a cargo to a specified area or place; that having arrived there, and, if she has brought cargo for discharge there, after discharging it, she should there load another cargo to be discharged in the area specified as the area of re-delivery or at the port specified as the port of re-delivery, and that the charterer is not entitled to load another cargo after the discharge of the cargo loaded at the first-mentioned specified area or place.

This finding of the learned umpire has, of course, no binding force in any other matter or arbitration, but in this case your Lordships are constrained to give effect to it unless it cannot be read into this charter-party without being inconsistent with its terms. The question of its alleged inconsistency is a matter with which I deal at a later stage.

On July 27, 1939, the vessel was delivered to the appellants and proceeded in ballast to Igarka in the Kara Sea, where she arrived on Aug. 16, 1939, and loaded a cargo of timber for delivery at Durban in South Africa under bills of lading making it deliverable to the shippers. On Sept. 1, 1939, she sailed from Igarka for Durban, but on Sept. 3, 1939, the appellants ordered her to put into Murmansk, to which she proceeded and at which she arrived on Sept. 9, when the appellants without giving up the bills of lading ordered her to discharge her cargo and she did discharge it. These orders to the vessel were given by the appellants on the instructions of the People's Commissariat for Foreign Trade of the U.S.S.R., a body with whose instructions the appellants were bound under Soviet law to comply.

On Sept. 27, 1939, the captain of the vessel received instructions from the British Admiralty to proceed immediately to the United Kingdom. Nevertheless, after her discharge was completed on Sept. 29, the vessel remained at Murmansk until Nov. 8, 1939. The umpire found it impossible to say why this delay occurred. He found, however, that during her discharge unsuccessful negotiations took place between the parties for the re-delivery of the vessel at Murmansk but these negotiations broke down before discharge was completed. He found also that the respondents, together with owners of other British ships also then lying in North Russian waters, were during this period in touch with the British Government in order to consider how the departure of these vessels could best be arranged; and the British Government was at the same time negotiating with the Soviet Government upon a proposal that the charter-

parties of the British ships should be terminated and the ships chartered to the British Government to carry timber cargoes to the United Kingdom. Ultimately, on Oct. 24, 1939, it was agreed between the two Governments that instead of this course being adopted the *Temple Moat* and certain other vessels should be sub-chartered to the British Ministry of Supply. On Oct. 27, 1939, the respondents were told of this agreement but, as the umpire found, the sub-charter was not entered into with the authority or consent of the respondents nor did they agree to it or waive their right to treat it as a breach of the charter-party. No due notice of it was given as required by Clause 19 of the charter.

The sub-charter-party between the appellants and the Ministry of Supply providing for a voyage from Murmansk to a United Kingdom port was not formally executed until Nov. 29, 1939. Meanwhile, however, on Nov. 8, the appellants had begun to load the *Temple Moat* with a cargo of pitprops and on Nov. 17 she left Murmansk for Garston. On Dec. 14, 1939, she arrived at Garston and began to discharge. On Dec. 15, 1939, the British Minister of Shipping gave notice to the respondents requisitioning the vessel " after the completion of the present voyage." The discharge was completed on Jan. 9, 1940. The umpire has made no finding as to what hire was paid under the charter-party or when or under what reservations (if any) it was paid; all he finds is that the appellants admitted their liability to pay £969 17s. 1d. as hire under the charter and had sent a cheque for that sum to the respondents' solicitors, who returned it. He does find, however, that if the *Temple Moat* had sailed for South Africa after she had discharged her original cargo at Murmansk she would have arrived there not later than Dec. 8, 1939; that it was not likely she would have been requisitioned there; but that if after such discharge she had proceeded to the United Kingdom it was highly probable that she would have been requisitioned there.

The breaches of charter-party which the respondents alleged were that the appellants (a) failed to deliver the *Temple Moat* in South Africa but re-delivered her at Garston; (b) discharged her cargo at Murmansk; (c) loaded another cargo at Murmansk, and ordered the vessel to proceed to Garston. For these breaches they claimed damages based on the loss of profit which they would have made if the *Temple Moat* had been re-delivered in South Africa. She should, they said, have been re-delivered there on Oct. 29, 1939, and could then have been fixed for a voyage to India and thence for another voyage to the United Kingdom, arriving in the United Kingdom on Feb. 15, 1940. They alleged that if this had been done she would have earned an additional sum of £12,135, being the difference between the profit they would have made during the period from July 27, 1939 (the date of the charter) to Feb. 15, 1940, if the charter-party had been carried out, and the

Dec. 4, 1945.]　　　LLOYD'S LIST LAW REPORTS.　　　[Vol. 79.—9

H.L.]　　　Temple Steamship Company, Ltd. v. V/O Sovfracht.　　　[H.L.

profit they actually made during this period under the charter-party with the appellants and under the British Government's requisition.

The appellants denied the alleged breaches, and with respect to the first alleged breach pleaded that they were relieved from re-delivering the ship in South Africa by (inter alia) the frustration of the charter-party consequent upon the requisitioning of the vessel at Garston.

The umpire found that the appellants had committed breaches of the charter-party (1) by not giving orders to the vessel to proceed to South Africa after the discharge of the cargo at Murmansk, and (2) by sending the vessel with a cargo of pitprops from Murmansk to Garston, and awarded the respondents £3000 as damages. He did not indicate the basis upon which these damages were calculated.

A further point as to the measure of damages, however, was raised by the appellants. In their contention the utmost sum which the respondents could recover if they were entitled to recover anything beyond the stipulated hire was the difference between the rate of hire which the respondents would have received under a charter-party calling for delivery at a British port and that which they were to receive under the charter-party in question. This difference is found to be £1348 13s. for the period up to Jan. 9, 1940.

The umpire stated three questions for the opinion of the Court, as follows:

(1) Whether upon the true construction of the charter-party dated July 6, 1939, and upon the facts as found by me the respondents [i.e., the now appellants] have committed any breach of the said charter-party.

(2) Whether, if the respondents have committed any such breach, the claimants are entitled to be paid any sum as damages for such breach.

(3) Whether, if the respondents have committed any such breach and if the claimants are entitled to be paid some sum as damages, such damages are restricted to the sum of £1348 13s.

Upon these findings by the umpire the appellants contended that they had committed no breach of their contract. In the first place they maintained that the charter-party was a time charter under which they were entitled to sail upon any route and to any port within the prescribed limits provided they re-delivered the ship within such time as a round voyage to the Kara Sea, with re-delivery of the ship at a South African port, would occupy. In their contention the stipulation as to " the period of the particular round voyage " was merely a method of determining the length of the time for which the vessel was chartered and had no reference to the voyage on which she was to go.

My Lords, I cannot conceive a more inconvenient method of specifying the length of the period for which a ship is to be let. It is the vaguest possible indication of the time stipulated for: it is the last measure which, I imagine, business men would adopt and would, if adopted, inevitably give rise to innumerable disputes. Moreover, it is inconsistent with the views expressed in Scottish Navigation Company, Ltd. v. Souter, [1917] I K.B. 222, at p. 245.

When a definite period can without difficulty be fixed, I cannot imagine that the length of time for which a ship is chartered would be calculated in the manner suggested. Moreover, the wording itself does not naturally bear that interpretation and it is contrary to the technical meaning found by the umpire and could only be defended, if at all, provided that either that meaning is inconsistent with the true construction of the charter-party as a whole or that the addition of the words " period of " make the umpire's finding inapplicable. With these two suggestions I deal later when considering the appellants' other contentions.

In the second place the appellant argued that the technical meaning attributed by the umpire to " one round voyage to " a specified place was inconsistent with the terms of the charter-party and must not be read into it. They pointed out that the ship's employment was specifically set out as " in lawful trades . . . between good and safe ports . . . within the following limits," and that the limits which followed embraced a range which would not confine the voyage from Igarka, if that were or were chosen as the port of shipment, to the carriage of a single cargo from that port as the port of departure to a South African port as the port of arrival. On this view they said that the second portion of the voyage beginning at the Kara Sea must proceed thence substantially to a South African port but that trading in the course of that route was permitted and the route need not be too narrowly interpreted, having regard to the width of the limits prescribed.

If this argument is to prevail the words " a round voyage to " a specified place must in this charter-party bear a different meaning from that found by the umpire.

In support of their contention that such a meaning was inconsistent with the contract as a whole, the appellants maintained that if it were adopted the words " for a period " were otiose and that the limits prescribed were meaningless. A charter to Igarka and thence to a South African port would, they said, naturally and readily convey this meaning and there was no need of the verbiage actually employed.

My Lords, in a document so inartistically drawn one cannot but feel some sympathy with the contentions of the appellants. The adaptation of what is in form a time charter to a contract which at least in some respects

partakes of the character of a voyage charter is likely to lead to difficulty however carefully the wording may be altered and the more so where, as here, the wording has been changed in a haphazard fashion. The result, however, is, I think, accurately described by the Court of Appeal (77 Ll.L.Rep. at p. 262) as

> while leaving the contract as still a time charter in regard to basis and method of payment by time, to incorporate in it so much of the essential character of a voyage charter as to make the described voyage the paramount feature of the whole contract, the actual length of time to be occupied by that voyage being treated as the measure by which to determine the duration of the period of chartered service and payment of chartered hire.

In this conception the use of the words " for the period of " is natural as pointing to the fact that payment is by time and not to be measured by the cargo carried or the vessel's tonnage. But the difficulty of the trading provision and of the limits mentioned in it still remains. Obviously if that provision grants a certain liberty of trading and defines its limits, the technical meaning given to a " round voyage to " cannot stand with it, but it does not stand alone: it must be read with the further provision as to the round voyage, and effect must be given to the document so read.

Agreeing, as I do, with the Court of Appeal that the described voyage is the paramount feature of the whole contract, the charter-party becomes an agreement for a voyage to Igarka and thence to a South African port. If no technical meaning is to be relied upon, the ship would be entitled to call at such ports as lay substantially upon her route and were within the prescribed limits. No question arises as to the call at Murmansk or her discharge there; each was excused by the orders of the Soviet Government within whose waters she was and whose instructions she was bound to obey. The respondents' complaint is of the charterers' actions after that discharge was completed. In the forefront of their claim they place the contention that the appellants undertook to deliver the ship in South Africa, whereas in fact they took her to Garston. They complained also of the delay at Murmansk for which no excuse or explanation was found, but delay is not enough since the damages are given not for that alone but for sending the vessel on a carrying voyage to Garston instead of direct to South Africa.

The breach is patent unless it can be excused, and the appellants seek to do so by maintaining that the voyage with pitprops to Garston is within the permitted range of the prescribed limits and also substantially on the route of the chartered voyage more particularly having regard to the wide range of limits allowed. The vessel, they say, is to be used for trading within those limits, although they are prepared

to concede that the general route must also substantially be adhered to.

The answer is in the first place to be found in the fact pointed out by the Court of Appeal, that the so-called limits in the charter-party under consideration do not give liberty to trade to the places mentioned but merely prohibit trading to any place outside them. They limit and do not extend the confines of the permitted voyage, and in this case may have some significance as preventing a voyage to a South African port via the Mediterranean, since the Suez Canal is East of Greece and a route taking the vessel East of Greece is prohibited.

But even if the charter-party had taken another form and had given liberty to trade to the places specified, the right to call there would still have been controlled by a consideration of the commercial adventure involved, and the provision must be construed accordingly. (See Glyn v. Margetson, [1893] A.C. 351.)

Bearing these matters in mind the technical meaning found by the arbitrator for the words " one round voyage to " a specified port or range of ports falls into place and is not inconsistent with the rest of the charter-party.

One way of testing its applicability is to write it out in full in the charter-party as if it were an express instead of an implied term. So read it out no doubt controls, as the specific adventure must always control, the meaning of the trading clause, but it is not inconsistent with it.

Construed in the light of this finding the trading clause is a limiting and not an enabling clause: it prescribes limits outside which the vessel must not go; it does not give liberty to neglect the prescribed adventure provided trading is confined within the limits mentioned. If support for the contention that the adventure contemplated is first of all a voyage to the Kara Sea is required, it is to be found in the typed clauses of the charter-party numbered 28, 29, 30, 32, 33, 34, 35 and 37, all of which contain provisions dealing with incidents in the Kara Sea. Further, Clause 35, which deals with towing off ground in the River Yenisei, appears to accept Igarka as a port of loading, even if it were not otherwise, as I think it is within the description " Kara Sea." Indeed, no contention to the contrary seems to have been put forward until the case reached your Lordships' House.

How necessary it is to control the trading clause by reference to the adventure may, I think, be accentuated from a consideration of Clause 34, which provides for insurance if the vessel proceeds to a place outside the limits of the trading warranties.

If the adventure is disregarded it might well be argued that the ship could proceed anywhere provided the charterers effected the insurance necessary to protect her when

Dec. 4, 1945.]   LLOYD'S LIST LAW REPORTS.   [Vol. 79.—11

H.L.]   Temple Steamship Company, Ltd. v. V/O Sovfracht.   [H.L.

trading to places outside those limits. Such a contention was not put to your Lordships and for the obvious reason that it is contrary to long-established authority.

The overriding consideration must always be the commercial adventure contemplated and if that adventure be borne in mind the limited meaning given to the words "a round voyage to" a specified port or range of ports is not inconsistent with the terms of this charter.

But even if they were originally wrong in sending the vessel to Gurston, the charterers say that the shipowners waived the breach by allowing her to be sent there with a cargo of pitprops without protest and by accepting freight up to Jan. 9, 1940. The appellants' case states that "hire under the charter-party was paid and accepted up to 20th December, 1939, leaving a balance of £969 17s. 1d. admitted to be due in respect of the period from 20th December, 1939, to the 9th of January, 1940." It adds that "this balance was in fact recovered in the arbitration."

My Lords, I can find nothing in the case to support either of these allegations. Certainly the sum of £969 17s. 1d. was neither claimed nor awarded in the arbitration, and the only justification for the statement appears to be an admission of liability for that amount contained in the points of defence.

I cannot think that in these circumstances your Lordships would be justified in finding that the respondents have waived the breach which the umpire has found. The considerations which prevailed in Tate & Lyle, Ltd. v. Hain Steamship Company, Ltd., 41 Com. Cas. 350; 55 Ll.L.Rep. 159, upon which the appellants placed reliance in support of their argument were very different. There the charterers, who had subchartered the vessel with full knowledge that she had deviated allowed her to proceed and load. It was suggested that the mere fact that the vessel was allowed to load and sail without protest was enough. I cannot accept this view. The ship had been detained in Murmansk for over five weeks and the owners may well have thought it advisable to make no protest against a sailing to Gurston, lest the charterers should be guilty of a worse deviation. In these circumstances the failure to protest is easily comprehensible and even the receipt of chartered hire under such conditions might well take place without being held to excuse the deviation, and, deviation or no deviation, there still remains the breach of the obligation to prosecute the voyage with the utmost despatch as required by Clause 8 and to send the ship direct to South Africa. No doubt the master obeyed the charterers' orders in sailing to Gurston, but under Clause 8 of the charter-party he was under their orders as regards employment, and in accordance with the principles adopted in Tyrer v. Hessler, 7 Com. Cas. 166, his obedience would not constitute a waiver of his employers' rights.

If this be the true view, the only further question for your Lordships' determination is as to the damages awarded. The sum found to be due is £38000. How or on what basis it is arrived at is not stated, and I venture to think that if the quantum is challenged some further facts should have been elucidated and some question suggested to the umpire which would have helped to solve the difficulty.

My Lords, the doctrine that even liberty to trade in the course of a voyage is limited to places on the usual route is no new one. For its enunciation Hammond v. Reid, 4 B. & Ald. 72, and Solly v. Whitmore, 5 B. & Ald. 45, may be cited. In your Lordships' House, Frenkel v. MacAndrews & Co., [1929] A.C. 545; 33 Ll.L.Rep. 191, may be referred as illustrative of many expressions to the same effect.

In the present case, as has been pointed out, the trading clause does not purport to give a liberty to trade outside the contractual adventure, and, it may be added, the vessel was in fact employed in trading between good and safe ports within the prescribed limits when carrying cargo from Igerka to South Africa and in the course of that employment might no doubt call for bunkering or water or other necessaries in the course of her voyage, even though by reason of the technical meaning ascribed to it she could not carry cargo to or pick up cargo at intermediate ports.

The respondents put their argument on a broad basis. The ship, they said, had on the orders of the charterers deviated from her course; while so deviating she was requisitioned: that requisition would not necessarily have happened if she had not deviated: on the contrary the umpire has found that if after the discharge at Murmansk the vessel had proceeded to South Africa, it was not likely she would be requisitioned there, but if after such discharge she proceeded to the United Kingdom it was highly probable she would be requisitioned there. In such circumstances the principle upon which damages are to be estimated is, I think, that applied in A/S. Rendal v. Arcos, Ltd., 43 Com. Cas. 1; 58 Ll.L.Rep. 287, viz., that such damage as naturally flows from the fact that an event causing loss has occurred, which might not have occurred had the contract not been broken, is recoverable unless the wrongdoer can show that it must inevitably have occurred even if the contract had not been broken. The locus classicus for the doctrine is Lilley v. Doubleday, 7 Q.B.D. 610, and further examples are to be found in James Morrison & Co. v. Shaw, Savill & Albion Company, [1916] 2 K.B. 783, and Tate & Lyle v. Hain Steamship Company, 41 Com. Cas. 350, at p. 361; 55 Ll.L.Rep. 159, at p. 177. If the vessel had sailed from Murmansk immediately after her discharge she almost certainly would not have been requisitioned, and in any case it has not been shewn that she would have been requisitioned. No

question has been asked by the umpire as to the basis upon which the breaches which he has found should be calculated. He may well have decided that the sum awarded represented the difference between a free and a requisitioned ship. But however he has estimated this damage, there is nothing to show that he is wrong.

In these circumstances I think the Court of Appeal rightly answered the questions put by the umpire and I should vote for the dismissal of the appeal with costs.

Lord SIMONDS: I also concur.

## COURT OF APPEAL.

Oct. 17 and 18, 1945.

### BURKEY v. MERSEY DOCKS AND HARBOUR BOARD.

Before Lord GREENE (Master of the Rolls), Lord Justice DU PARCQ and Lord Justice MORTON.

*Master and servant—Transference of employment—Respondeat superior—Negligence—Personal injuries sustained by plaintiff dock labourer—Unloading of iron girders from ship to bogie on quayside by means of ship's derrick and from bogie to railway wagon by mobile crane — Plaintiff (employee of stevedoring company) in railway wagon—Mobile crane hired by stevedoring company from defendant dock board on terms that hirers " must supply all necessary slings, chains, and labour for preparing the article to be lifted, and for unshackling the same. They must also take all risks in connection with the matter. The Board do not provide any labour in connection with the cranes except the services of the crane drivers for power cranes. The drivers so provided shall be the servants of the [hirers] "—Failure by crane driver, in spite of warning that sling was too long, to swing girder over railway wagon, girder coming to rest on side of wagon—Plaintiff requested by crane driver to help free girder by pushing —Fall of girder into bottom of wagon, plaintiff being injured—Claim brought by plaintiff against dock board—Evidence as to crane driver's negligence—Error of judgment — Alleged contributory negligence of plaintiff—Whether crane driver at time of accident acting as servant of dock board.*

*Held, by C.A., affirming LYNSKEY, J., that the accident was due to the negligence of the crane driver; that there was no contributory negligence by the plaintiff; and that the dock board had not discharged the onus of showing that they were not the crane driver's employers at the time of the accident (The evidence showed that the stevedores were entitled to tell the crane driver of the work he had to do and when he had to do it; but they had no right to control the doing of the work)—McFarlane v. Coggins & Griffith (Liverpool), Ltd., 78 Ll.L.Rep. 383, followed.*

*Per Lord GREENE, M.R.: It is said that the crane driver in deliberately taking the risk was guilty of a mere error of judgment. It can be called an error of judgment, but that carries the matter a very*

EXHIBIT 5

## QUEEN'S BENCH DIVISION
### (COMMERCIAL COURT)

June 18, 1999

MELVIN INTERNATIONAL S.A.
v.
POSEIDON SCHIFFAHRT G.m.b.H.

(THE "KALMA")

Before Mr. Justice CRESSWELL

Charter-party (Time) — Guarantee — Construction — Variation — Defendant guaranteed liabilities of charterers — Addendum extended period of charter — Whether addendum varied terms of charter for purposes of guarantee — Whether defendant's obligation under guarantee covered performance of charterers' obligations under addendum.

By a charter-party on the New York Produce Exchange form as amended, dated June 1, 1994 the claimant agreed to let its vessel *Kalma* to Concept Bulk Carriers (Concept) (the charterers):

For one time charter trip via safe port(s) safe berth(s) Black Sea to the Far East always afloat within Institute Warranty limits. ... Charterers guarantee minimum duration 57.5 days within below mentioned trading limits . . .

Clause 13 which provided that charterers were to have the option of continuing the charter for a further period was deleted. The hire rate was to be U.S.$13,250 daily and the cargo was to be steel or steel products only.

By letter of guarantee dated June 1, 1994 the defendant agreed to —

. . . unconditionally guarantee to you the due performance by Concept . . . of their obligations under the charterparty and without qualification guarantee to you the due and punctual payment by Concept . . . of all and every sum of money . . . becoming due and payable by Concept . . . to the owners in accordance with the provisions of the charterparty . . .

It is further agreed that our obligations under this letter of guarantee are not altered . . . by reason of any extension for payment being given by you to Concept . . . or by any variation in the terms of the charter . . .

This guarantee is to be a continuing guarantee until all the obligations of Concept . . . have been fully performed . . .

The vessel was delivered to Concept on June 8 and performed the voyage from Nemrut Bay via the Black Sea to Keelung, Taiwan.

By addendum 1 dated July 18, 1994 it was agreed between the owners and the charterers that after drydocking there should be a worldwide time charter with the charterers. The addendum provided that delivery was to be in direct continuation of present charter-party, the period was to be about six/about eight months and the hire rate was to be U.S.$8250 daily. The charterers

were to pay the owners on delivery into direct continuation U.S.$50,000 in full and final settlement of the hire differential arising from the fact that the present voyage would be completed in less than 57.5 days agreed in the original charter-party.

The vessel completed discharge on July 26, 1994 and entered drydock at Keelung, Taiwan on the same date. She completed repairs and was redelivered to the charterers on Aug. 11, 1994.

By addendum 2 dated Feb. 14, 1995 it was agreed that the charterers had the option to perform another voyage and that if the vessel was not redelivered by May 5, 1995 hire would be adjusted to U.S.$10,500 daily.

On Mar. 3, 1995 the vessel sustained bottom damage while loading a cargo of steel at Providence, Rhode Island, U.S.A.

The vessel was finally redelivered to the claimant on June 30, 1995.

Various disputes arose between owners and charterers following the grounding at Providence and were referred to arbitration. The arbitrators found that the vessel had been ordered to load at an unsafe berth and made awards in favour of the owners.

The charterers defaulted in payment of the awards.

The claimants applied by summons under R.S.C., O. 14A/O. 14 for the determination of the issue whether on a proper construction of the relevant documents, the guarantee given by the defendant to the claimant in respect of the liabilities of Concept Bulk Carriers under a charter-party dated June 1, 1994 extended to cover the liabilities of Concept under addendums 1 and 2.

The claimant submitted that addendum 1 constituted a variation of the charter-party and the guarantee covered Concept's obligations under the charter during both the original period and the extended period.

The defendant argued that addendum 1 was not a variation of the charter but gave rise to a separate contract for the hire of the vessel for a period of six to eight months; alternatively, even if addendum 1 was a variation of the charter it was not a "variation in the terms of the charter" within the scope of the relevant clause of the guarantee.

————Held, by Q.B. (Com. Ct.) (CRESSWELL, J.), that (1) it had become a frequent practice to time charter for a period measured by the duration of a certain voyage instead of a stated number of months or days; the voyage was then not merely the measure of the charter but became the subject matter of the contract so that the charterers must send the ship on that particular voyage (see p. 379, col. 1);

(2) addenda 1 and 2 were not variations within the purview of the guarantee; they were beyond the purview (or commercial range or scope) of the guarantee; the purview of the guarantee was a time charter trip Black Sea to Far East, minimum duration 57.5 days; the purview did not extend to an about six/about eight months time charter (addendum 1); nor the option to perform another voyage (addendum 2); in context addenda 1 and 2 were not variations "in terms of the (time) charter (trip)"; they were so fundamental that they could not properly be described as a variation at all; the claimant could have sought from the defendant

a variation of the guarantee or a new guarantee but it did not do so; the issues would be answered accordingly; addendum 1 was not a variation in the terms of the charter for the purposes of the guarantee and the defendant's obligations under the guarantee did not cover the performance of the charterers' obligations under addendum 1 (*see* p. 379, col. 2).

- - -

The following cases were referred to in the judgment:

Investors Compensation Scheme v. West Bromwich Building Society, (H.L.) [1998] 1 W.L.R. 896;

*Nefeli*, The [1986] 1 Lloyd's Rep. 339;

Samuels Finance Group Plc v. Beechmanor Ltd., 67 P. & C.R. 282;

Temple Steamship Co. v. V/O Sovfracht, (1945) 79 Ll.L.Rep. 1;

Trade Indemnity Co. Ltd. v. Workington Harbour and Dock Board, (H.L.) [1937] A.C. 1.

─────────

The claimant shipowners Melvin International S.A. applied by summons under O. 14A/O. 14 for the determination of the issue whether the defendant Poseidon Schiffahrt G.m.b.H, were liable under addenda 1 and 2 for the liabilities of the charterers Concept Bulk Carriers the defendant having guaranteed performance of the charterers' liabilities under the charter-party dated June 1, 1994.

Mr. M. McLaren (instructed by Messrs. Waterson Hicks) for the claimant; Mr. Jonathan Hirst, Q.C. (instructed by Messrs. Richards Butler) for the defendant.

The further facts are stated in the judgment of Mr. Justice Cresswell.

Judgment was released for publication.

June 18, 1999

─────────

## JUDGMENT

Mr Justice CRESSWELL: The claimant shipowners apply by summons under O. 14A/O. 14 for the determination of certain issues in this action and for judgment. The central dispute is whether, on a proper construction of the relevant documents, the guarantee given by the defendant to the claimant in respect of the liabilities of Concept Bulk Carriers ("Concept") under a charter-party dated June 1,

1994 extends to cover the liabilities of Concept under addendum No. 1 thereto dated July 18, 1994 and addendum No. 2 dated Feb. 14, 1995.

At par. 5 of the points of claim the claimant pleaded its construction of the documents, namely that addendum No. 1 constituted a variation of the charter-party and, as a result, the guarantee covered Concept's obligations under the charter-party during both the original period and the extended period.

The defendant's contrary construction is pleaded at par. 5 of the points of defence as follows. Addendum No. 1 was not a variation of the charter-party, but gave rise to a separate contract for the hire of the vessel for a period of a further six to eight months; alternatively, even if addendum No. 1 was a variation of the charter-party, it was not a "variation in the terms of the charter" within the scope of the relevant clause of the guarantee.

I refer to the summons, which is in these terms. The claimant applies for a determination pursuant to O. 14A of the issues: (1) whether addendum No. 1 dated July 18, 1994 to the charter-party dated June 1, 1994 pleaded at par. 1 of the points of claim constituted a variation in the terms of the charter-party for the purposes of the guarantee given by the defendant dated June 1, 1994; (2) whether the defendant's obligations under the guarantee cover the performance of the charterers' obligations under addendum No. 1. Further, the claimant seeks judgment pursuant to O. 14A, alternatively O. 14 on the claim.

### *The factual background*

By a charter-party on the NYPE form, as amended, dated June 1, 1994, the claimant agreed to let its vessel, *Kalma*, to Concept ("the charterers"):

For one time charter trip via safe port(s) safe berth(s) Black Sea to the Far East always afloat, always within Institute Warranty Limits. Charterers guarantee minimum duration 57.5 days within below mentioned trading limits . . . Vessel to be placed at the disposal of the charterers on dropping last outward sea pilot Nemrut Bay.

The standard cl. 13 in the charter which provided that "the charterers shall have the option of continuing this charter for a further period of . . . " was deleted.

The hire rate was U.S.$13,250 daily and the cargo was to be steel or steel products only. The 73 clauses of the charter-party contained numerous detailed provisions.

By letter of guarantee dated June 1, 1994 the defendant agreed as follows:

In consideration of you entering into the charterparty dated 1st June 1994 with Messrs. Concept Bulk Carriers of Hamilton, Bermuda, pursuant to which you have chartered the M V. KALMA for a time charter trip from Nenrut Bay, via the Black Sea to the Far East and for the sum of S . . . USA receipt of which is hereby acknowledged — we hereby unconditionally guarantee to you the due performance by Concept . . . of their obligations under the charterparty and without qualification guarantee to you the due and punctual payment of Concept . . . of all and every sum of money from time to time becoming due and payable by Concept . . . to the owners in accordance with the provisions of the charterparty and accordingly, whenever Concept . . . is in default in the payment of any such sums, we will on demand pay in United States dollars the monies in respect of which such default has been made together with all losses, damages and costs and expenses thereby arising or incurred by you.

It is further agreed that our obligations under this letter of guarantee are not altered, nor are we exempted from any liability hereunder by reason of any extension for payment being given by you to Concept . . . or by anything done, or omitted or neglected to be done by you or by any variation in the terms of the charter or by any course of dealing between you and Concept . . .

This guarantee is to be a continuing guarantee until all the obligations of Concept . . . have been fully performed and this guarantee is in addition to and not by way of substitution or limitation on any other rights which you may have under the charter, by law or otherwise or on any other security held by you. Any default under this letter of guarantee shall likewise be deemed to be a material default under the charterparty.

This letter of guarantee shall be governed by and construed in accordance with English law and any disputes arising between the parties shall be referred to the exclusive jurisdiction of the English High Court of Justice.

The vessel was delivered to Concept on June 8 and performed the voyage from Nenrut Bay, via the Black Sea, to Keelung, Taiwan.

By July 18, 1994 it was clear that the time charter trip would be completed in rather less than the guaranteed 57.5 days.

By addendum No. 1 dated July 18, 1994 it was agreed between owners and charterers that after dry-docking there should be a worldwide time charter with the charterers. The addendum provided:

— delivery in direct continuation present charter-party

— vessel to be drydocked at Ulsan after completion discharge present voyage

— clause 48 add at end "deviation for the drydocking at the end of the present voyage is also covered by this clause"

— about six/about eight months time charter

— hire US$8,250 daily including overtime

— charterers to pay owners on delivery into direct continuation US$50,000 in full and final settlement of the hire differential arising from the fact that the present voyage be completed in less than the minimum 57.5 days agreed in the original charterparty

— commission payable on hire and bonus.

As part of addendum No. 1 the vessel was to carry any cargo except those excluded by the new exclusion clause and different geographical exclusions were agreed.

The vessel completed discharge on July 26, 1994 and entered drydock at Keelung, Taiwan on the same date. She completed repairs and was redelivered to the charterers on Aug. 11, 1994.

By addendum No. 2 to the charter-party dated Feb. 14, 1995, it was agreed that the charterers had the option to perform another voyage and that if the vessel was not redelivered by May 5, 1995, hire would be adjusted to U.S.$10,500 daily.

On Mar. 3, 1995, the vessel sustained bottom damage while loading a cargo of steel at Providence, Rhode Island, U.S.A.

The vessel was finally redelivered to the claimant on June 30, 1995.

Various disputes arose between owners and charterers following the grounding at Providence. They were referred to arbitration. The arbitrators found, among other matters, that the vessel had been ordered to load at an unsafe berth and made awards in favour of the owners.

The charterers have defaulted in payment of the awards. All the outstanding items post date the completion of the original time charter trip, save for stevedore damage of U.S.$9,727.77 plus interest from Oct. 1, 1995.

I interpose to record that it is agreed between the parties that the issue as to whether the claimant is or is not entitled to recover in respect of the stevedore damage of $9,727.77 plus interest, is to be dealt with at a separate hearing, if it cannot be agreed in the meantime.

*The claimant's submissions*

Mr. McLaren for the claimant has presented clear and comprehensive submissions both in writing and

orally. I am grateful to him for his assistance. He submitted as follows.

A separate contract or a rescission would fall outside the terms of the guarantee but here the Court is concerned with a variation. While a "variation" would not encompass the case of an alteration of the charter-party so substantial as to raise an inference that the claimant and Concept agreed to substitute a new contract, that is not this case. Whether there was a variation of the charter-party depends on the intention of the parties thereto, to be gathered from an examination of the terms of the subsequent agreement and from all the surrounding circumstances. The question for the Court is whether the common intention of the claimant and Concept was to "abrogate, rescind, supersede or extinguish the old contract by a substitution of a completely new or self-subsisting agreement" (see Chitty on Contracts (27th ed.) par. 22–025).

On the wording of addendum No. 1 the only plausible interpretation is that it amounted to a variation of the charter-party. The factual background to the conclusion of addendum No. 1 shows that the parties to the charter-party intended to effect a variation of the charter-party.

It is clear from the face of addendum number 1, on a natural reading of it, that it was intended to take effect as a variation extending the existing charter-party, not a separate charter. (Mr. McLaren made detailed submissions by reference to the particular provisions of addendum No. 1.)

As to addendum No. 2, many of the characteristics apparent on the face of addendum No. 1 are also shared by addendum No. 2. It cannot sensibly be suggested that addendum No. 2 is also a separate charter-party. Any conclusion that addendum No. 1 is a separate charter-party would be inconsistent (at least in those respects) with the conclusion that the similar addendum No. 2 was a mere variation. The ordinary meaning of the words does not allow for the interpretation of addendum No. 1 in the manner contended for by the defendant. The terms of addendum No. 1 are wholly inconsistent with it being a separate charter.

If, contrary to primary submissions set out above, addendum No. 1 constituted a variation of the charter-party then that variation is, on any view, caught by the terms of the guarantee. The wording of the guarantee is very wide. The defendant's obligations are not affected by "any variation in the terms of the charter" (underlining added). The variation affects only a very limited number of terms of the charter-party and does not change the nature of the basic liability being undertaken by Concept. This is not a situation where the variations to the principal contract alter it so substantially as to raise an inference that the principal and the creditor

have agreed to rescind the main contract and to substitute a new contract. All variations are caught by the very wide wording of the guarantee. The defendant cannot characterize the extension of the charter-party as a fundamental variation of the charter-party not contemplated by the variation clause.

Mr. McLaren further submitted that if addendum No. 1 had been in exactly the same terms, save that instead of the words "about six/about eight months time charter" there had appeared the words "about six/about eight years time charter", this would nonetheless have constituted a variation within the terms of the guarantee and the claimant would have been entitled to recover thereunder.

Mr. McLaren also submitted that if addendum No. 1 had provided for 10 time charter trips to and fro between the Black Sea and the Far East this would have nonetheless constituted a variation within the terms of the guarantee and the claimant would again have been entitled to recover thereunder.

### The defendant's submissions

Mr. Hirst, Q.C. for the defendant in his helpful skeleton argument submitted as follows.

Upon the true construction of the guarantee, it was of the charterers' performance of a time charter trip from Nemrut Bay, via the Black Sea to the Far East. The fallacy of the claimant's case is revealed by the failure in par. 3 of the points of claim to quote the terms of the guarantee fully. They have omitted the introduction:

*In consideration of you entering into the charterparty dated 1st June 1994 with Concept pursuant to which you have chartered the M. V. KALMA for a time charter trip from Nemrut Bay, via the Black Sea to the Far East.* (Emphasis supplied.)

These introductory words colour the rest of the guarantee. This was the paramount feature of the whole contract: (compare *Temple Steamship Co. v. V/O Sovfracht*, (1945) 79 Ll.L.Rep. 1, per Lord Porter at p. 10). The provisions allowing for variation of the charter allow for variations of the contract for a time charter trip from Nemrut Bay to the Far East, not for some further charter of the vessel. That leaves the variation provision with ample scope in which to operate. In the nature of things it was quite possible that variations would be needed to the terms of the time charter trip.

The claimant's case involves the proposition that Poseidon, by agreeing to be bound by any variation in the terms of the charter-party, effectively gave the claimant and the charterers a blank cheque. As it is, on their case, a time charter trip of 57.5 days guaranteed minimum duration was transformed into

a 13 month worldwide time charter but, if they are right, there is no limit in time to the duration of the time charter that might have been agreed. The claimant's construction leads to unreasonable and unbusinesslike results. That tells against their construction.

The provision allowing variation permits major variation, but there are limits (see Lord Atkin in *Trade Indemnity Co. Ltd. v. Workington Harbour and Dock Board*, [1937] A.C. 1 at p. 21).

Applying the ordinary canons of construction, the contract guaranteed was the time charter trip. The further agreements, whether made by means of a separate contract, or by the way of the rather artificial device of addenda to the original time trip charter, are outwith the contract guaranteed by Poseidon.

### ANALYSIS AND CONCLUSIONS

#### *The relevant legal principles*

The relevant legal principles are as follows.

1. The principles by which contractual documents are construed are summarized by Lord Hoffmann in *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*, [1998] 1 W.L.R. 896 at p. 912H et seq.

2. Contracts of guarantee are to be construed according to the principles referred to above, but in cases of any doubt or uncertainty in favour of the guarantor.

3. Any variation in the terms of the underlying contract between the creditor and the debtor which could prejudice the guarantor will discharge him from liability, unless he consents thereto or the contract of guarantee provides to the contrary.

4. To give a meaning to the word "variation" in such a provision, the Court will look at the context in which it occurred.

5. Where a guarantee contains a clause to the effect that it is not to be affected by "any variation" in the underlying contract: (a) "any variation" does not mean "any minor variation" and will be widely construed (*Samuels Finance Group plc v. Beechmanor Ltd*, 67 P. & C.R. 282 at p. 285, Lord Justice Lloyd); but (b) "variation" does not extend to a novation and changes falling short of a novation may be so fundamental that they could not properly be described as a variation at all (*Samuels* sup. at p. 285).

6. Assent, whether previous or subsequent to a variation to the underlying contract, only renders the surety liable for the contract as varied, where it remains a contract within the general purview (or commercial scope or range) of the original guarantee. In *Trade Indemnity Co. Ltd. v. Workington*

*Harbour & Dock Board* sup. at p. 21 Lord Atkin said:

The words "any arrangement ... for any alteration in or to the said works or the contract" are very wide. Probably they would have to be cut down so as not to include such changes as have been suggested as substituting a cathedral for a dock, or the construction of a dock elsewhere, or possibly such an enlargement of the works as would double the financial liability. An author of great authority ... suggests that such words only relate to alterations "within the general purview of the original guarantee".

See further Mr. Justice Bingham (as he then was) in *The Nefeli*, [1986] 1 Lloyd's Rep. 339 at p. 345 where he said:

The second argument is, therefore, important. Even if it be assumed against the defendants that Mr. Napoliteno, on their behalf, made the original guarantee agreement alleged and that the agreement to extend the charter was made by ATI with the knowledge and assent of Mr. Tarricone [of the defendants] on their behalf, does the extended charter agreement and does any default under it fall within the purview of the original guarantee? The defendants relied on passages in Rowlatt on The Law of Principal and Surety, 4th ed., in particular:

A guarantee will only extend to a liability precisely answering the description contained in the guarantee (p. 77) [and] A surety is not discharged by a variation to which he assents afterwards, even though there may be no fresh consideration for the assent. However, it is apprehended that assent, whether previous or subsequent to a variation, only renders the surety liable for the contract as varied, where it remains a contract within the general purview of the original guarantee ... (p. 91).

The authority cited for this last proposition in the test is *Trade Indemnity Co. v. Workington Harbour & Dock Board*, where at p. 21 Lord Atkin quoted with approval the closing words of this passage.

The terms of the Evdori guarantee, to be treated mutatis mutandis as applied to the Nefeli charter for the purposes of this argument were:

In consideration of the owners of the MT EVDORI entering into a charter party dated February 8th 1979 in New York with Nominee ATI International Limited, we hereby guarantee due performance in every respect by ATI International Limited of the terms and conditions of the charter party.

We undertake to pay and make good all amounts due to the owner of the MT EVDORI

under the charter party immediately upon the same becoming due.

We agree that our liability under this agreement shall be a primary liability and shall in no way be conditional upon the owners the MT EVDORI first proceeding against ATI International Limited.

Had the *Nefeli* charter been for 12 months with an option for the charterers to renew for a further 12 months, a mere exercise of that option might very well not, in my judgment, have taken the extended charter outside the general purview of the original guarantee. But that was not the position. This was a 12 month charter with no option. When the extension was agreed the charter had run for six months only. The effect of the charter was greatly to increase the potential liability of the guarantor, the more so since the charter would last long after the end of the existing sub-charter. The original guarantee did not apply to this, and it makes no difference that the extension was agreed by means of an addendum rather than a separate contract to take effect at a future date.

*Application of these principles*

I turn to apply these principles to the present case. It has become a frequent practice to time charter for a period measured by the duration of a certain voyage instead of a stated number of months or days. The voyage is then not merely the measure of the duration of the charter, but becomes the subject matter of the contract, so that the charterers must send the ship on that particular voyage (see Time Charters (4th ed.) Wilford and Others, 1995).

In the present case the option "of continuing" in cl. 13 of the charter-party was deleted. The guarantee started with the words:

In consideration of you entering into the charterparty dated 1st June 1994 with Concept . . . pursuant to which you have chartered the M.V. KALMA for a time charter trip from Nemrut Bay, via the Black Sea to the Far East . . .

we hereby unconditionally guarantee to you . . .

I consider that a reasonable person, having the commercial background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract of guarantee would have said that:

1. The commercial adventure contemplated by the guarantee was a time charter trip by *Kalma* from the Black Sea to the Far East, on the terms of the charter-party dated June 1, 1994.

2. There was room for wide variations within the contract for the time charter trip.

3. There was a recognizable distinction between wide variations of the contract for the time charter trip and a new, separate or further adventure.

4. Addendum No. 1 and addendum No. 2 provided for a new, separate and further adventure.

It has to be noted that addendum No. 1 refers to "the end of the present voyage" which I read as meaning "the end of the present time charter trip".

In my judgment, addendum No. 1 and addendum No. 2 were not variations within the purview of the guarantee. They were beyond the purview (or commercial range or scope) of the guarantee. The purview of the guarantee was a time charter trip Black Sea to Far East, minimum duration 57.5 days. The purview did not extend to an about six/ about eight months time charter (addendum No. 1); nor the option to perform another voyage (addendum No. 2). In context, addenda 1 and 2 were not variations "in the terms of the (time) charter (trip)", They were so fundamental that they could not properly be described as a variation at all. It makes no difference that the word "addendum" was used. The claimant could have sought from the defendant a variation to the guarantee or a new guarantee, but it did not do so.

Accordingly, for the reasons set out above, I answer question one, no; and question two, no. I order accordingly.

This judgment is released for publication.

EXHIBIT 6

## QUEEN'S BENCH DIVISION
### (COMMERCIAL COURT)

Feb. 24 and 25, 1975

SEGOVIA COMPANIA NAVIERA S.A.
OF PANAMA
v.
R. PAGNAN & F.LLI OF PADOVA
(THE " ARAGON ")

Before Mr. Justice DONALDSON

*Charter-party (Time) — Nomination of loading port — Charterers hired vessel for " one time charter trip via safe ports East Coast Canada " — Whether charterers entitled to order vessel to proceed to U.S. Gulf — Whether owners entitled to additional hire—New York Produce Exchange Time Charter form.*

The charterers chartered the vessel *Aragon* from the owners under a charter-party on the New York Produce Exchange Time Charter form and dated July 31, 1974. The charter-party provided that the charterers were to hire the vessel:

. . . for the period necessary to perform one time charter trip via safe port(s) East Coast Canada within . . . trading limits.

The trading limits were defined as:

. . . always within Institute Warranty Limits East Coast Canada, U.S.A. East of Panama Canal, U.K. Continent Gibraltar— Hamburg Range, Mediterranean . . .

On Aug. 1, 1974, the charterers requested an option of a " Gulf round " carrying meals. The owners agreed subject to (inter alia) an increase in the rate of hire of not less than 25 cents and the exercise of the option by 1800 hours on Aug. 2. The option was neither accepted nor exercised.

On Aug. 7, 1974, the charterers nominated Port Cartier as the loading part but owing to a strike the vessel was unable to load. On Sept. 17 the charterers ordered the vessel to proceed to U.S. Gulf with a view to loading at New Orleans. The owners protested but agreed that the vessel would sail for the Gulf and load a cargo without prejudice to the rights of the parties. It was further agreed that if the charterers were entitled to give the order no additional hire was payable but if they were not the owners were entitled to U.S.$30,000.

In arbitration proceedings the arbitrator, Mr. Cedric Barclay, held that the charterers were entitled to order the vessel to proceed to U.S. Gulf and stated his award in the form of a special case, the question of law for decision of the Court being

Whether on the facts found and on the true construction of the charter-party the charterers were entitled to direct the vessel to port(s) outside the East Coast of Canada for loading.

————*Held*, by Q.B. (Com. Ct.) (DONALDSON, J.), that (1) the charterer was entitled to order the vessel to proceed anywhere within trading limits which was not inconsistent with the charter-party (*see* p. 633, col. 1);

(2) " U.S.A. East of Panama Canal " meant what it said and excluded the U.S. Gulf (*see* p. 633, col. 2);

(3) the argument before the Court had turned on issues which were not fully reflected in the award (*see* p. 633, col. 2); and the award would be remitted to the arbitrator for further consideration (*see* p. 633, col. 1);

(4) the charterers could not order the vessel to ports in the U.S. Gulf but could order her to U.S. ports north of about Charleston (*see* p. 634, col. 1).

Award remitted to arbitrator for further consideration.

————

The following cases were referred to in the judgment:

Scottish Navigation Co., Ltd. v. W. A. Souter & Co., [1917] 1 K.B. 222;

Temple Steamship Co. Ltd. v. V/O Sovfracht, (1945) 79 Li.L.Rep. 1.

————

This was a special case stated in a dispute in which the shipowners, Segovia Compania Naviera S.A. of Panama, claimed U.S. $30,000 additional hire from the charterers, R. Pagnan & F.LLI. of Padova, on the ground that the charterers were not entitled under a time charter-party to order the vessel to proceed to the U.S. Gulf. The arbitrator, Mr. Cedric Barclay, decided in favour of the charterers and stated his award in the form of a special case which provided as follows:—

" WHEREAS :—

(A) By a Charter Party dated 31 July 1974 on a New York Produce Exchange form, Respondents Time Chartered the Owners' vessel ARAGON for the period of a trip between specified geographical limits, for the carriage of cereals and cereal products only, on terms and conditions as stated therein.

(B) The said Charter Party provided for disputes to be referred to Arbitration in London in a manner described.

(C) A dispute did arise for the determination of which the parties agreed that

The "Aragon"    [1975] Vol. I

I, Cedric Barclay, of No. 1, Cromwell Road, London S.W.7 should act as Sole Arbitrator.

I was requested, and have agreed, to state my Award in the form of a special case.

SPECIAL CASE stated pursuant to s. 21 of the Arbitration Act 1950

I FIND as follows:—

1. The Charter Party dated 31 July 1974 is annexed hereto and forms part of this Award.

2. On 23 July 1974 the *ARAGON* sailed from Brunsbuttelkoog under Owners' orders westbound, in ballast.

3. Between 23 July and 31 July, negotiations took place through brokers between Owners and Charterers and resulted in the fixture under the Charter Party of 31 July.

4. The parties agreed that the commencement of the Charter should be reckoned retrospectively from 23 July 1974 at 06.15 hours when the vessel sailed from Brunsbuttelkoog.

5. Some time during 1st August, the Charterers' brokers telexed Owners' brokers:—

PAGNAN asking the option of performing round via Churchill instead of St. Lawrence as fixed. Please ask Owners if they can agree to this.

6. At 18.39 hours on 1st August, Charterers' brokers telexed Owners' brokers:—

ARAGON. Pagnan say Churchill option not necessary any more although no reply from Owners received stop They now asking option do Gulf round with meals included to which they would reply within today stop This time they really need a very quick reply from Owners. Please advise soonest.

7. At 10.25 hours on 2nd August the London brokers "WOHDRA" telexed Charterers' brokers:—

ARAGON: we would mention that if Charterers declare option of US Gulf then US Clause Paramount should be reinstated instead of Canadian Clause Paramount stop Owners' brokers also say that his Owners will expect a punctual reply and is not likely stand behind Charterers if they late in replying.

8. At 12.45 on 2nd August Charterers' brokers telexed Owners brokers:—

Regret lack reply but Pagnan apologises they cannot be back yet so if they will

want have to ask Owners otherwise vessel shall proceed as fixed to St. Lawrence.

9. At 18.07 hours on 2nd August, Charterers' brokers telexed Owners' brokers:—

Sorry to trouble you so often on this vessel but Charterers just come up asking again option perform Gulf Round instead of St. Lawrence River as fixed their intention to include also SBM.

Charterers would not hold Owners responsible for deviation St. Lawrence/ US Gulf stop Charterers asking Owners view fact U.S. Gulf Round and with SBM bound to last longer and with present market whose outlook not at all bright to possibly have option at less than 0.25 US Cents extra stop Pagnan point out would be able to reply in about 1 hour only.

10. SBM stands for Soya Bean Meal.

11. To the telex in recital 9 there was an immediate reply from Owners' brokers:—

Owners agree Charterers option Gulf Cargo to include SBM but will not accept less than 25 Cents extra also require Canadian Clause Paramount amended to US Clause Paramount; also require option to be declared latest 1800 hours today.

The telex continues:—

If ship goes U.S. Gulf we want U.S. Clause Paramount if goes St. Lawrence we want Canadian Clause Paramount as fixed.

To which the reply was:—

OK Pagnan thanks for option they will come back soonest meantime ask Owners be alert and in case US Gulf Round option exercised be very immediate inform Master divert promptly to US Gulf.

12. At 11.48 hours on 5th August, Charterers' brokers telexed Owners' brokers:—

ARAGON—sorry but Pagnan still unable declare whether vessel will perform voyage via St. Lawrence or Gulf—from his silence presume vessel performing voyage as originally fixed however reporting soonest possible.

13. There may have been other telexes exchanged between brokers and between 1 and 5 August, but these have not been disclosed to the Arbitrator.

14. There was no reply to the telex in recital 12.

15. On 7th August at 09.55 hours Canadian time (16.01 Italian time) the Charterers Montreal Brokers telexed PAGNAN:—

ARAGON—Port Cartier nominated load port—we have instructed Master proceed immediately and tender his vessel to the Elevator thereby establishing turn and enabling authorities to inspect vessel—for your guidance at this time only 1500 tons of oats in elevator furthermore LAKER deck officers taking strike action tomorrow therefore we are unable at this time to determine when balance of cargo will be delivered to the elevator.

16. Thereupon the Charterers' Agents in Montreal radioed the Master:—

Loadport declared PORT CARTIER where proceed soonest keeping agents Quebec Cartier Mining Company cable CARTIER advised your ETA and request docking instructions.

17. The *Aragon* arrived at Port Cartier on 7th August, but was unable to load cargo because of multiple strikes. She remained at the port until 17th September, when the Charterers ordered the Master to proceed to the US Gulf for loading (Intention: New Orleans). At that time Port Cartier was still strike bound. Prospects of a resumption of work were unknown.

18. The Master informed the Owners of this order and was instructed by them not to obey the Charterers' instructions to proceed to the US Gulf.

The Owners said to their brokers:—

In fact Charterers insistence in maintaining their position could be considered as a repudiation of the C/P by them from which damages would flow. In the event Charterers wish direct vessel to US Gulf Owners are prepared accommodate Charterers on terms to be mutually agreed.

19. The Owners asked for $30,000 extra freight and the Charterers put up a Bank Guarantee for that sum, subject to the dispute over this extra freight being submitted to immediate Arbitration.

20. The vessel sailed from Port Cartier on 20th September, in ballast for the US Gulf.

She loaded cargo in the US Gulf.

21. The relevant Clauses in the Charter Party are:—

*Lines 13 to 15*

That the said Owners agree to let and the said Charterers agree to hire the said vessel from the time of delivery, for the period necessary to perform one time charter trip via Safe port(s) East Coast Canada within below mentioned trading limits.

*Lines 32 to 34*

trading limits always within Institute Warranty Limits—East Coast Canada, USA East of Panama Canal, U.K. Continent Gibraltar—Hamburg Range, Mediterranean excluding Israel, Scandinavia (including Denmark excluding U.A.R. Syria Lebanon Turkey Cyprus Greece Cuba and all Communist and Communist controlled territories (except Yugoslavia).

*Clause 24.*

It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled 'An Act relating to Navigation of Vessels, etc., in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clause, Canadian Clause Paramount (as attached.')

*Clause 39.*

Charterers shall furnish the Master from time to time with all requisite instructions and sailing directions, in writing or by telegram and the Master shall keep a full and correct log of the voyage or voyages, showing, inter alia, the course of the vessel and distance run and the consumption of Fuel Oil which is to be patent to the Charterers or their Agents, a true copy of which is to be sent to Charterers from each port of call on the voyage and immediately after completion of the voyage, together with any other information which the Master deems necessary.

22. The dictionary definition of ' VIA ' is ' by way of '.

23. CONTENTIONS:

The Owners say that the order having been given to load at Port Cartier (East Coast Canada) the Charterers did not have the right to order the vessel to the U.S. Gulf. The Charterers had exercised the right of election. The adoption of the Canadian Clause Paramount confirmed the intention to load in East Coast Canada, only.

The Charterers say that the fixture being a Time Charter, they had the right to order the vessel to the U.S. Gulf. They read the Charter terms as follows:—

. . . the Owners agree to let and the said Charterers agree to hire the said vessel from the time of her delivery for the period necessary to perform one time charter trip *by way of* safe port(s) East Coast Canada within below mentioned trading limits: . . . always within Institute Warranty limits—East Coast Canada, U.S.A. East of Panama Canal, U.K. Continent Gibraltar—Hamburg Range . . . (etc).

24. In as far as it may assist the Court, the outcome of a Private 'Gallup Poll' conducted by the Arbitrator among the Members of the Baltic Exchange indicates that opinions are equally divided as to the meaning of 'Via' East Coast Canada ports. There is no decided opinion whether via East Coast Canada is limitative to loading in Canada only or if it indicates Canadian ports as intermediate place(s) of call, there being no mention (as is more usual) of 'a round trip to Safe Ports in East Coast Canada'. There is therefore no 'Custom of the Trade'.

25. The question for the Court is:—

Whether on the facts found and the true construction of the Charter Party the Charterers were entitled to direct the vessel to port(s) outside the East Coast of Canada for loading.

26. If the answer of the Court is *yes*, then I AWARD AND ADJUDGE that Charterers succeed and that there is no additional freight to be paid by them (other than the Charter Party freight) and that the Charterers' Bank Guarantee of U.S. $30,000. —be returned to Charterers forthwith.

The Owners shall bear and pay their own and the Charterers' costs in the Reference and also the costs of this Award.

If Charterers have in the first instance paid for this Award they shall be reimbursed by Owners for the cost thereof.

27. If the answer of the Court is *no*, then I AWARD AND ADJUDGE that Owners succeed and that the Charterers' Bank Guarantee in the sum of U.S. $30,000.— shall immediately be released in favour of the Owners.

The Charterers shall bear and pay their own and the Owners' costs in the Reference (to be taxed if not agreed) and also the costs of this Award.

If Owners have in the first instance paid for this Award they shall be reimbursed by Charterers for the cost thereof.

28. The cost of this Award is £250.

29. If within six weeks of the date of this Award it is not set down for Hearing by the Court, then my final Award shall be . that indicated in Recital 26 herebefore."

Mr. Andrew Longmore (instructed by Messrs. Coward, Chance) for the claimant owners; Mr. Anthony Coleman (instructed by Messrs. Crawley & de Reya) for the respondent charterers.

The further facts are stated in the judgment of Mr. Justice Donaldson.

## JUDGMENT

Mr. Justice DONALDSON: The question raised by this award in the form of a special case, stated by Mr. Cedric Barclay, is:—

Whether on the facts found and the true construction of the Charterparty the Charterers were entitled to direct the vessel to port(s) outside the East Coast of Canada for loading.

The charter-party in question is dated July 31, 1974, and is on the New York Produce Exchange Time Charter form. It provided that the charterers should hire the vessel

. . . for the period necessary to perform one time charter trip via safe port(s) East Coast Canada within below mentioned trading limits.

The trading limits referred to are defined in lines 32 to 34 of the charter as follows:—

. . . trading limits always within Institute Warranty Limits—East Coast Canada, USA East of Panama Canal, U.K. Continental Gibraltar—Hamburg Range, Mediterranean excluding Israel, Scandinavia (including Denmark excluding U.A.R. Syria Lebanon Turkey Cyprus Greece Cuba and all Communist and Communist controlled territories (except Yugoslavia).

The cargoes which could be carried under the charter were limited to cereals and cereal products only.

Redelivery was to take place at charterers' option in " U.K./Gibraltar/ Hamburg range; Mediterranean not East of but including Italian Adriatic ".

Although the vessel was fixed only on July 31, 1974, it was agreed that the charter would take effect retrospectively from

06 15 hours on July 23 when she had sailed from Brunsbuttelkoog bound across the Atlantic in ballast for the St. Lawrence.

On Aug. 1, at a time when the charterers had given no specific orders as to the port of loading, their brokers telexed inquiring whether the owners would give the charterers " the option of performing round via Churchill instead of St. Lawrence as fixed ". Churchill is outside Institute Warranty Limits. Later the same day the charterers changed their minds and asked for an option for a " Gulf round " carrying meals. Negotiations went on between the brokers and eventually the owners offered to include this Gulf option subject to (a) an increase in the rate of hire of not less than 25 cents, (b) retention of the Canadian clause paramount if the vessel went to the St. Lawrence, and insertion of the United States clause paramount if she went to the Gulf, and (c) the exercise of the option by 18 00 hours on Aug. 2 latest. The option was neither accepted nor exercised by this time and the vessel continued on her way towards the St. Lawrence.

On Aug. 7, 1974, the charterers nominated Port Cartier as the loading port, but warned that owing to a strike by Laker deck officers there would be a shortage of cargo. Lakers are, of course, the vessels which bring the grain down the seaway from the Great Lakes. They are remarkable for their size and the fact that the bridge is so close to the bow that they have to have a howsprit in order to detect changes in the vessel's heading. Port Cartier is in the province of Quebec near Clarke City, 80 miles west of Anti-costi Island. The vessel arrived there on the same day, but multiple strikes prevented her loading any cargo.

The vessel was still there and unladen on Sept. 17, 1974. On that day the charterers ordered her to proceed to the U.S. Gulf with a view to loading at New Orleans. The owners refused to obey this instruction. Three days later agreement was reached that the vessel would sail for the Gulf and load a cargo without prejudice to the rights of the parties. It was further agreed that if the charterers were entitled to give this order, no additional hire would be payable, but that if they were not, the owners would be paid an additional U.S. $30,000.

The arbitrator held that there was no customary meaning for " via " East Coast Canada ports,

Mr. Longmore, who appeared for the owners, submitted that the common intention of the parties was that there should be a round trip from Europe to the East Coast of Canada and return. The reference to the trading limits and to the Institute Warranty Limits were intended solely for insurance purposes. They limited, but did not define, the ports to which the vessel could be ordered. On the true construction of the charter the vessel could be ordered to call at ports other than those on the East Coast of Canada only if they were substantially on her route between Canada and Europe. The U.S. Gulf was plainly not in this category. In support of this submission, Mr. Longmore referred to *Scottish Navigation Company, Limited v. W. A. Souter & Co.*, [1917] 1 K.B. 222. In particular he relied upon a passage from the judgment of Lord Justice Bankes at p. 245. There the learned Lord Justice said :—

It was assumed in the Court below that the expression " Baltic round " has a well-known meaning in the shipping trade, but the exact meaning was not gone into. During the hearing in this Court counsel were content for the purposes of these appeals to treat a Baltic round as meaning a voyage from a port in the United Kingdom to a port or ports in the Baltic, with liberty to call at United Kingdom or Continental ports *substantially on the way there* !—and those are the words which need to be emphasised—] and returning from a Baltic port or ports to a coal port in the United Kingdom, with the same liberty to call at ports en route.

He also relied upon *Temple Steamship Co. Ltd. v. V/O Sovfracht*, (1945) 79 Ll.L.Rep. 1, after very properly drawing my attention to the warning by Viscount Simon, L.C., on p. 7, that the decision was not to be treated as a precedent for anything. However, irrespective of the warning, I do not think that the decision does more than give added sanctity to the *Scottish Navigation* case to which Lord Porter referred with approval at p. 10 of the report.

Alternatively, Mr. Longmore submitted that having nominated Port Cartier as the loading port, the charterers were unable to make any further nomination.

Mr. Coleman answered this last point by submitting that this doctrine of election was well established in relation to a

Q.B. (Adm. Ct.)]    LLOYD'S LAW REPORTS    633

DONALDSON, J.]    The " Aragon "    [1975] VOL. I

voyage charter-party which provided for loading at a port or specified number of ports within a range, but that it had never been applied to a time charter-party. It was indeed wholly foreign to the whole conception of a time charter-party, which entitled the charterer upon paying the hire to call upon the vessel to visit any port or ports which he wished within trading limits subject to any express agreement to the contrary. This submission is plainly sound.

As to the main argument, Mr. Coleman submitted that the proper approach was to consider the underlying nature of the charter-party and its express terms including in particular any terms containing geographical restrictions upon the use of the vessel. The charterer was entitled to order the vessel to proceed anywhere within trading limits which was not inconsistent with the underlying nature of the charter-party, namely a trip via safe port(s) East Canada and return to Europe. So construed the charter-party permitted a trip from Brunsbuttelkoog to the U.S. Gulf via Port Cartier returning to discharge in Europe and thence to the port of redelivery. This submission is also sound. Although I have some doubts whether such a trip could be commercially successful in the light of the limitation on the classes of cargo which could be carried if the trip is within trading limits, I do not think that it can be said to be inconsistent with the underlying nature of the charter. It does not, for example, involve any retracing of the vessel's tracks or anything which makes it other than a transatlantic round trip.

Only the election argument was advanced before the arbitrator who decided, subject to the opinion of the Court, that the charterers were entitled to order the vessel to proceed to the U.S. Gulf.

I can understand his decision as all concerned seem to have accepted that the U.S. Gulf was within the expressed trading limits and, on the arguments advanced before him, it was right. But during the course of the argument before me I inquired where Port Cartier was and as I then had an atlas, further inquired what was the area falling within the trading limits. It then emerged that Mr. Longmore had read " U.S.A. East of Panama Canal " as two separate limits, " U.S.A." and " East of Panama Canal ", the latter operating to prevent the vessel entering into the Pacific.

I expressed the view that this was a single limit and permitted the vessel to trade east but not west of the meridian running through the Panama Canal. This is in fact Cristobal at the northern or Atlantic end of the Canal on 79 54 30 W. and Balboa at the southern or Pacific end on 79 34 W. Each meridian crosses the east coast of the United States a few miles north of Charleston and wholly excludes the U.S. Gulf. This makes commercial sense because the vessel is free to load at the Canadian and United States ports which might be expected to be shipping the cereal products coming from the middle west, but excludes other ports.

In this situation Mr. Longmore argued in the further alternative that perhaps after all the trading limits did define the area within which the vessel could be ordered to load, although he did not abandon his primary arguments.

In my judgment, Mr. Coleman's approach is correct and trading limits mean what they say. But I also consider that " U.S.A. East of Panama Canal " means what it says and excludes the U.S. Gulf. Mr. Longmore submits that this concludes the matter in favour of the owners. However, there are two difficulties. First, the argument before me has turned on issues which are not fully reflected in the award. The accurate answer to the question stated is " It all depends upon the port to which the vessel was ordered ". Second, I am very conscious of the fact that I am deciding this case upon an argument which was not before the arbitrator and, but for judicial curiosity, might well not have been put before me. I do not wish to be told hereafter that everyone on the Baltic knows that " U.S.A. East of Panama Canal " means that a vessel cannot enter the Pacific, but leaves it free to trade to the U.S. Gulf. I confess that I can see no possible justification for such a construction since the Canal does not run east and west but north and south, and surprisingly and more accurately it seems to run from the Atlantic S.S.E. by S. into the Pacific. But customary meanings do not derive from logic.

The award will be remitted to the arbitrator for further consideration. In taking this course, I wish to give him the opportunity of (a) re-phrasing the question for the opinion of the Court and (b) considering any evidence which may be tendered of a customary meaning for the expression

" U.S.A. East of the Panama Canal " but he is at liberty to consider or reconsider any other matters which may be submitted to him, such as interest and costs. For the reasons which I have given, my present view is that the charterers could not order the vessel to ports in the U.S. Gulf, but could order her to U.S. ports north of about Charleston.

## QUEEN'S BENCH DIVISION
## (COMMERCIAL COURT)

Nov. 11, 12, 13, 1974

MARDORF PEACH & CO. LTD.

v.

ATTICA SEA CARRIERS CORPORATION
OF LIBERIA
(THE " LACONIA ")

Before Mr. Justice DONALDSON

**Charter-party (Time) — Hire — Withdrawal of vessel by shipowners for non-payment — Whether hire accepted before notice of withdrawal received by charterers.**

The charterers chartered the vessel *Laconia* from the shipowners under a time charter on New York Produce Exchange form which conferred a contractual right to withdraw the vessel failing the punctual and regular payment of hire. Further cl. 53 provided (inter alia) that hire was to be paid

. . . to Owners . . . into their account with First National City Bank of New York 34 Moorgate London . . .

The relevant instalment was payable on Sunday, Apr. 12, 1970, but since London banks are closed on Saturdays and Sundays it was payable by 3 p.m. on Friday, Apr. 10, 1970, if it was to be paid " punctually and regularly ". The charterers did not tender the hire on Apr. 10, and on Apr. 13 the shipowners' London agents advised them that there had been a breach of the charter and the shipowners were contemplating withdrawing the vessel.

On Apr. 13, at about 3.10 — 3.15 p.m., the charterers' bank delivered a " payment order " to the shipowners' bank. The shipowners' bank advised the shipowners' London agents that they had received the payment order and were instructed by the agents to return it. On Apr. 13, 1970, at 6.55 p.m. charterers' London agents received a telex notice withdrawing the vessel.

In arbitration proceedings the arbitrators, Mr. Cedric Barclay and Mr. Richard A. Clyde, decided in favour of the shipowners and stated their award as a special case the question of law for decision by the Court being whether the owners were entitled so to withdraw the *Laconia* from the charter.

————*Held*, by Q.B. (Com. Ct.) (DONALDSON, J.), that (i) a " payment order " established a credit in favour of the shipowners' bank in the books of the charterers' bank to be drawn on only in accordance with their instructions (see p. 640, col. 1); and it instructed the

EXHIBIT 7

Engin Kaptanoglu - voyage calculation

Actual rotation:

| FROM | TO | DISTANCE (nau miles) | DAYS | HOURS |
|------|-----|------|------|-------|
| Xingang (delivery) | Fangcheng | 1,783 | 6 | 17 |
| Fangcheng | Shanghai | 1,185 | 3 | 19 |
| Shanghai | Xingang | 687 | 2 | 5 |
| Xingang | Itaqui (via Good Hope) | 12,233 | 39 | 5 |
| Itaqui | Vitoria | 1,594 | 5 | 2 |
| Vitoria | Rio de Janeiro | 276 | 1 | 22 |
| Rio de Janeiro | Paranagua (redelivery) | 336 | 1 | 2 |
| TOTAL | | 18,094 | 58 | 0 |

Total steaming time = 58 days

Rotation based on 3 load and 3 discharge ports:

| FROM | TO | DISTANCE (nau miles) | DAYS | HOURS |
|------|-----|------|------|-------|
| Xingang (delivery) | Fangcheng | 1,783 | 5 | 17 |
| Fangcheng | Xingang | 1,783 | 5 | 17 |
| Xingang | Itaqui (via Good Hope) | 12,233 | 39 | 5 |
| Itaqui | Rio de Janeiro | 1851 | 6 | |
| Rio de Janeiro | Paranagua (redelivery) | 336 | 1 | 2 |
| TOTAL | | 17,996 | 57 | 17 |

Total steaming time = 57 days 17 hours

Port to port distances. Sea ports distance calculation. Sea routes between port...                    Page 1 of...

    Sign up | Sign in

Home > Reference book > **Port distance**

CALCULATION RESULTS

Port of loading: Xingang, CN
Port of discharge: Fangcheng, CN
Distance: 1783 nautical miles
Vessel speed: 13 knots
Time: 5 days 17 hours



Map size: 🔍 🔍

○ - Port terminal

Click the icon in the map to get more information

CALCULATE DISTANCE

| | |
|---|---|
| Port of loading: | Xingang, CN 🔍 |
| Port of discharging: | Fangcheng, CN 🔍 |
| Vessel speed, knots: | 13 |

Enter code from image:

http://www.searates.com/reference/portdistance/?fcity1=753&fcity2=570&speed=13&ccode...    20/08/2008

2

Port to port distances. Sea ports distance calculation. Sea routes between ports                    Page 1 of 2

     Sign up | Sign in

Home > Reference book > **Port distance**

CALCULATION RESULTS

Port of loading: Fangcheng, CN
Port of discharge: Shanghai, CN
Distance: 1185 nautical miles
Vessel speed: 13 knots
Time: 3 days 19 hours



Map size: 📷 📷

O - Port terminal

Click the icon in the map to get more Information

CALCULATE DISTANCE

| | |
|---|---|
| Port of loading: | Fangcheng, CN 📷 |
| Port of discharging: | Shanghai, CN 📷 |
| Vessel speed, knots: | 13 |

Enter code from image:

*3*

Port to port distances. Sea ports distance calculation. Sea routes between ports          Page 1 of 2

 Sea-Rates.com                    Sign up | Sign in                    2

Home > Reference book > Port distance

CALCULATION RESULTS

Port of loading: Shanghai, CN
Port of discharge: Xingang, CN
Distance: 687 nautical miles
Vessel speed: 13 knots
Time: 2 days 5 hours



Map size: 🔍 🔍

○ - Port terminal

Click the icon in the map to get more information

CALCULATE DISTANCE

| | |
|---|---|
| Port of loading: | Shanghai, CN |
| Port of discharging: | Xingang, CN |
| Vessel speed, knots: | 13 |

Enter code from image:

distances_2

## SEA DISTANCES - VOYAGE CALCULATOR

Back to MAIN PAGE

| Nr | Port | Time zone | Distance | Route via | Speed | Days | | Costs | | Arrival | Departure |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | at Sea | in Port | at Sea | in Port | | |
| 1 | Xingang, China to | GMT +8.0 | | | | | | | 0.0 | | 21.08.08 10:17 |
| 2 | Itaqui, Brazil to | GMT -3.0 | 12 283 | Good Hope | 13 | 39.2 | 0 | 0.0 | 0.0 | 29.09.03 06:17 | 29.09.08 06:17 |
| 3 | Vitória, Brazil to | GMT -3.0 | 1 594 | direct | 13 | 5.1 | 0 | 0.0 | 0.0 | 04.10.08 08:17 | 04.10.08 08:17 |
| 4 | Rio de Janeiro, Brazil to | GMT -3.0 | 278 | direct | 13 | 0.9 | 0 | 0.0 | 0.0 | 05.10.08 08:17 | 05.10.08 08:17 |
| 5 | Paranagua, Brazil | GMT -3.0 | 336 | direct | 13 | 1.1 | 0 | 0.0 | 0.0 | 06.10.08 08:17 | 06.10.03 08:17 |
| | TOTAL | | 14 441 | | | 46.3 | 0 | 0 | 0 | | |

Commence date: (dd,mm,yy) 21.08.08 10:17    OK    Display ⊙ By Leg ○ Continued    Clear All    Calculate

21/08/2008

5

```
From :     Lightship operation<opsflash@lightship.dk>
To :       guy@intermarbelgium.com
Date   :   Tue, 15 Apr 2008 17:27:31 +0200
Subject : engin kaptanoglu
```

```
FRM: LIGHTSHIP OPERATION
     PHONE: +45 45460777 / FAX: 45 45460770 WWW.LIGHTSHIP.DK
     EMAIL: OPSFLASH@LIGHTSHIP.DK
```

Ref: 080415-CM727 - DIRECT LINE 45-45460785.

guy/carina

gd day

foll rcvd fm ows
qta

Re:     m/v  " ENGIN KAPTANOGLU " VOY 7

        IMT/ A.B.T.

Charter Party dated April 4th, 2008

Have not received a reply to the following, which was sent April 14th -

Despite several requests/reminders, Owners note that they have still not
received any communication regarding the On Hire Surveyor and/or the
cost of same.  In the meantime, Owners have received a copy of the
Delivery Certificate and the Bunker Survey from the Master, which
apparently was conducted by Oceanwise Marine Services Co., Ltd.  Kindly
confirm and also advise the cost of same, by return.

Meantime, Owners note that the vessel is still in Fengchang.  Kindly
advise itinerary for the balance of the port call in Fengchang as well
as the expected itineraries in Shanghai and Xingang.

Await yours by return.

Thank you and Regards,

Deborah Miller

Phoenix Bulk Carriers (US) Corp.

(As agents only)

6

19-AUG-2008  18:09    IMT DUESSELDF

FANGCHENG

## 中国防城外轮代理有限公司
## CHINA OCEAN SHIPPING AGENCY FANGCHENG

Date: 20 April 2008    Cargo name: RAILS    Quantity: 7,005.35MT(19262PCS)

MV: HONGIN KAPTANOGLU    装卸时间事实记录

# LAYTIME STATEMENT OF FACTS

| DATE | DAY | FR. | TO | DESCRIPTIONS |
|------|-----|-----|-----|-------------|
| Apr.11 | FRI. | | 14:45 | ARRIVED PILOT STATION AND TENDERED NOTICE OF READINESS. |
| | | 16:45 | 17:25 | AWAITING BERTHING. |
| | | 17:25 | 18:35 | PILOT ON BOARD AND VESSEL PROCEEDING TO WHARF NO.8 |
| | | 18:35 | 20:35 | VESSEL MADE LINES FAST AND INWARD FORMALITIES. |
| | | 20:35 | 22:00 | HOLDS INSPECTION. |
| | | 22:00 | 24:00 | STEVEDORES PREPARED FOR LOADING |
| Apr.12 | SAT. | 00:00 | 01:00 | STEVEDORES PREPARED FOR LOADING. |
| | | | | SHIPPERS REPRESENTATIVE MR. WANG ONBOARD AND ADVICED 40MMTS RAILS WITH HEAD UP POSITION REACHED FOR LOADING. |
| | | 01:50 | 04:00 | STEVEDORES WENT OFF AS TOLD LOADING WOULD COMMENCE BY NEXT SHIFT SINCE SHIPPERS COULD NOT SECURE THE TIME AND CARGO READINESS. VESSEL IDLED AND WAITED FOR FURTHER INSTRUCTION. |
| | | 04:00 | 24:00 | LOADING COMMENCED AND CONTINUED |
| Apr.13 | SUN. | 00:00 | 05:35 | LOADING CONTINUED. |
| | | 05:35 | 10:05 | LOADING SUSPENDED DUE TO RAIN. |
| | | 10:05 | 24:00 | LOADING RESUMED AND CONTINUED. |
| Apr.14 | MON. | 00:00 | 01:00 | LOADING CONTINUED. |
| | | 01:00 | 05:15 | LOADING SUSPENDED DUE TO RAIN. |
| | | 05:15 | 24:00 | LOADING RESUMED AND CONTINUED. |
| Apr.15 | TUE. | 00:00 | 16:30 | LOADING CONTINUED. |
| | | 16:30 | 24:00 | LOADING SUSPENDED PER ORDER OF FANGCHENG ENTRY AND EXIT INSPECTION AND QUARANTINE BUREAU DUE PART OF THE DUNNAGES SUPPLIED BY SHIPPER WAS FOUND LOADED TO VESSEL WITHOUT FUMIGATED. |
| Apr.16 | WED. | 00:00 | 24:00 | NO CARGO LOADING DUE TO SHORTAGE OF FUMIGATED DUNNAGES AND AWAITING AUTHORIZATION FROM FANGCHENG ENTRY AND EXIT INSPECTION AND QUARANTINE BUREAU. |
| Apr.17 | THU. | 00:00 | 21:10 | NO CARGO LOADING AND AWAITING AUTHORIZATION FROM FANGCHENG ENTRY AND EXIT INSPECTION AND QUARANTINE BUREAU. |
| | | 21:10 | 24:00 | LOADING RESUMED AND CONTINUED |
| Apr.18 | FRI. | 00:00 | 15:00 | LOADING CONTINUED. |
| | | 15:00 | | LOADING COMPLETED. |
| | | 15:00 | 17:10 | LASHING CARGO. |
| | | 17:10 | 22:10 | PILOT ON BOARD AND VESSEL SHIFTING TO 200K TERMINAL FOR FUMIGATION AS PER THE REQUIREMENT OF FANGCHENG ENTRY AND EXIT INSPECTION AND QUARANTINE BUREAU |
| | | 22:10 | 22:30 | VESSEL MADE FAST ON 200KK TERMINAL AND PREPARED FOR FUMIGATION. |
| | | 22:30 | | DURING CLOSING OF HATCH COVERS AT HOLD 2 AND 4, IT WAS FOUND THAT THE PANELS UNABLE TO REST ONTO THE COMBUSTION BAR LEAVING A GAP WHICH WAS NOT ACCEPTABLE BY THE FUMIGATION FOREMAN. SHIP'S CREW AND SUPERCARGO ALL ONBOARD TO RECTIFY THE SITUATION. SOME OF THE GAPS BEEN FILLED UP BY THE BOARDING/SEALING SYSTEM. REPAIRING SUCCEEDED. |
| Apr.19 | SAT. | | 07:30 | QUARANTINE STAFFERS PREPARED FOR FUMI |
| | | 07:30 | 08:00 | FUMIGATION COMMENCED. |
| | | 08:00 | | FUMIGATION COMPLETED. |
| | | 16:30 | | PILOT ON BOARD AND VESSEL SAILED. |
| | | 19:00 | | |

REMARKS:

1. NOTICE OF READINESS ACCEPTED WITHOUT PREJUDICE AS PER CHARTER PARTY.
2. AT 11TH APRIL(1600HRS), SUPERCARGO AND CHIEF OFFICER FOUND IN HOLD NO.2 IN WAY OF FORWARD TANKTOP WITH A SMALL CRACK AND WATER SPILLAGE. IT WAS IMMEDIATELY REPAIRED BY PATCHING UP WITH CEMENT AND DEBALLAST CARRY ON.

1.SHIP'S QUANTITY:20377    2.NUMBER OF SHIP'S HATCHES: 5
3.HATCHES WORKED IN THIS PORT: 2 & 4    4.OTHERS:NIL

MASTER'S SIGNATURE    AGENT SIGNATURE

7

19-AUG-2020  18:09    IMT DUESSELDORF-

民生国际船务代理公司
Min Sheng International Shipping Agency Co.
装卸时间事实记录
LAYTIME STATEMENT OF FACTS

| 船 名<br>S/S. M/V | ENGIN KAPTANOGLU | | 日期<br>Date | 2008/04/24 ~ 2008/04/27 | |
| --- | --- | --- | --- | --- | --- |
| 装卸货物名称及吨数<br>Loading / | 1954.283 | | Metric tons of | TRUCK ETC | |

| 日 期<br>Date | 星 期<br>Day of<br>the Week | 时 间<br>Hrs (Local time) | 说 明<br>Description |
| --- | --- | --- | --- |
| 24th, Apr. | Thu. | 1830 | Drop anchor at C.I.K. anchorage and tendered NOR |
| | | 1830~2110 | waiting for berth |
| | | 2110 | Heave up anchor and proceed to P/Station |
| | | 2240 | POB and proceed to wharf |
| | | 2240~2359 | Proceed to wharf |
| 25th, Apr. | Fri. | 0000~0415 | ————do——— |
| | | 0415 | 1st line to shore |
| | | 0500 | Made fast |
| | | 0845 | Commence loading |
| | | 0845~2359 | ———do——— |
| 26th, Apr. | Sat. | 0000~2359 | ———do——— |
| 27th, Apr. | Sun. | 0000~0230 | ———do——— |
| | | 0230 | Completed loading |
| | | 0730 | Completed lashing |
| | | 1130 | Sailing |
| | | | MASTER REMARK.<br>AFTER INSPECTION BY INKIDATION<br>SHIPER REPRESENTANT INSTRUCT, A TEAM<br>TO LOAD ALL CRANES TRUCK WHICH THIS<br>AGAINS THE REGULATIONS AGENT STOP THEM<br>DURING LOADING ON 26/04 OF AKSA CARGO<br>LOADING SUSPENDENT DUE LAST PARCEL<br>WAS NOT CLEARE BY CUSTOMS FROM MEMBER<br>TILL 19:00 H2I<br>A LETTER OF PROTEST ALL PARTY PRESENT<br>TO AGENT FOR FEATHER SOME PAPER. |

1. 船舶总吨数    2. 船上舱口数
Ship's G.R.T. 13072.    There are 5 Hatches on board this ship.
3. 本港使用的舱口    4. 其他
Hatches worked in this port Nos. 2 and 4 only.    Others

船 长 Master                          (船长/代理) As Agent

19-AUG-2008 18:29    INT BUESSELIXIRF    +49 211 3687688    5.03

FROM :    FAX NO. :    May. 21 2008 21:44    P2

XINGANG



# 天津新天国际船舶代理有限公司
## TIANJIN XINTIAN INT'L SHIPPING AGENCY CO.,LTD

# STATEMENT OF FACTS

船 名 ENGIN KAPTANOGLU    船舶登记总吨 23077    日 期 19TH MAY 2008
M. S/S    Ship's G.R.T.    Date
政策贸名称之货物 GENERAL CARGO    23553.125MT
Loading    Metric Tons of
现舱舱口数 5
There are    Hatches on board this ship.
在 本 港 装 即 货 物 的 舱 口    ALL
Hatches worked in this port Nos.    and    Only
NOTICE OF READINESS TENDERED    1830LT 29TH APR 2008
NOTICE OF READINESS ACCEPTED    AS PER C/P

| WORK COMMENCED | | WORK COMPLETED | | DESCRIPTION |
|---|---|---|---|---|
| DATE | HRS | DATE | HRS | |
| 29TH APR | 1850 | ------ | ----- | VSL ARRIVED AT XINGANG ANCHORAGE AND B.O.R. TENDERED AT THE SAME TIME |
| 29TH APR | 1830 | 03TH MAY | 0105 | WAITING FOR BERTHING ARRANGEMENT |
| 03RD MAY | 0150 | 03RD MAY | 0255 | P.O.D. AND FIRST LINE CLEAR |
| 03RD MAY | 0255 | 03RD MAY | 0315 | ALL FAST |
| 03RD MAY | 0315 | 03RD MAY | 0340 | GANGWAY LANDED |
| 03RD MAY | 0340 | 03RD MAY | 0430 | FOR IMMIGRATION FORMALITY N COMPLETED |
| 03RD MAY | 0430 | 03RD MAY | 1000 | PREPARE FOR LOADING |
| SAIL UP 12.5M | | | | |
| 03RD MAY | 1030 | | | LDG COMM IN HOLDS 1+4 |
| 03RD MAY | 1040 | | | LDG COMM IN HOLD 5 |
| 03RD MAY | 1045 | | | SUSPENDED LDG IN ALL HOLDS NO LABORS CAME |
| 03RD MAY | 1100 | | | RESUMED IN ALL HOLDS |
| 03RD MAY | 1150 | | | SUSPENDED LDG IN ALL HOLDS DUE TO TURNING THE RAILS UP |
| 03RD MAY | 1305 | | | RESUMED IN ALL HOLDS |
| 03RD MAY | 1515 | | | SUSPENDED LDG DUE TO RAIN |
| 03RD MAY | 1840 | | | RESUMED IN HOLD 1 |
| 03RD MAY | 1855 | | | RESUMED IN HOLD 3 |
| 03RD MAY | 1900 | | | RESUMED IN HOLD 5 |
| 03RD MAY | 1930 | | | SUSPENDED LDG IN ALL HOLDS DUE TO NO LABORS |
| 03RD MAY | 2030 | | | ALL HATCHES CLOSED DUE TO RAIN |

9

19-JUL-2008  18:10    FR: DUESSELDORF

FROM :                        FAX NO. :

140 222 ........  ....
Mag. 21 2008 21:44    P3

| | | | | | |
|---|---|---|---|---|---|
| | | | | | HATCH OPENED PER CHTRS ORDERED |
| 03° MAY | 2315 | | | | RESUMED IN HOLD 1+3 |
| 04° MAY | 0000 | | | | RESUMED IN HOLD 5 |
| 04° MAY | 0030 | | | | SUSPENDED LDG HOLD 3 DUE SPREADERS N LABORS FIND FORKLIFT |
| 04° MAY | 0145 | | | | SUSPENDED LDG HOLD 1+3 DUE TO TURNING THE RAILS UP |
| 04° MAY | 0155 | | | | RESUMED IN HOLD 3 |
| 04° MAY | 0305 | | | | RESUMED HOLD 1 |
| 04° MAY | 0315 | | | | RESUMED IN HOLD 3 |
| 04° MAY | 0330 | | | | SUSPENDED LDG IN HOLD 1 DUE TO TURNING THE RAILS UP |
| 04° MAY | 0340 | | | | RESUMED IN HOLD 1 |
| 04° MAY | 0430 | | | | SUSPENDED IN HOLD 3 DUE TO TURNING THE RAILS UP |
| 04° MAY | 0630 | | | | SUSPENDED LDG FOR CHANGE OF SHIFTS |
| 04° MAY | 0744 | | | | RESUMED IN HOLDS 1+3 |
| 04° MAY | 0800 | | | | RESUMED LDG HOLD 5 |
| 04° MAY | 0910 | | | | SUSPENDED IN HOLD 5 DUE TO TURNING THE RAILS UP |
| 04° MAY | 1155 | | | | SUSPENDED HOLD 1+5 DUE TO TURNING THE RAILS UP |
| 04° MAY | 1300 | | | | RESUMED IN HOLD 3 |
| 04° MAY | 1320 | | | | RESUMED IN HOLD 1+5 |
| 04° MAY | 1825 | | | | SUSPENDED IN HOLD 5 DUE TO TURNING THE RAILS UP |
| 04° MAY | 1930 | | | | SUSPENDED IN HOLD 1+3 DUE TO TURNING THE RAILS UP |
| 04° MAY | 1945 | | | | RESUMED IN HOLD 5 |
| 04° MAY | 2030 | | | | RESUMED IN HOLD 1+3 |
| 04° MAY | 2045 | | | | RE-POSITIONING OF ALL SHORE CRANES |
| 04° MAY | 2105 | 04° MAY | 21.35 | | RESUMED LDG IN ALL HOLDS |
| 04° MAY | 2135 | | | | SUSPENDED LDG IN ALL HOLDS DUE TO TURNING THE RAILS UP |
| 05° MAY | 0150 | | | | RESUMED IN HOLD 3 |
| 05° MAY | 0310 | | | | RESUMED IN HOLDS 1+3 |
| 05° MAY | 0325 | | | | SUSPENDED LDG HOLD 3 DUE TO TURNING THE RAILS UP |
| 05° MAY | 0535 | | | | RESUMED IN HOLD 3 |
| 06° MAY | 0510 | | | | CHANGED SHIFTS |
| 06° MAY | 0745 | | | | RESUMED IN HOLD 3 |
| 06° MAY | 0830 | | | | |

19-AUG-2008  18:10    IPI DUESSELDORF                    1*0 *** ***0***0    *****

FROM :                              FAX NO. :          May. 21 2008 21:44    P4

| | | | |
|---|---|---|---|
| 05ᵗʰ MAY | 0840 | | RESUMED LDG IN HOLDS 1+3 |
| 05ᵗʰ MAY | 1155 | | SUSPENDED LDG FOR MEAL BREAK |
| 05ᵗʰ MAY | 1215 | | RESUMED LDG IN ALL HOLDS |
| 05ᵗʰ MAY | 1430 | | HOLD 3 SHORE CRANE OUT OF ORDER LDG...CEASED |
| 05ᵗʰ MAY | 1525 | | RESUMED AT HOLD 3 |
| 05ᵗʰ MAY | 1549 | | SUSPENDED AT HOLD 3 DUE TO TURNING THE RAILS UP |
| 05ᵗʰ MAY | 1605 | | RESUMED HOLD 3 |
| 05ᵗʰ MAY | 2000 | | CHANGED SHIFTS |
| 05ᵗʰ MAY | 2150 | | RESUMED IN HOLD 1 |
| 05ᵗʰ MAY | 2135 | | RESUMED IN HOLD 3 |
| 05ᵗʰ MAY | 2210 | | RESUMED IN HOLD 5 |
| 06ᵗʰ MAY | 0200 | | STOPPPED LDG FOR MEALBREAK |
| 06ᵗʰ MAY | 0305 | | RESUMED IN HOLD 1 |
| 06ᵗʰ MAY | 0320 | | RESUMED IN HOLD 5 |
| 06ᵗʰ MAY | 0420 | | SUSPENDED LDG AT HOLD 5 DUE POOR HANDLING OF CRANE DRIVER AND 1 PC RAILS DROPPED INTO THE SEA |
| 06ᵗʰ MAY | 0453 | | RESUMED LDG HOLD 5 |
| 06ᵗʰ MAY | 0745 | | CHANGED SHIFTS |
| 06ᵗʰ MAY | 0835 | | RESUMED IN HOLD 5 |
| 06ᵗʰ MAY | 0840 | | RESUMED IN HOLD 3 |
| 06ᵗʰ MAY | 0850 | | RESUMED IN HOLD 1 |
| 06ᵗʰ MAY | 1140 | | FOUND PORT DECK HOLD 3 ONE TRUCK CRANE'S HYDRAULIC PIPES BEING DAMAGED BY THE SWING OF CRANE'S SPREADER |
| | | | DUTY FOREMAN + P & I SURVEYOR BEING NOTIFIED INDDLY |
| 06ᵗʰ MAY | 1150 | | CEASED FOR MEALBREAK |
| 06ᵗʰ MAY | 1205 | | RESUMED LDG IN HOLD 3 |
| 06ᵗʰ MAY | 1315 | | RESUMED LDG IN HOLD 5 |
| 06ᵗʰ MAY | 1330 | | SUSPENDED IN HOLD 5 DUE TO TURNING THE RAILS UP |
| 06ᵗʰ MAY | 1350 | | RESUMED IN HOLD 1 |
| 06ᵗʰ MAY | 1415 | | RESUMED IN HOLD 3 |
| 06ᵗʰ MAY | 1450 | | SUSPENDED LDG IN HOLD 1 DUE TO TURNING THE RAILS UP |
| 06ᵗʰ MAY | 1640 | | RESUMED LDG IN HOLD 1 |
| 06ᵗʰ MAY | 1833 | | SUSPENDED LDG HOLD 3 DUE TO TURNING THE RAILS UP |

VI

19-AUG-2008  18:15    IMI DUESSELDORF

FROM :                          FAX NO. :              May. 21 2003 21:44    P5

| Date | Time | Description |
|---|---|---|
| 06ᵗʰ MAY | 1906 | RESUMED LDG IN HOLD 3 |
| 05ᵗʰ MAY | 1925 | SUSPENDED IN HOLD 3+5 DUE TO TURNING THE RAILS UP |
| 06ᵗʰ MAY | 1950 | SUSPENDED IN HOLD 1 DUE TO TURNING THE RAILS UP |
| 06ᵗʰ MAY | 2125 | RESUMED IN HOLD 5 |
| 06ᵗʰ MAY | 3135 | RESUMED IN HOLD 1+3 |
| 07ᵗʰ MAY | 0145 | SUSPENDED IN ALL HOLDS DUE TO TURNING THE RAILS UP |
| 07ᵗʰ MAY | 2215 | RESUMED IN HOLD 5 |
| 07ᵗʰ MAY | 0300 | RESUMED IN HOLD 3 |
| 07ᵗʰ MAY | 0335 | RESUMED IN HOLD 1 |
| 07ᵗʰ MAY | 0340 | SUSPENDED LDG HOLD 1 DUE TO TURNING THE RAILS UP |
| 07ᵗʰ MAY | 0435 | RESUMED IN HOLD 1 |
| 07ᵗʰ MAY | 0750 | CHANGE OF SHIFTS |
| 07ᵗʰ MAY | 0820 | RESUMED IN HOLD 5 |
| 07ᵗʰ MAY | 0825 | SUSPENDED IN HOLD 1 |
| 07ᵗʰ MAY | 0835 | RESUMED IN HOLD 3 |
| 07ᵗʰ MAY | 1150 | MEALBREAK |
| 07ᵗʰ MAY | 1320 | RESUMED IN ALL HOLDS |
| 07ᵗʰ MAY | 1945 | CHANGE OF SHIFTS |
| 07ᵗʰ MAY | 2045 | RESUMED IN ALL HOLDS |
| 08ᵗʰ MAY | 0155 | SUSPENDED LDG .... MEAL BREAK |
| 08ᵗʰ MAY | 0302 | RESUMED IN ALL HOLDS |
| 06ᵗʰ MAY | 0745 | SUSPENDED IN HOLD 5 DUE TO TURNING THE RAILS UP |
| 08ᵗʰ MAY | 0735 | SUSPENDED IN HOLD 1+3...CHANGING SHIFTS |
| 08ᵗʰ MAY | 0900 | RESUMED ALL HOLDS |
| 08ᵗʰ MAY | 1145 | SUSPENDED DUE TO MEALBREAK |
| 08ᵗʰ MAY | 1320 | RESUMED ALL HOLDS |
| 08ᵗʰ MAY | 1920 | SUSPENDED DUE TO CHANGE OF SHIFT |
| 08ᵗʰ MAY | 2010 | RESUMED ALL HOLDS |
| 08ᵗʰ MAY | 2200 | SUSPENDED IN NO. 1 HOLD DUE TO TURNING RAILS UP |
| 08ᵗʰ MAY | 2220 | RESUMED OF NO. 1 HOLD |
| 08ᵗʰ MAY | 2400 | SUSPENDED IN NO. 5 HOLD DUE TO TURNING RAILS UP |
| 08ᵗʰ MAY | 0040 | RESUMED IN NO. 5 HOLD |

12

| | |
|---|---|
| 09ʰ MAY | 0310 |
| 09ᵖ MAY | 0340 |
| 09ᵗʰ MAY | 0520 |
| 09ᵗʰ MAY | 0540 |
| 09ᵗʰ MAY | 0600 |
| 09ᵗˣ MAY | 0640 |
| 09ˣᵗ MAY | 1500 |
| 09ᵗʰ MAY | 1540 |
| 09ˡʸ MAY | 2000 |
| 09ᵗʰ MAY | 2300 |
| 10ᵗʰ MAY | 1150 |
| 10ᵗʰ MAY | 1300 |
| 10ᵗʸ MAY | 1600 |
| 10ᵗᵉ MAY | 1600 |
| 10ᵗʰ MAY | 2300 |
| 10ᵗʰ MAY | 2300 |
| 11ˣᵗ MAY | 1000 |
| 11ˢᵗ MAY | 1100 |
| 11ˣ MAY | 2300 |
| 12ᵗˣ MAY | 0030 |
| 12ᵗʰ MAY | 0700 |
| 12ᵗʰ MAY | 0600 |
| 12ᵗʰ MAY | 2200 |
| 12ᵗᵖ MAY | 2230 |
| 13ᵗˣ MAY | 0200 |
| 13ᵗʰ MAY | 0330 |
| 13ᵗʰ MAY | 1000 |
| 13ᵗʰ MAY | 1100 |
| 13ᵗʰ MAY | 1500 |
| 13ᵗʰ MAY | 1600 |
| 13ᵗʰ MAY | 2100 |

SUSPENDED IN NO. 1 HOLD DUE TO WAITING LASHING

RESUMED IN NO. 1 HOLD

SUSPENDED IN NO. 6 HOLD DUE TO TURNING RAILS UP

RESUMED IN NO. 6 HOLD

SUSPENDED IN ALL HOLDS DUE TO WAITING LASHING

RESUMED ALL THE HOLD

SUSPENDED DUE TO TURNING THE RAILS UP

RESUMED ALL THE HOLD

SUSPENDED IN ALL HOLDS DUE TO TURNING RAILS UP

RESUMED IN ALL HOLDS

SUSPENDED DUE TO MEALBREAK

RESUMED ALL THE HOLD

SUSPENDED IN ALL HOLDS DUE TO TURNING RAILS UP

RESUMED ALL THE HOLDS

SUSPENDED ALL THE HOLDS DUE TO TURNING RAILS UP

RESUMED ALL THE HOLDS

SUSPENDED ALL THE HOLDS DUE TO TURNING RAILS UP

RESUMED DUE TO TURNING UP THE RAILS

SUSPENDED DUE TO WAITING LASHING

RESUMED ALL THE HOLDS

SUSPENDED ALL THE HOLDS DUE TO WAITING LASHING

RESUMED ALL THE HOLDS

SUSPENDED ALL THE HOLDS DUE TO TURNING UP THE RAILS

RESUMED ALL THE HOLDS

SUSPENDED ALL THE HOLDS DUE TO TURNING UP THE RAILS

RESUMED ALL THE HOLDS

SUSPENDED NO. 1 HOLD DUE TO TURNING UP THE RAILS

RESUMED NO. 1 HOLD

SUSPENDED NO. 5 HOLD DUE TO TURNING UP THE RAILS

RESUME NO. 5 HOLD

SUSPENDED NO. 3 N NO. 5 HOLDS DUE TO TURNING UP THE HAILS

13

| 13ᵗʰ MAY | 2200 |  |  | RESUMED NO. 3 N NO. 5 HOLDS. |
| 14ᵗʰ MAY | 0300 |  |  | COMPLETED LHG OF 12. 5M STEEL RAILS |

Remarks till DN may/0800 tally reoarted 16g steel rails for Paranaqua grand

ctl :1171¶pcs/ 8602mts
2304/2961/2786mts respectively in hold 1/3/5

Remarks:

Vsl encountered various stoppages as per above recording timings. Due to the
fact and our investigations ref:

1)    cgo being stowed in extended areas away in vessel and the way they
loaded by trailers and mobile crane with slings i/o the claws type tht not
keeping the rails in horizontal posn but some twisted at both ends.. Though we
shut hv a gd managing awns of mixed up/down posn.
2)    When trailers with cgo sent alongside... bundles been dispatch fm
trailors by forklift and place on wharf in a messed up posn.  Stevedores hv to
adjust to 'head up' posn one by one with crawl bars, avarage to restored and
lifting by spreader 45 minutes every lifting
3)    When all in posn of 10·1)atsof rails stevedores loaded onhd by means of
spreader with slings at both ends manually..
4)    When reaching into holds... again the stevedores hv to adjust again the
rails each piece by crawl

MASTER _____                         AS AGENT _____

14

20-AUG-2008  16:05     IMT DIESSELSURF                    +49 211 305 1666     S.01

*At Laurence p/ce*

HEAD OFFICE: Porto do Requi S/N - P.O Box: 250
PABX: 55 69 592-9494 / Telex: 992005
FAX: 55 69 292-9468 / 232-8782
E-MAIL: pedreiras@obl.com.br

PEDREIRAS
Transportes

ITAQUI.

| | PAGE |
|---|---|
| | 1 |

## STATEMENT OF FACTS

| | |
|---|---|
| VESSEL | M/V SAGITA KAPTANOGLU |
| DISCHARGING PORT | QUAY 103 / ITAQUI - BRAZIL |
| CARGO AND QUANTITY | 7,000MT STEEL RAILS+SHIFTING CARGOES+ ALUMAR/LOGSMASTER OGS |
| RECEIVERS | DSISAF / LOGSPROJECTS |
| VESSEL ARRIVED | July 6th, 2008 at 13:00R |
| DROPPED ANCHOR | July 6th, 2008 At 13:35R |
| NOTICE OF READINESS TENDERED | July 8th, 2008 at 13:40R |
| NOTICE OF READINESS ACCEPTED | As per Charter Party |
| ANCHOR AWEIGH TO SHIFT TO BERTH | July 20th, 2008 at 04:15R |
| PILOT BOARDED FOR BERTHING | July 20th, 2008 at 05:35R |
| FIRST LINE ASHORE | July 20th, 2008 at 07:10R |
| VESSEL BERTHED ALONGSIDE | July 20th, 2008 at 07:55R |
| VESSEL CLEARED BY PORT AUTHORITIES | July 20th, 2008 at 09:50R |
| DISCHARGING COMMENCED | July 24th, 2008, at 21:00R |
| DISCHARGING COMPLETED | July 27th, 2008 at 04:45R |
| COMPLETED RELOAING SHIFTED CARGO | July 23rd, 2008 at 06:30R |
| PILOT BOARDED FOR SAILING | July 29th, 2008 at 23:15R |

### WORKING TIMES

| DATE | HOLD | UNITY | WEIGHT | TIMES FROM/TO | | REMARKS |
|---|---|---|---|---|---|---|
| July 20, 2008 | | | | 07:50 | 07:55 | Awaiting vessel to come alongside AT QUAY 103 |
| | | | | 07:55 | 09:00 | Awaiting clerance by port authorities |
| | | | | 09:00 | 11:30 | Unlashing cargo hatch cover hold n2 |
| | | | | 11:30 | 13:00 | Stevedores meal hours |
| | | | | 13:00 | 14:00 | Unlashing cargo hatch cover hold n° 2 |
| | | | | 14:30 | 18:30 | Stevedores awaiting battery to start crane truck |
| | | | | 18:30 | 18:30 | Daily safety dialogue |
| | | | | 18:30 | 21:15 | Unlashing shifting cargo of hld cover 4 |
| | | | | 21:15 | 21:30 | Shifting ship's crane to hold 4 |
| | Deck | 1 | 98,210 | 21:30 | 23:30 | Discharging shifting cargo to be reloaded |
| | | | | 33:30 | 01:30 | Stevedores meal hours |
| July 21st, 2008 | Deck | 5 | 37,065 | 01:30 | 02:10 | Discharging shifting cargo |
| | | | | 02:10 | 04:00 | Unlashing shifting cargo hatch cover 4 |
| | | | | 04:00 | 05:00 | Shore preparations |
| | Deck | 7 | 41,000 | 05:00 | 06:00 | Discharging shifting cargo |
| | | | | 05:05 | 06:10 | Shifting shore crane |
| | Deck | 1 | 29,780 | 06:10 | 07:00 | Discharging shifting cargo |
| | | | | 07:00 | 07:50 | Daily safety dialogue |
| | | | | 07:50 | 09:00 | Unlashing shifting cargo hatch cover 4 |
| | Deck | 3 | 80,980 | 09:00 | 11:30 | Discharging shifting cargo |
| | 4 | 2 | 65,000 | 09:30 | 11:30 | Discharging Alumar/LOGSPROJECTS cargo |
| | | | | 11:00 | 13:30 | Stevedores meal hours |
| TOTAL | | | | | | |
| ARRIVAL DRAFT | | FORE: | | | APT: | |
| DEPARTURE DRAFT | | FORE: | | | AFT: | |

### CARGO PLAN (Enginner's figures)

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| HOLDS | 1 | 2 Rails | 3 | 4 Rails | 2Reloaded | 4 Reloaded | 2 Deck | 4 Deck |
| WEIGHT | | 2,469,045 | | 3,019,710 | 266,752 | 131,650 | 167,000 | 218,103 |
| UNITY | | 15,078 | | 9,194 | 90 | 12 | 5 | 7 |
| HOLDS | | 2 Alumar | | 4 Alumar | | | | |
| WEIGHT | | 94,148 | | 878,030 | | | TOTAL CARGO |
| UNITY | | 27 | | 647 | | | 9,405,539 Tons |

REMARKS: All Alumar / Logsprojects 926,092 tons stowed on top of rails on both holds n° 2 and or 4
Shifting and Discharging and Restow of cargo were carried out as per proposed cargo stowage plan received from Master

We deny any responsibility to any shortage/damage during the operations.

APPROVED BY.

20-AUG-2008  16:09    IMT DUESSELDORF    +49 211 3087088   S.04



**PEDRENAS Transportes**

HEAD OFFICE: Porto de Paça S/N - P.O.Box 260-
PABX: 55 98 232-3334 / Telex: 903605
FAX: 55 98 232-3509 / 232-3762
E-MAIL: pedre@ele.com.br

| | | | PAGE 2 |
|---|---|---|---|

## STATEMENT OF FACTS

| VESSEL | MV ENGIN KAPTANOGLU |
|---|---|
| DISCHARGING PORT | QUAY 933 / ITAQUI - BRAZIL |
| CARGO AND QUANTITY | 7.000MT STEEL RAILS+SHIFTING CARGOES+ ALUMARI,LOGMASTER UGO |
| RECEIVERS | DEMAI / LOGIPROJECTS |

### WORKING TIMES

| DATE | HOLD | UNITY | WEIGHT | TIMES FROM/TO | | REMARKS |
|---|---|---|---|---|---|---|
| | | | | TRANSPORTED FROM PAGE 1 | | |
| July 21st, 2008 | 1 | | | 13:00 | 14:45 | Unloading cargo on LH nr 4 |
| | 4 | 7 | 41.000 | 14:45 | 17:30 | Discharging Alumari/LOGIPROJECTS cargo |
| | | | | 17:30 | 16:50 | Preparations on board to remove discharging Alumar ca |
| | Deck | 2 | 21.850 | 14:45 | 17:30 | Discharging shifting cargo |
| | | | | 17:30 | 17:50 | Changing shore crane to hold 2 |
| | | | | 17:50 | 19:00 | Unloading cargo on hold 2 |
| | Deck | 1 | 31.000 | 18:00 | 19:30 | Discharging shifting cargo |
| | | | | 19:30 | 12:35 | Awaiting stevedores to come on board |
| | | | | 19:55 | 20:15 | Daily safety dialogue |
| | Deck | 21 | 62.000 | 20:05 | 21:50 | Discharging shifting cargo |
| | | | | 21:50 | 24:00 | Waiting start ignition of crane trucks |
| | 4 | 10 | 35.420 | 20:15 | 22:30 | Discharging Alumari/LOGIPROJECTS cargo |
| | | | | 22:30 | 01:00 | Stevedores meal hours |
| July 22nd, 2008 | 4 | 17 | 75.563 | 01:00 | 07:00 | Discharging Alumari/LOGIPROJECTS cargo |
| | | | | 01:30 | 02:00 | Preparations to discharging shifting cranes trucks |
| | Deck | 2 | 62.000 | 02:00 | 03:20 | Discharging shifting cargo |
| | | | | 03:20 | 03:30 | Opening hatch cover 2 |
| | | | | 03:30 | 06:50 | Unloading shifting cargo on hold 2 |
| | 2 | 1 | 40.660 | 05:50 | 07:00 | Discharging shifting cargo |
| | | | | 07:00 | 07:30 | Installing lashing cargo on hold 2 |
| | | | | 07:30 | 07:50 | Daily safety dialogue |
| | | | | 07:50 | 08:00 | Preparations on chute |
| | 4 | 134 | 193.500 | 08:00 | 11:30 | Discharging Alumari/LOGIPROJECTS cargo |
| | 2 | 4 | 122.970 | 08:00 | 10:40 | Discharging shifting cargo |
| | | | | 10:40 | 11:30 | Removal of cargo alongside vessel |
| | | | | 11:30 | 13:00 | Stevedores meal hours |
| | | | | 13:00 | 13:30 | Removal of cargo alongside vessel |
| | 4 | 09 | 92.931 | 13:30 | 16:25 | Discharging Alumari/LOGIPROJECTS cargo |
| | 2 | | | 15:50 | 16:25 | Placing plates and forklift into hold 2 |
| | 2 | 8 | 5.165 | 16:25 | 16:50 | Discharging shifting cargo |
| | | | | 16:50 | 16:30 | Forklift failure |
| | | | | 17:30 | 18:50 | Daily safety dialogue |
| | | | | 19:50 | 20:30 | Shore preparations |
| | 4 | 36 | 80.947 | 20:00 | 18:30 | Discharging Alumari/LOGIPROJECTS cargo |
| | 2 | 15 | 29.480 | 20:30 | 21:50 | Discharging shifting cargo |
| | 2 | 17 | 30.010 | 21:50 | 22:30 | Discharging Alumari/LOGIPROJECTS cargo |
| | | | | 23:00 | 01:00 | Stevedores meal hours |
| July 23rd, 2008 | 4 | 120 | 141.530 | 01:00 | 07:20 | Discharging Alumari/LOGIPROJECTS cargo |
| | 2 | 20 | 70.350 | 01:00 | 07:20 | Discharging Alumari/LOGIPROJECTS cargo |
| | | | | 07:20 | 06:30 | Awaiting stevedores gang |
| | | | | 08:00 | 08:45 | Daily safety dialogue |
| | 4 | 86 | 151.070 | 08:45 | 13:30 | Discharging Alumari/LOGIPROJECTS cargo |
| | 2 | 10 | 31.140 | 08:45 | 13:30 | Discharging Alumari/LOGIPROJECTS cargo |
| TOTAL | | | | | | |

APPROVED BY

16

28-AUG-2008  15:59        IMT DUESSELDORF                        +49 211 3057555      5.03

**PEDRENAS Transportes**

HEAD OFFICE: Porto de Itaqui S/N • P.O.Box: 150
PABX: 65 92 232-0354 / Telex: 822505
FAX: 65 92 232-0503 / 232-0762
E-MAIL: pedra@pto.com.br

| | | | | | | PAGE |
|---|---|---|---|---|---|---|
| | | | | | | 3 |

## STATEMENT OF FACTS

| VESSEL | | | | MV ONSIN KAPTANOGLU | | |
|---|---|---|---|---|---|---|
| DISCHARGING PORT | | | | QUAY 105 / ITAQUI – BRAZIL | | |
| CARGO AND QUANTITY | | | | 7.000MT STEEL RAILS+SHIFTING CARGO 650+ ALUMAR/LOGIPROJECTS CCD | | |
| RECEIVERS | | | | DESIME / LOGIPROJECTS | | |

| DATE | HOLD | UNITY | WEIGHT | WORKING TIMES | | REMARKS |
|---|---|---|---|---|---|---|
| | | | | TIMES FROM/TO | | TRANSPORTED FROM PAGE 2 |
| July 22nd 2008 | | | | 11.20 | 13:00 | Stevedores meal hours |
| | 4 | 48 | 58,336 | 13:30 | 15:45 | Discharging Alumar/LOGIPROJECTS cargo |
| | 2 | 31 | 37,639 | 12:30 | 16:50 | Discharging Alumar/LOGIPROJECTS cargo |
| | | | | 16:48 | 16:28 | Shore preparations to start discharging rails |
| | 3 | 5 | 13,714 | 16:50 | 16:00 | Discharging Alumar/LOGIPROJECTS cargo |
| | 2 | 3 | 2,935 | 16:50 | 13:50 | Discharging shifting cargo |
| | 4 | 355 | 108,310 | 18:20 | 19:30 | Discharging rails with ship's crane |
| | 3 | 9 | 10,167 | 19:50 | 18:30 | Discharging Alumar/LOGIPROJECTS cargo |
| | | | | 19:30 | 19:30 | Daily safety dialogue |
| | | | | 19:50 | 22:30 | Preparations on shore |
| | 2 | 4 | 11,294 | 20:30 | 23:30 | Discharging shifting cargo |
| | 4 | 139 | 28,006 | 20:30 | 23:30 | Discharging rails |
| | | | | 23:30 | 01:30 | Stevedores meal hours |
| July 24th, 2008 | 4 | 63 | 43,060 | 01:30 | 03:00 | Discharging rails |
| | 2 | 7 | 22,700 | 01:50 | 03:00 | Discharging shifting cargo |
| | | | | 03:00 | 03:30 | Preparations on shore to start discharging rails |
| | 2 | 176 | 118,600 | 03:30 | 07:30 | Discharging rails |
| | | | | 03:00 | 03:30 | Preparations on shore |
| | 4 | 65 | 109,930 | 03:00 | 07:30 | Discharging Alumar/LOGIPROJECTS cargo |
| | | | | 07:30 | 07:50 | Daily safety dialogue |
| | | | | 07:50 | 08:00 | Awaiting stevedores gang to come on board |
| | 4 | 148 | 78,230 | 08:00 | 10:40 | Completed discharging Alumar/LOGIPROJECTS cargo |
| | 4 | 272 | 36,460 | 10:40 | 11:50 | Discharging rails |
| | 2 | 81 | 86,500 | 08:00 | 11:50 | Discharging rails |
| | | | | 11:50 | 13:30 | Stevedores meal hours |
| | 4 | 604 | 483,200 | 19:30 | 19:30 | Discharging rails |
| | 2 | 428 | 344,050 | 10:00 | 19:50 | Discharging rails |
| | | | | 19:30 | 20:30 | Awaiting stevedores gang to come on board |
| | | | | 20:00 | 20:50 | Daily safety dialogue |
| | | | | 20:50 | 21:30 | Awaiting forklift operator |
| | 4 | 210 | 149,500 | 21:30 | 23:30 | Discharging rails |
| | 3 | 192 | 151,050 | 21:30 | 23:30 | Discharging rails |
| | | | | 23:30 | 01:30 | Stevedores meal hours |
| July 25th, 2008 | 2 | 705 | 515,400 | 01:30 | 07:00 | Discharging rails |
| | 4 | 345 | 510,600 | 01:30 | 07:00 | Discharging rails |
| | 3 | | | 07:00 | 07:30 | Forklift arc hold & failure |
| | | | | 07:30 | 08:00 | Awaiting stevedores gang to come on board |
| | | | | 08:00 | 08:20 | Daily safety dialogue |
| | | | | 08:20 | 15:00 | Preparations on shore |
| | 2 | 217 | 145,300 | 03:00 | 11:30 | Discharging rails |
| | 3 | 337 | 230,000 | 09:30 | 11:30 | Discharging rails |
| | | | | 11:30 | 13:30 | Stevedores meal hours |
| TOTAL | | 6480 | 442,000 | 13:30 | 16:30 | Discharging rails |

Consignee: Pedrenas Transportes

APPROVED BY

MASTER

17

20-AUG-2008  16:10        IMT DUESSELDORF                    +49 211 368 7666        S.04

PEDREIRAS
Transportes

HEAD OFFICE: Porto do Raqui S/N - P.O.Box: 256
PABX: 55 68 232-6584 / Telex: 952004
FAXI 55 68 282-4868 / 232-0782
E-MAIL: porto@cta.com.br

PAGE
4

## STATEMENT OF FACTS

| VESSEL | SV ENGIN KAPTANOGLU |
|--------|---------------------|
| DISCHARGING PORT | QUAY 106 / ITAQUI - BRAZIL |
| CARGO AND QUANTITY | 7,000MT STEEL RAILS+COATING CARGOES+ ALUMAR/LOGMASTER CGO |
| RECEIVERS | OISMAS / LOGIPROJECTS |

**WORKING TIMES**

| DATE | HOLD | UNITY | WEIGHT | TIMES FROM/TO | | REMARKS |
|------|------|-------|--------|------|------|---------|
| | | | | | | TRANSPORTED FROM PAGE 3 |
| July 25th, 2008 | 6 | 713 | 447,000 | 18:50 | 19:50 | Discharging rails |
| | | | | 19:30 | 19:50 | Daily safety dialogue |
| | | | | 19:50 | 83:20 | Preparations on shore |
| | 2 | 220 | 150,000 | 20:20 | 22:30 | Discharging rails |
| | 4 | 239 | 160,000 | 22:20 | 23:50 | Discharging rails |
| | | | | 23:50 | 01:20 | Stevedores meal hours |
| July 26th, 2008 | 4 | 569 | 343,600 | 01:30 | 07:00 | Discharging rails |
| | 2 | 637 | 450,000 | 07:00 | 07:00 | Discharging rails |
| | | | | 07:00 | 08:00 | Awaiting stevedores gang to come on board |
| | | | | 08:00 | 08:30 | Daily safety dialogue |
| | 4 | 342 | 234,000 | 08:30 | 11:30 | Discharging rails |
| | 2 | 343 | 224,000 | 08:20 | 11:30 | Discharging rails |
| | | | | 11:30 | 13:30 | Stevedores meal hours |
| | 4 | 256 | 173,000 | 13:30 | 16:40 | Discharging rails |
| | 2 | 285 | 193,000 | 13:30 | 15:50 | Discharging rails |
| | | | | 15:40 | 16:10 | Awaiting conclusion of Reports on Pedreiras piket |
| | 4 | 570 | 389,000 | 16:10 | 18:40 | Discharging rails |
| | 2 | 502 | 340,000 | 16:10 | 19:00 | Discharging rails |
| | | | | 19:00 | 20:00 | Awaiting stevedores gang |
| | | | | 20:00 | 20:20 | Daily safety dialogue |
| | 4 | 190 | 130,000 | 20:20 | 21:00 | Removal of dunnages from hold 4 |
| | 2 | 270 | 184,000 | 21:00 | 23:20 | Completed discharging rails hold 4 |
| | | | | 20:20 | 23:00 | Discharging rails |
| | | | | 23:20 | 01:20 | Stevedores meal hours |
| July 27th, 2008 | 2 | 284 | 194,100 | 01:30 | 04:45 | Completed discharging rails hold 2 |
| | | | | 04:45 | | Suspended restowing cgo due to shoreorane failure |
| | | | | 07:30 | 08:00 | Delivantry dialogue |
| | | | | 08:00 | 08:10 | Getting vessel for restowing |
| | | | | 08:10 | 11:40 | Completed restowing |
| | | | | 11:40 | 13:30 | Stevedores meal hours |
| | | | | 13:30 | 14:50 | Preparations on shore |
| | 2 | 28 | 87,160 | 14:50 | 19:30 | Restowing cargo with ship's crane |
| | | | | 19:30 | 18:30 | Removal of cargo obstructing passway of crane |
| | | | | 16:20 | 19:00 | Shorecrane failure for hold nr 4 |
| | | | | 19:00 | 19:50 | Daily safety dialogue |
| | | | | 19:50 | 20:40 | Preparations on shore |
| | | | | 20:40 | 21:30 | Changing foklifters info hold 2 |
| | 2 | 43 | 28,337 | 21:30 | 23:30 | Restowing cargo |
| | | | | 23:30 | 01:30 | Stevedores meal hours |
| July 28th, 2008 | 2 | 10 | 12,675 | 01:30 | 02:30 | Restowing cargo |
| | 2 | | | 02:30 | 02:50 | Stow cargo in to hold properly |
| | | | | 02:50 | 03:00 | Removal of forklit from hold 2 |
| | | | | 03:00 | 03:30 | Changing gang to hold 4 |
| **TOTAL** | | | | | | |

APPROVED BY

22-AUG-2008  16:10    [M] DIESSELDORF    +49 211 588/0355    5.05

HEAD OFFICE: Porto do Itaqui S/N - P.O.Box 259
PABX: 55 98 218-8334 | Telex: 832009
FAX: 55 98 222-2809 / 232-9765
E-Mail: pedra@elo.com.br

**STATEMENT OF FACTS**

| | PAGE |
|---|---|
| | 5 |

VESSEL: MV ENGIN KAPTANOGLU
DISCHARGING PORT: QUAY 108 ( ITAQUI) - BRAZIL
CARGO AND QUANTITY: 7,595MT STEEL RAILS/SHIFTING CARGOES+ ALUMAR LOGMASTER C90
RECEIVERS: CISMAR / LOGIPRODUCTS

**WORKING TIMES**

| DATE | HOLD | UNITY | WEIGHT | TIME FROM/TO | | REMARKS |
|---|---|---|---|---|---|---|
| July 25th, 2008 | 4 | 0 | 9,286 | 03:20 | 06:30 | Restowing cargo by ship's crane |
| | | | | 06:30 | 06:30 | Bringing cargo along side vessel |
| | | | | 06:30 | 07:20 | Awaiting removal of shore cranes |
| | | | | 07:20 | 07:50 | Daily safety dialogue |
| | | | | 07:50 | 08:20 | Changing shore crane to hold nr 4 |
| | | | | 08:20 | 10:20 | Resumed restow cargo by shore crane |
| | 4 | 3 | 122,608 | 10:30 | 11:50 | Completed restowing cargo LH 4 with shore crane |
| | | | | 11:50 | 13:30 | Stevedores meal break |
| | | | | 13:30 | 15:30 | Awaiting open hatch cover for lashing gear |
| | 2 | 6 | 129,370 | 13:30 | 18:30 | Completed restowing cargo on low hold 2 |
| | | | | 18:30 | 19:30 | Awaiting overboard lashing on low hold 4 |
| | | | | 19:30 | 19:50 | Daily safety dialogue |
| | | | | 19:50 | 20:30 | Lashing cargo on low hold 4 |
| | | | | 20:30 | 21:00 | Preparations on shore |
| | Deck | 2 | 89,213 | 21:30 | 23:30 | Restowing crane trucks on hatch cover of hold 4 |
| | | | | 23:30 | 01:30 | Stevedores meal break |
| July 26th, 2008 | Deck | 0 | 149,948 | 01:30 | 06:15 | Restowing cargo on deck hold 4/5 |
| | | | | 06:15 | 06:40 | Changing shore crane to hold 2 |
| | | | | 06:40 | 06:20 | Completed lashing cargo on low hold 2 |
| | Deck | 2 | 62,000 | 06:45 | 07:30 | Restowing crane trucks of hatch cover on hold 2 |
| | Deck | 0 | 91,000 | 07:30 | 08:30 | Completed restowing crane trucks hatch cover of hold 2 |
| | | | | 08:30 | 10:20 | Awaiting for lashing gang |
| | | | | 10:20 | 21:10 | Completed lashing cargo on hatch covers |
| TOTAL | | | | | | |

MASTER PROTEST RECORD THE SOF WILL HAND IT TO AGENT
BELOW REMARKT WHICH AS PER OUR RECORDS FOR SUSPENDED,
DELAY DISCHARGING AND REASONING:

① SHORE CRANE DAMAGED AND SUSPENDED RESTOWING ON 27TH
1330 TILL ON 28 AT 1950

② RESULTS FROM 12 HRS ON 2700 FRM 1835 TO 1930

③ WE SHOULD COMPLAIN ON PSI RESTOW CARGO AS SHOWN
AS SOF

④ STEVEDORE DAMAGE REPORT AS ATTACHED

⑤ DELAYS PUSH AND RESTOWING OPERATIONS UNDER PSI CHIEF SUPER
REQUEST TO STOP OR SUSPEND

⑥ ALL VESSEL CLO DISCHARGE AS PER INFO LOADED,

APPROVED BY

GESAMTSEITEN  05

19

10 AUG-2008  18:11     INT DUESELDORF                    +49 211 356 1898    S.01

VITORIA

STANDARD STATEMENT OF FACTS (SHORT FORM)
Recommended by
The Baltic International Maritime Conference (BIMCO)
and the Federation of National Associations
of Ship Brokers and Agents (FONASBA)

TRANSREGIONAL SHIPPING AGENCY LTD
Av Juscelino Kubitschek, 1909-Sul Trade Center,
Sales 1216/1220, Vitoria, ES-Brazil
Tel 55 27 21248161 FAX 55 22 32297098

VITORIA, BRAZIL - CAPUABA QUAY - BERTH 202

ENGIN KAPTANOGLU

05 AUGUST 2008 AT 10:06 H

08 AUGUST 2008 AT 07:00 H

40T - SHIPPING & CHARTERING CASH

05 AUGUST 2008 AT 10:06 H        06 AUGUST 2008 AT 07:00 H

09 AUGUST 2008 AT 04:00 H        09 AUGUST 2008 AT 05:00 H

32 UNITS
1,027,300 KGS
2,355.127 CBM                     06 AUGUST 2008 AT

SHIFT TO 07:00-16:00H, 13:00-18:00H, 18:00-01:00H, 01:00H-07:00H
MONDAY 07:00H TO SATURDAY 13:00H, NORMAL HOURS
SATURDAY 13:00H TO SUNDAY 07:00H, OVERTIME

BRAVO 1,027,300 KGS

05 AUGUST 2008 AT VITORIA

RECEIVED ON AUGUST 05TH, 2008 AT 02:00H / AS PER C/P        08 AUGUST 2008 AT

RIO DE JANEIRO, BRZ        AUGUST 2008 AT        H        ON ARRIVAL

DRAFT FWD:        Aft:

| Date | Day | Hours Worked | | Hours Stopped | | No. of Gangs | Quantity Loaded/Disch. | Remarks |
|------|-----|------|----|------|----|------|------|---------|
| | | From | To | From | To | | | |
| 05.08.2008 | TUE | | | | 0000 | | | ARRIVAL AT ROADS |
| | | | | | | | | FREE PRATIQUE GRANTED AT ROADS |
| | | | | | | | | NOR TENDERED / ACCEPTED AS PER C/P |
| | | | | | | | | PILOT ON BOARD FOR BERTHING |
| | | | | 0315 | | | | FIRST LINE ASHORE |
| | | | | 0425 | | | | ALL FAST, BERTH ED, CLEARED BY AUTHORITIES |
| | | | | 1508 | | | | WAITING STEVEDORES FOR DISCHARGE |
| | | | 0505 | 0700 | | | | MANEUVERING SHORECRANE |
| | | | 0700 | 0730 | | | | WAITING BATTERY FOR MACHINES IGNITION |
| | | | 0750 | 1000 | | | | DISCHARGE COMMENCED |
| | | | | 1050 | | 1 | 127,452 MT | DISCHARGED FROM DECK AND HATCH COVERS |
| | | 1000 | 1300 | | | 1 | 535,100 MT | DISCHARGED FROM HATCH COVERS |
| | | 1300 | 1300 | | | | | MANEUVERING SHORECRANE |
| | LESS STOPPAGES | >> | 1405 | 1420 | | | | PERFORMING CARGO UNLASHING |
| | | >> | 1420 | 1440 | | | | WAITING BATTERY FOR MACHINES IGNITION |
| | | >> | 1615 | 1830 | | 1 | 650,145 MT | DISCHARGE FROM HOLD #01 |
| 06.08.2008 | WED | 1800 | 0100 | | | 1 | 60,200 MT | DISCHARGE FROM HOLD #01 |
| | | 0100 | 0300 | | | | | DISCHARGE COMPLETED |
| | | | | | 0300 0445 | | | PILOT BOARD FOR SAILING |
| | | | | | | | | VESSEL SAILED |

FOLLOWING TRUCK CRANES ARRIVE WITH DAMAGE BEFORE DISCHARGE:

ALMOST ALL MACHINES DISCHARGED AT VITORIA ENGINE NOT RUNNING, CRADLES NOT MOVING IN ORDER TO LIFT, THEREFORE MACHINES
LIFTED FROM THE CRADLES WITH SHACKLES AND SHACKLES CAUSE DAMAGE ON THE SIDE OF MACHINE PROTECTION

SEE AS ATTACHMENT MASTER REMARKS

VITORIA BRAZIL, 08 AUGUST 2008        ENGIN KAPTANOGLU

TRANSREGIONAL SHIPPING AGENCY LTD
AS AGENTS

GESAMTSEITEN 01

20

EXHIBIT 8



# LLOYD'S MARITIME LAW Newsletter

lmln.com

28 November 2007 • LMLN 731

## CASES – ENGLAND

### (2007) 731 LMLN 1

**Charterparty – Demurrage – Time bar – Whether owners presented relevant supporting documents within 90 days of completion of discharge – Whether documents needed to be signed – Whether absence of signatures was de minimis – Whether owners' claim time-barred**

*Waterfront Shipping Co Ltd v Trafigura AG (The "Sabrewing") – QBD (Com Ct) (Gloster J) – 31 October 2007*

The vessel *Sabrewing* was chartered on a Beepeevoy 3 form to carry a cargo of unleaded gasoline from New York to Vancouver. The issue in the present case was whether the owners had presented a demurrage claim with relevant supporting documents within the 90 period specified in the charterparty.

The relevant provisions of the charterparty were as follows:

"16. Owners shall undertake that the Vessel shall discharge a full cargo, as defined hereunder, within 24 hours ... or that the Vessel shall maintain an average discharge pressure of 100 psig at the Vessel's manifold ... provided that the shore receiving facilities are capable of accepting discharge of the cargo within such time or at such pressure. ... Any additional time used owing to the inability of the Vessel to discharge the cargo within 24 hours ... or to maintain an average discharge pressure of 100 psig at the Vessel's manifold ... shall be for Owners' account ... If the shore receiving terminal facilities are unable to accept discharge of the cargo within the aforementioned time or at the aforementioned discharge pressure the Master shall present the shore receiving terminal with a Note of Protest forthwith ... and shall use all reasonable endeavours to have such Note of Protest countersigned on behalf of the shore receiving terminal in the absence of which countersignature the Master shall present a further Note of Protest to the shore receiving terminal. ...

Charterers will not consider any claim by Owners for additional time used in the foregoing circumstances in the absence of the provision by Owners of the following documentation:-

(a) an hourly pumping log, signed by a responsible officer of the Vessel and a terminal or Charterers' representative, showing the pressure maintained at the manifold throughout discharge and, in the absence of a signature from a terminal or Charterers' representative, a Note of Protest;

(b) copies of all Notes of Protest issued or received by the Vessel in relation to the discharge in question; and

(c) copies of any other documentation generated by the Vessel or by the shore receiving terminal relevant to the discharge in question.

23. Charterers shall be discharged and released from all liability in respect of any claim for demurrage which Owners may have under this Charter unless a claim in writing has been presented to Charterers together with supporting documentation substantiating each and every constituent part of the claim within 90 days of the completion of discharge of the cargo carried hereunder."

The 90 day period for presenting a claim for demurrage in accordance with clause 23 of the charterparty expired on 14 November 2005.

The vessel was already on demurrage for 34 hours and 41 minutes on leaving the loadport. As the total laytime allowance of 84 hours had already been utilised at the load port the vessel went on demurrage immediately on arrival at the discharge port. Total time on demurrage was 121 hours and 24 minutes. The actual discharging time was 47 hours and 10 minutes.

The owners presented a claim for demurrage in the sum of US$114,387.40 together with various supporting documents prior to 14 November 2005. However, the supporting documents were not described on their face as pumping logs, and were not signed by a responsible officer of the vessel, or by a terminal or charterer's representative. They were not signed at all. The charterers refused to pay and the owners brought proceedings to recover the demurrage.

The charterers said that the claim was time-barred, and they applied for summary judgment. They said that on the true construction of the charter the owners were obliged to provide to the charterers within the 90 day period (ie prior to 14 November 2005):

a) pumping logs signed:
  i) by a responsible officer of the vessel and
  ii) by a terminal or charterers' representative; or

b) in the absence of a signature from a terminal or charterers' representative:
  (i) pumping logs signed by a responsible officer of the vessel; and
  (ii) a note of protest as to the lack of countersignature on such pumping logs from a terminal or Charterers' representative.

The owners contended *inter alia* (1) that all they had to produce under clause 23 were the usual documents which evidenced the sum claimed, such as a Notice of Readiness and a statement of facts to demonstrate when hoses were disconnected, (2) they did not need to provide pumping logs under clause 23 because their claim was not dependent upon such logs: the pumping logs might be relevant to a defence run by charterers to a claim for demurrage, but they were not relevant to owners' claim for demurrage, (3) even if pumping logs had to be provided, there was no requirement under clause 23 for them to be signed by the owners and terminal/charterers or, failing a signature from the terminal/ charterers, no requirement for the production of a notice of protest, (4) clause 23 imposed no obligation to provide additional documents where there was said to be a claim for "additional time used", (5) even if the owners were obliged to provide pumping logs signed by the owners within the 90 day

EDITED BY MICHAEL DATCHES, BARRISTER

Lloyd's is the registered trade mark of the Society incorporated by the Lloyd's Act 1871 by the name of Lloyd's.

You may be breaching copyright if you photocopy any pages from this publication. To purchase additional copies or site licences, please contact Daniel Jones Tel +44 (0)20 7017 5966

**informa**
law
an informa business

www.lmln.com

period the lack of signature by the owners was *de minimis* and irrelevant, and (6) the charterers did in fact receive (from a different source) pumping logs signed by the charterers' representatives within the 90 day period.

*Held*, that parties were obliged to comply carefully and strictly with demurrage time-bar clauses. Importance was also attached to requirements for signed documents where included (*The Oltenia* [1982] 1 Lloyd's Rep 448). The commercial purpose of such clauses was also to achieve finality (*The Yellow Star* [2002] 2 Lloyd's Rep 637).

On the true construction of clauses 16 and 23 the owners were obliged to provide signed pumping logs within the 90 day period. The owners' argument that they did not need to produce documents to anticipate a defence by the charterers would be rejected. The onus was on the owners to support their claim with appropriate documents. Unless they produced pumping logs, they could not, in circumstances where discharge had taken longer than 24 hours (as in the present case), justify their claim for additional time.

There was a linkage between clauses 16 and 23. Clause 16 supplemented the provisions of clause 23 by making it clear that the charterers were under no obligation even to consider a claim for demurrage for additional time if the 24 hour rule was exceeded, unless the owners had demonstrated, by provision of the relevant documentation identified in clause 16(a)-(c), that they were not in breach of their pumping warranty, and that the fault lay with the terminal. Clause 16 identified some of the necessary "supporting documentation" for the purposes of clause 23.

The owners' failure to provide signed pumping logs by 14 November 2005 was not *de minimis*. There was a real commercial purpose and importance in requiring a signed pumping log to support a claim in these circumstances for additional pumping time in excess of 24 hours, ie to prove that they had maintained the required average pressure throughout the discharge and that the fault lay with the terminal. The signature of a responsible officer of the vessel was important to show that such a person was prepared to put his name to the document to confirm its accuracy, to authenticate it and to prove its provenance.

The same arguments also applied to the signatures of either a charterer's representative or a terminal representative (or in their absence, relevant notices of protest). The absence of any of those signatures was not trifling or insignificant. Other than in very special circumstances, the *de minimis* principle did not apply to a document that was expressly required to be produced by the contract and was plainly relevant.

The Court would reject the owners' argument that the consequence of the owners' failure to provide signed pumping logs was that only the part of the claim relating to "additional time" was time-barred. If, as in the present case, only one composite claim for demurrage was made, the owners were time-barred in respect of the entirety of the claim, notwithstanding that the absence of documents only related to one constituent part of the claim.

Accordingly, the charterers were entitled to summary judgment on the whole of owners' claim for demurrage because it was time barred. The owners' claim would be dismissed.

*Michael Ashcroft (Middleton Potts) for the charterers; Charles Kimmins (Norton Rose LLP) for the owners.*

## CASES – CANADA

**(2007) 731 LMLN 2**

*Admiralty jurisdiction – Contract of affreightment – Shipowners agreeing to carry defendant's cargo on shipowners' vessel – Defendant alleged to have breached contract by loading cargo on different vessel – Shipowners arresting defendant's cargo whilst on board other vessel – Whether shipowners entitled to commence proceedings in rem against cargo*

*Phoenix Bulk Carriers Ltd v Kremikovtzi Trade (The "Swift Fortune") – Supreme Court of Canada (McLachlin CJ, Bastarache, Binnie, LeBel, Deschamps, Fish, Abella, Charron and Rothstein JJ) – 16 March 2007*

By a contract of affreightment dated 27 July 2005 between the first defendant cargo owners and the plaintiff shipowners, the cargo owners agreed to ship a cargo of approximately 70,000 to 75,000 metric tons of coal ("the cargo") onboard the plaintiffs' vessel *Far Eastern Marine* for carriage from Vancouver, Canada to Bourgas, Bulgaria. The plaintiffs contended that, in breach of their contractual obligations, the cargo owners entered into a contract with the owners of another vessel, the *Swift Fortune*, and loaded their cargo on that ship between 3 and 5 September 2005 in Vancouver.

On 13 September 2005 the plaintiffs failed a statement of claim *in rem* against the cargo and *in personam* against the cargo owners, and on the same day caused the cargo to be arrested while on the *Swift Fortune* in Vancouver.

On 14 September 2005 the cargo owners applied for an order striking out the statement of claim *in rem* and setting aside the warrant of arrest. The application was dismissed by Rouleau J.

The cargo owners appealed. They relied on the decision of the Federal Court of Appeal in *Paramount Enterprises International Inc v "An Xin Jiang"* [2001] 2 FC 551.

Section 43(2) of the Federal Court Act RS 1985 provided:

"(2) Subject to subsection (3), the jurisdiction conferred on the Federal Court by section 22 may be exercised *in rem* against the ship, aircraft or other property that is the subject of the action, or against any proceeds from its sale that have been paid into court."

Section 22 provided:

"(1) The Federal Court has concurrent original jurisdiction, between subject and subject as well as otherwise, in all cases in which a claim for relief is made or a remedy is sought under or by virtue of Canadian maritime law or any other law of Canada relating to any matter coming within the class of subject of navigation and shipping, except to the extent that jurisdiction has been otherwise specially assigned.

(2) Without limiting the generality of subsection (1), for greater certainty, the Federal Court has jurisdiction with respect to all of the following ...
    (i) any claim arising out of any agreement relating to the carriage of goods in or on a ship or to the use or hire of a ship whether by charter party or otherwise"

The Federal Court of Appeal allowed the appeal, holding that it was bound by *Paramount* which applied a narrow "physical nexus" interpretation of section 43(2). However, had the Court not been bound, it would have decided the issue in favour of the plaintiffs on the basis that section 43(2) did not require a physical nexus between the cargo and the vessel in order to give rise to *in rem* rights. Rather, section 43(2) proposed identifiability of the property as the controlling factor. The action *in rem* had to relate to the specific property contemplated in the contract at issue. To the extent that the cargo could be clearly identified as being the one contemplated under the contract, the breach of which was alleged by the shipowners in their statement of claim, the cargo under arrest was the "subject of the action" – see (2006) 693 LMLN 2 *sub nom Kremikovtzi Trade v Phoenix Bulk Carriers Ltd and Ors (The "Swift Fortune")*.

The plaintiffs applied to the Supreme Court of Canada.

*Held*, that the appeal would be allowed for the reasons given by the Federal Court of Appeal below. The narrow "physical nexus" interpretation of section 43(2) should be rejected in favour of an "identifiability" test that asked whether the cargo was the cargo designated in the contract of affreightment alleged to be breached. Applying that approach, section 43(2) had been satisfied in the present case.

You may be breaching copyright if you photocopy any pages from this publication. To purchase additional copies or site licences, please contact Daniel Jones Tel +44 (0)20 7017 5966

LLOYD'S MARITIME LAW NEWSLETTER • 731

## LONDON ARBITRATIONS

### (2007) 731 LMLN 3

**Charterparty – Vessel to be placed at charterers' disposal "on passing Balboa" – Charterers originally paying hire on basis of information from owners as to when vessel was at Balboa – Charterers subsequently alleging that time of vessel "passing Balboa" was later than that stated by owners – Whether charterers entitled to claim overpaid hire – Meaning of "passing Balboa"**

*London Arbitration 24/07*

The vessel was on her way from Manzanillo towards the Panama Canal when negotiations for the fixture took place. Since the intended fixture anticipated loading at Callao, the owners ordered the ship to drift at sea off the coast of Panama, well to the east and slightly north of Balboa. When the fixture was concluded it provided for the ship to be placed at the disposal of the charterers "on passing Balboa any time day or night, Sundays and holidays included" and for time to count from "the date the vessel has been placed at Charterers' disposal".

The charterers originally paid hire on the basis that time started at 1300 on 26 April when, they said, the owners had told them the ship was at Balboa. When they later discovered that that was not the true position, they claimed overpaid hire in the sum of $14,710.06 on the basis that at best the ship had been delivered at 2000 on 27 April, that being the time when they estimated that the ship had passed Balboa. They defined "passing Balboa" as meaning that it had to be on a bearing 90 degrees to that of the ship's heading.

The owners contended that the charterers had agreed the delivery time and were effectively stuck with that agreement.

*Held*, that there was nothing in the exchanges to indicate a binding agreement, from which the charterers could not resile, on the question of when time started. On the contrary, the charterers had based their original approach on information which was not accurate. There were none of the ingredients of estoppel or waiver present, and there was no reason why, without even having to consider arguments as to misrepresentation, the charterers should not be entitled to re-open the position if it could be shown that the ship was "passing Balboa" at some later time than that originally used for the payment of hire.

The tribunal agreed with the charterers' definition of "passing Balboa". At the time originally taken for the start of hire the ship was by no means off that port, let alone passing it. The evidence did not permit the precise time of the passing on the charterers' definition, to be ascertained. However, it was reasonable, in the light of the evidence that was adduced, to infer that the time taken by the charterers, namely 2000 on 27 April, was at the very least not overfavourable to them.

Accordingly, the charterers' claim succeeded and the owners' counterclaim would be dismissed.

### (2007) 731 LMLN 3(2)

**Charterparty – Time charter trip – Vessel incurring substantial delay at discharge port – Owners claiming to have incurred financial loss – Whether implied term that charterers would discharge cargo within reasonable time**

*London Arbitration 25/07*

The vessel was chartered on the NYPE form for " .. 1 time charter trip ... within below mentioned trading limits." It provided for the ship to be delivered "on arrival first sea pilot station Kohsichang", and for redelivery "on dropping outward pilot 1 safe port Durban/Nouakchott range".

In the event the charterers ordered the vessel to discharge in Lagos and Abidjan with her going to Lagos first for registration, thence to Abidjan for partial discharge, followed by a return to Lagos to discharge the balance of cargo. She loaded at Kohsichang between 18 April and 23 May, and arrived off Lagos on 29 June. After registering there, she left on 7 July for Abidjan, arriving there on 9 July. Discharging at Abidjan took place promptly and the ship returned to Lagos anchorage on 18 July.

She did not berth until 5 April the following year - some 9 months later. Discharging then started, although it was seriously interrupted and ultimately stopped on 27 May when the ship was off-berthed and taken to the outer anchorage. She still had around 15,000 mt of cargo on board. The delays in discharging and the subsequent off-berthing arose because of financial difficulties experienced by, and ultimately the demise of, the intended receivers in Lagos.

Following an agreement between the parties, the remaining cargo was discharged at Cotonou, where the ship arrived on 20 June, completing and redelivering only on 6 September.

Disputes arose under the charter which were referred to arbitration. The principal dispute was whether the charterers were liable for the delay in discharging the cargo and redelivering the vessel. The tribunal ordered that point to be determined as a preliminary issue.

The owners said that they had suffered loss and damage as a result of the delay in discharge and redelivery. If discharging had taken no more than a reasonable time, redelivery would have taken place by mid-August the previous year. By that time the shipping market had risen appreciably, and if they had been able to take advantage of that increased market, the owners would have been able to earn some $1,372,500 more than they did.

The owners said that a term had to be implied into clause 8 of the charter that the charterers would discharge the cargo within a time which was reasonable, given the circumstances of the particular port in question, here Lagos. The owners relied on the voyage charter cases of *Postlethwaite v Freeland* (1880) 5 App Cas 599 and *Temple Steamship v Sovfracht* (1945) 79 Ll L Rep 1. They said that where a contract did not expressly or by necessary implication fix a time for performance of an obligation, the law implied that it should be performed in a reasonable time (*Hick v Raymond & Reid* [1893] AC 22). The charterers could not have laid the ship up (see *Scottish Navigation v Souter* [1917] 1 KB 222 or used her indefinitely as a storage facility. The object of both parties when the charter was concluded was the performance of a voyage consistent with the contractual description.

The charterers denied that any such term should be implied. They said that there was no particular feature of this particular charter that would justify the implication of such a term, so the owners would have to show that one was to be implied into all time charters, and they could not do that. If such a term was to be implied, it was surprising that there was no authority on the point. Clause 8 was only concerned with making it clear that the charterers were to arrange and pay for, in this case, discharging, but not with the time in which this operation was to be performed. That was in contrast to the master's obligation under clause 8 to prosecute voyages "with due despatch". Under a period time charter there could not be a breach of any obligation by a charterer for delay in loading or discharging, whether or not the charterer was at fault: and the position could be no different under a trip time charter. The only material difference between the two types of charter was that the period of the first was defined by reference to a period, whereas that of the latter was determined by the particular trip carried out.

Furthermore, the implication of a term such as that suggested by the owners was not necessary to give the contract business efficacy. In the event of delay in loading or discharging under any type of time charter, the owners received what they had agreed to take: hire at the agreed rate. *Hick v Raymond* did not support the owners: it was a bill of lading case in which no time was provided for within which discharge had to be taken and the implication of a term was plainly necessary.

The charterers accepted that they could not keep the ship indefinitely, and that if there was delay that frustrated the

underlying purpose of the charter it could be brought to an end. But the time here was not of that extent, and even if it had been it would not have given rise to a claim for damages. And if there was some implication as to a reasonable time, there was no breach on the facts of this case. The concept of "reasonable time" had to be interpreted effectively so as to include any amount of time that did not frustrate the charter.

*Held*, that the Durban/Nouakchott range was a substantial range of over 5,000 miles of coastline that included nearly all the major South African ports and numerous ports on the West Coast of Africa. No estimate or indication of the likely duration of the charter was given in the charter itself or in preceding negotiations. Clause 42 made it clear that the ship was only to load bagged rice. Given the delivery location, the tribunal's experience would suggest that the parties anticipated loading there, at Kohsichang; but there was no indication of any intended discharging ports, save that it was probably to be expected that they would be amongst the many covered by the very wide redelivery range.

There was no authority as to what were the precise temporal obligations on a time charter in relation, particularly, to discharging under a time charter trip. The mere absence of authority to the contrary was not enormously telling. But as a matter of principle there was no need, in order to give business efficacy to a trip time charter in the present terms, to imply an obligation as argued for by the owners. Such a charter could work perfectly well without it. If the parties wanted a temporal obligation they could agree a period charter; or special provisions as to changes in hire rates if the actual period exceeded a certain duration. In the absence of such provisions they took the risk that what each expected at the outset might not manifest.

In that respect, the two parties might have very different initial expectations. Based on his previous experience, an owner might think that, with a fixture such as the present, the charterer was going to load at Kohsichang and discharge at one or two West African ports at which the owner anticipated a certain amount of delay. The charterer, in contrast, might actually intend to discharge at one South African port and to do so very quickly; or to discharge at one West African port where he happened to be able to arrange very quick despatch; or at five West African ports at each of which he anticipated exceptional delays because he had particular information as to the situations in those ports.

Or the charterer might have no particular intention when fixing, not having found a buyer for his cargo (if he already had one). And, looking at the other side of the coin, the parties might have very different expectations as to how the market would stand when, respectively, they estimated redelivery would take place.

So, quite apart from any other considerations, it was impossible to know how what was a "reasonable time" would be determined. Given the probably very different, yet in both cases arguably reasonable, expectations of the parties, a tribunal could not safely form any view as to what, viewed objectively at the date of the charter, was a reasonable duration for the charter, or – more particularly – a reasonable time within which discharging was to take place.

Further, against the background of what the expectations and intentions of the parties might be, it was very difficult to see why there should be any requirement that a term be implied as to any time for discharging. The parties, at the time of contracting, took their own views on what they thought was likely to happen, and made their bargain accordingly. In particular, owners agreed to take a certain daily rate of hire; and for the duration of the charter to be fixed by reference to what the charterers ordered the ship to do within the limits provided for in the charter.

The consequences of delay which one or both parties might have failed to anticipate might be adverse to either party, depending on market movements. If, in the present case, the market had declined, the charterers would nonetheless have been obliged to pay hire at the agreed rate, as they did.

With respect to the owners' submissions, there was a world of difference between voyage charters and bills of lading on the one hand, and trip time charters on the other. For present purposes, there was no material distinction between a period time charter and a trip time charter; and there was no reason to import into the former any temporal discharging obligation. Accordingly, there was no reason for any such implication in the present case; and the owners' claim had to fail.

Although there was no authority on the point, the tribunal was comforted by the fact that a similar point had apparently been decided in the same way by an arbitration tribunal in a case which reached the Court of Appeal on an application by the owners for leave to appeal out of time (*Nagusina Naviera v Allied Maritime Inc* [2002] EWCA Civ 1147). In the Court of Appeal Mance LJ said:

> "The judge described the essential issue in paragraph 3 of his judgment as being:
>
> 'whether charterers, under a trip charter with no duration are under any obligation as to the time within which discharge of the cargo is to be effected and, if so, what the nature of that obligation is.'
>
> It is, one might say, an unusual contention that charterers are under such an obligation under such a charter..."

and later he said:

> "In my judgment, this was, and is, clearly not a case where the owners' claim can be regarded as so strong that it would obviously be a hardship for them not to be able to pursue it: *if anything, rather the contrary.*" (Emphasis added by tribunal).

The plain inference from those comments, especially bearing in mind that they were made in the context of an application that had nothing to do with the merits of the owners' substantive claim, was that one of England's leading commercial judges thought there was little, if anything, in the argument for an implied term.

Even if, contrary to the tribunal's basic view, there was some implication as to reasonable time, it had to include any amount of time that was not frustrating. As the tribunal had said, there was no way in which an objectively reasonable time could be arrived at, looking at the matter at the date of the charter. All kinds of things could happen which either or both parties might think possible yet not expect. The ship could go to any number of ports and encounter any number of and type of delays. The tribunal did not pretend that it would be easy to determine what would be a frustrating amount of time, but it seemed to the tribunal that that was the only possible test.

Similar considerations applied to the owners' contention that the charterers were obliged to redeliver the ship within a reasonable time; and for the reasons already given that argument too had to fail.

Published fortnightly. Annual subscriptions:
Printed copy and internet access: £695/US$1251.81008/AUS$1738/SG$2085

**Editorial and Subscription Office:**
Informa Law, Informa House, 30–32 Mortimer Street, London W1W 7RE
Telephone: + 44 (0)20 7017 5532 • Email: legal.enquiries@informa.com

Worldwide Subscriptions: To purchase additional copies or site licences, please contact
Martin Conroy Tel: +44 (0)20 7017 5157 • Email: martin.r.conroy@informa.com

Overseas Subscriptions: Asia Customers: Grant Rourke on +65 6835 5151 or
email: grant.rourke@informa.com • Australian Customers on +61 1249080 4428
or email nanny.wang@mura@informa.com.au

© Informa Law 2006 ISSN 0268-0696
Printed by Masterprint, Charlton, London SE7 7AV Tel (020 8858 1094

Informa Law would like to thank the Society of Maritime Arbitrators
Inc (SMA) for allowing us to report on these decisions. The full texts of all decisions
rendered by its members are available through the SMA Award Service.
For information contact the SMA at Tel: (212) 587 4031 or by Fax: (212) 587 6179

Whilst every effort has been made to ensure that the information contained in this
newsletter is correct neither the editor and contributors nor Informa Law can accept any
responsibility for any errors or omissions or for any consequences resulting therefrom.
Registered Office: Mortimer House, 37–41 Mortimer Street, London W1T 3JH.
Registered in England and Wales No 167.2954.                    *an Informa business*

# INDEX

### Issues 721–731 (4 July 2007–28 November 2007)

*Please note that as of Issue 665 the following citation will be used for items included within LMLN: [year]/Issue/LMLN/page/[item sequence if more than one item appears on the page]. Therefore: (2005) 665 LMLN 1 and (2005) 665 LMLN 1(2) etc.*

## ADMIRALTY

Admiralty jurisdiction – Arrest of sister ship in Singapore – Whether arrest should be set aside on ground of non-disclosure of material facts – Issue estoppel – Whether plaintiff banks had arguable case on the merits – Whether shipowners entitled to damages for wrongful arrest (Singapore). 728(3)

Admiralty jurisdiction – Contract of affreightment – Shipowners agreeing to carry defendant's cargo on shipowners' vessel – Defendant alleged to have breached contract by loading cargo on different vessel – Shipowners arresting defendant's vessel whilst on board other vessel – Whether shipowners entitled to commence proceedings *in rem* against cargo (Canada). 731(2)

Admiralty jurisdiction – Liquidation of company in Singapore – Plaintiffs arresting company's vessels – Company was person liable in personam at time cause of action arose – Whether company in liquidation was "beneficial owner" of vessels at time action brought – Whether liquidation divested company of beneficial ownership of vessels – Effect of judicial sale – Whether Court had in rem jurisdiction (Hong Kong). 723(1)

Admiralty practice – Indemnity claim – NYPE Inter Club Agreement – Plaintiff obtaining order of maritime attachment – Whether order should be vacated on ground that claim was premature. 722(2)(2)

Admiralty practice – Indemnity claim – Plaintiff obtaining order of maritime attachment – Plaintiff having put up security and having obtained interim arbitration award – Whether order for attachment should be vacated. 722(3)

Admiralty practice – Indemnity claim – Plaintiffs obtaining order of maritime attachment – Whether order should be vacated on ground that claim was unripe. 722(2)

Collision action – Three vessels colliding in English Channel – Whether the rule in *The Pennsylvania* applicable – Whether vessels violated Collision Regulations – Causation – Alteration of logbooks (United States). 726(3)

Salvage – Award – Claim by salvors for salvage remuneration – International Salvage Convention 1989 – Appeal against quantum of primary judge's award (Australia). 728(1)

## AGENCY

Authority – Whether owners' port agents had implied or ostensible authority to agree that vessel should adopt "quick departure" procedure. 725(2)

"Independent broker". 721(3)

## ARBITRATION

Apparent bias – Court holding that third arbitrator should have recused himself – Third arbitrator resigning – Whether remaining arbitrators tainted – Application to remove remaining arbitrators. 724(3)

Charterparty providing that "Any dispute arising under this charter" should be referred to London arbitration – Shipowners bringing court proceedings claiming rescission of charterparties for bribery and fraud – Whether arbitration clause covered dispute – Whether charterers entitled to stay of proceedings under section 9(1) Arbitration Act 1996. 729(1)

Jurisdiction – Shiprepairing contracts containing arbitration clauses – Arbitrator appointed under LMAA Terms – Whether arbitrator had jurisdiction to determine claims for misrepresentation arising out of alleged prior contract – Arbitration clauses conferring choice of arbitration forum – Whether shiprepairers in breach of arbitration clauses by bringing arbitration proceedings in foreign tribunal subsequent to shipowners' commencement of London arbitration – LMAA Terms (2002) paragraph 10. 726(3)

Jurisdiction – Whether binding charterparty concluded – Agency – "Independent broker" – Whether parties bound by London arbitration clause. 721(3)

Serious irregularity – Tribunal finding against party on ground not raised or disputed by other party – Whether award should be set aside or remitted. 724(4)

Serious irregularity – Whether arbitrators acted unfairly by failing to give counsel reasonable opportunity of putting his case. 729(2)

## CARRIAGE OF GOODS BY SEA

Conversion of goods – Cargo of containers of copper cathodes discharged from vessel to container terminal – Fraudsters obtaining delivery order by presenting fraudulent bills of lading – Whether carrier entitled to rely on limitation provisions in bill of lading and Hague/Hague-Visby Rules – Whether cargo owner entitled to recover hedging losses – Whether damages to be assessed on value of goods at date of conversion or date of trial. 724(1)

Deck cargo damaged following vessel's grounding – Master failing to alert authorities of grounding – Cargo owners suing carrier under bills of lading – Whether carrier in breach of contract or bailment – Whether carrier entitled to rely on exemption of negligence in navigation or management of ship – Relevance of *bona fides* (New Zealand). 727(3)

Hazardous goods – Carrier incurring expense in relation to cargo of leaking aerosols – Carrier claiming damages from shippers endorsees – Whether endorsees "shippers" – Whether provisions of bill of lading rendered void by US COGSA – Whether endorsees liable under bill of lading (United States). 726(2)

Negligence in navigation or management of ship (New Zealand). 727(3)

## CHARTERPARTY

Delay at loading port caused by non-availability of boat to remove cargo inspector at night – Delay in delivery of goods. 722(4)

Delay at loading port – Whether owners in breach of charter. 725(2)

Delivery – Vessel to be placed at charterers' disposal "on passing Balboa" – Charterers originally paying hire on basis of information from owners as to when vessel was at Balboa – Charterers subsequently alleging that time of vessel "passing Balboa" was later than that stated by owners – Whether charterers entitled to claim overpaid hire – Meaning of "passing Balboa". 731(3)

Formation – Whether binding charterparty concluded. 721(3)

Frustration – Oil tanker grounding near port of Karachi – Tanker owners engaging salvors on LOF form – Salvors time-chartering shuttle vessel for 20 days to tranship oil from tanker casualty to larger tanker – Port authority refusing to issue certificate which would allow shuttle vessel to leave port – Court eventually holding that refusal to issue certificate was unlawful – Shuttle vessel prevented from leaving port and being re-delivered under charter for over three months – Owners of shuttle vessel claiming hire for whole period – Whether time-charter frustrated by reason of delay. 721(1)

International convention – MARPOL changes having effect of restricting vessels' cargo carrying capacity – Whether loss to be borne by owners or charterers. 724(2)

Lien on sub-freights – Freezing injunction against time-charterers – Injunction permitting freight on voyage charter of different vessel to be paid to time-charterers' solicitors – Voyage charterer paying freight to time-charterers' solicitors – Owners exercising lien on sub-freights – Whether lien validly exercised – Whether determination by arbitrator that lien validly exercised binding on non-party to arbitration – Priorities of funds in hands of time-charterers' solicitors. 729(3)

Lien over cargo – Whether lawfully exercised. 723(3)

Redelivery under time charter – Damages – First limb of "Hadley v Baxendale" – Whether owners' damages limited to difference between market rate and charter rate for overrun period – Whether owners entitled to damages for loss of profits under subsequent fixture. 727(1)

Repudiation – Measure of damages. 721(4)

Safe berth warranty – Cement dust. 722(4)

Safe port warranty – Vessel damaged by ice on leaving St Petersburg – Charter expressly naming loading port and also containing in different section a safe port warranty – Whether safe port warranty applied to named loading port. 722(1)

You may be breaching copyright if you photocopy any pages from this publication. To purchase additional copies or site licences, please contact Daniel Jones Tel +44 (0)20 7017 5966

Speed and performance claim – Application of margin for "about" – Whether owners entitled to credit for underconsumption of bunkers. 723(3)

Time charter trip – Vessel incurring substantial delay at discharge port – Owners claiming to have incurred financial loss – Whether implied term that charterers would discharge cargo within reasonable time. 731(3(2))

Vegoilvoy form – Vessel rejected by charterers because of substantial failure of epoxy coating of cargo tanks – Whether owners in breach of charter – Whether owners entitled to rely on exemption clauses in charter (Singapore). 728(2)

Wharfage and watchmen – Liability for additional dues resulting from delays at discharge Port. 730(2)

## CONFLICT OF LAWS

Forum non conveniens – Plaintiff cargo interests suing in Canada – Bill of lading containing exclusive Japanese jurisdiction clause – Whether Canadian proceedings should be stayed in favour of Japan – Effect of section 46 Marine Liability Act (Canada). 730(1)

## CRIMINAL LAW

Fishing vessel lost at sea – Whether shipowning company committed offence by operating vessel in manner causing unnecessary risk to other persons – Whether director of shipowning company committed offence – Maritime Transport Act 1994 (New Zealand). 726(3)

Illegal fishing – Whether appellants were fishing in Cook Strait protection zone – Whether appellants in exemption zone – Ascertainment of "low water mark" (New Zealand). 726(1)

## DAMAGES

Charterparty – Late redelivery under time charter – Damages – First limb of "Hadley v Baxendale" – Whether owners' damages limited to difference between market rate and charter rate for overrun period – Whether owners entitled to damages for loss of profits under subsequent fixture. 727(1)

## DEMURRAGE

Berth or port charter. 730(2)

Notice of readiness – "customary anchorage" – Vessel tendering NOR outside port limits – Whether NOR valid. 725(2)

Notice of readiness – Validity – Vessel needing exemption from general prohibition of entry to Libyan ports – NOR tendered before application for exemption granted – Whether owners entitled to demurrage. 723(2)

Time bar – Whether owners presented relevant supporting documents within 90 days of completion of discharge – Whether documents needed to be signed – Whether absence of signatures was de minimis – Whether owners' claim time-barred. 731(1)

## LAYTIME – see "DEMURRAGE"

## PRACTICE

Anti-suit injunction – Inter-relationship between section 37 Supreme Court Act 1981 and section 44 Arbitration Act 1996. 725(1)

Freezing injunction – Claimant obtaining freezing injunction in support of claim relating to sale of accommodation barge – Whether injunction should be varied – Whether claimant's security for cross-undertaking should be increased – Whether question of relief should be remitted to arbitrator. 729(3(2))

## SALE OF GOODS

Sale of goods fob – Cement to be supplied by sellers fob in Far East for ultimate delivery to Mexico – Sellers' suppliers refusing to supply cement to sellers because of existence of cartel in Mexican cement market – Whether contract frustrated – Whether implied term that contract should be cancelled in the event of monopoly supplier intervening so as to prevent the supply. 727(2)

Sale of goods fob – Sale contract containing provision for "Delivery" including a "laycan" period – Seller failing to deliver goods within laycan period – Buyer cancelling contract – Whether seller in breach of obligation to deliver goods – Whether buyer entitled to terminate contract. 721(2)

## TORT

Conversion of goods – Cargo of containers of copper cathodes discharged from vessel to container terminal – Fraudsters

obtaining delivery order by presenting fraudulent bills of lading – Whether carrier entitled to rely on limitation provisions in bill of lading and Hague/Hague-Visby Rules – Whether cargo owner entitled to recover hedging losses – Whether damages to be assessed on value of goods at date of conversion or date of trial. 724(1)

Damages – Date of assessment. 724(1)

## CASES

APL v UK Aerosols, 726(2)
ASM Shipping v Harris, 724(3)
Albacore Fisheries v Ministry of Transport, 726(1)
Bandwidth Shipping v Intaari, 729(2)
Bottigliere Di Navigazione v Tradeline, 722(2)
CTI Group v Transclear, 727(2)
ERG Raffinerie Mediterranee v Chevron USA, 721(2)
Edwinton Commercial v Tsavliris Russ, 721(1)
Fiona Trust and Holding v Privalov, 729(1)
Golden Fleece Maritime v ST Shipping & Transport, 724(2)
International Transportation Service v The "Convenience Container", 723(1)
Maritime New Zealand v Crusader Fisheries, 726(1(2))
Mazda Canada v Mitsui OSK Lines, 730(1)
Navalmar (UK) v Welspun Gujarat Stahl Rohren, 722(3)
New Zealand China Clays v Tasman Orient Line, 727(3)
OAO Northern Shipping v Remolcadores De Marin, 724(4)
Otal Investments. Re, 726(1(3))
Pacific Maritime (Asia) v Holystone Overseas, 729(3(2))
Phoenix Bulk Carriers v Kremikovtai Trade, 731(2)
STX Pan Ocean v Ugland Bulk Transport, 722(1)
Samsun Logix v Oceantrade, 729(3)
Starlight Shipping v Tai Ping Insurance, 725(1)
Sonito Shipping v Sun United Maritime, 722(2(2))
Trafigura Beheer v Mediterranean Shipping, 724(1)
Transfield Shipping v Mercator Shipping, 727(1)
United Salvage v Louis Dreyfus Armateurs, 728(1)
Waterfront Shipping v Trafigura, 731(1)

## SHIP'S NAMES

Achilleas, 727(1)
Asia Star, 728(2)
Convenience Container, 723(1)
Cougar Ace, 730(1)
Elli, 724(2)
Frixos, 724(2)
Kavo Delfini, 722(2)
Lazos, 722(2(2))
Livanita, 722(1)
Luxmar, 721(2)
MSC Amsterdam, 724(1)
Magdalena Oldendorff, 729(2)
Mary Nour, 727(2)
Patara, 722(3)
Remmar, 724(4)
Sabrewing, 731(1)
Sea Angel, 721(1)
Swift Fortune, 731(2)
Tasman Pioneer, 727(3)
Vasiliy Golovnin, 728(3)

## ARBITRATIONS
### London Arbitrations
16/07 – 721(3)
17/07 – 721(4)
18/07 – 722(4)
19/07 – 723(2)
20/07 – 723(3)
21/07 – 725(2)
22/07 – 726(3)
23/07 – 730(2)
24/07 – 731(3)
25/07 – 731(3(2))

You may be breaching copyright if you photocopy any pages from this publication. To purchase additional copies or site licences, please contact Daniel Jones Tel +44 (0)20 7017 5966

EXHIBIT 9

Baltic Exchange Handysize Index ™

Date: 1 July 2008

## Baltic Exchange Handysize Index    2706    (DOWN 7)

| Route Number | Description | | Weighting | Average | Movement |
|---|---|---|---|---|---|
| HS1 | Skaw ~ Passero trip Recalada ~ Rio de Janeiro | | 12.5 | 31714 | -272 |
| HS2 | Skaw ~ Passero trip Boston ~ Galveston | | 12.5 | 31029 | -192 |
| HS3 | Recalada ~ Rio de Janeiro trip Skaw ~ Passero. | | 12.5 | 48000 | 528 |
| HS4 | US Gulf trip via US Gulf or NCSA to Skaw ~ Passero | | 12.5 | 62000 | -100 |
| HS5 | SE Asia trip via Australia to Singapore ~ Japan | | 25 | 35650 | -150 |
| HS6 | S Korea ~ Japan via NOPAC to Singapore-Japan | | 25 | 34721 | -136 |
| Average of the T/C Routes | | | | 39186 | -76 |

(c) The Baltic Exchange Limited 2008

All copyright and intellectual property rights in all material and information on this document is owned by The Baltic Exchange Limited. Any form of copying or distribution of the information contained in this document by any means whether electronic or otherwise is expressly prohibited including distribution by e-mail or reproducing on a website. Persons wishing to copy or distribute information must obtain a licence from The Baltic Exchange Limited.

The Baltic Exchange would like to thank its panellists for their contributions. Names of the panellists are available from the Baltic Exchange website (www.balticexchange.com) and in the manual for the panellists.

01.07.2008 14:34

Baltic Exchange Handysize Index ™

Date: 30 June 2008

## Baltic Exchange Handysize Index    2713    (DOWN 10)

| Route Number | Description | Weighting | Average | Movement |
|---|---|---|---|---|
| HS1 | Skaw - Passero trip Recalada - Rio de Janeiro | 12.5 | 31986 | -314 |
| HS2 | Skaw - Passero trip Boston - Galveston | 12.5 | 31221 | -229 |
| HS3 | Recalada - Rio de Janeiro trip Skaw - Passero. | 12.5 | 47472 | 555 |
| HS4 | US Gulf trip via US Gulf or NCSA to Skaw - Passero | 12.5 | 62100 | -179 |
| HS5 | SE Asia trip via Australia to Singapore - Japan | 25 | 35800 | -221 |
| HS6 | S Korea - Japan via NOPAC to Singapore-Japan | 25 | 34857 | -229 |
| Average of the T/C Routes | | | 39262 | -132 |

(c) The Baltic Exchange Limited 2008

All copyright and intellectual property rights in all material and information on this document is owned by The Baltic Exchange Limited. Any form of copying or distribution of the information contained in this document by any means whether electronic or otherwise is expressly prohibited including distribution by e-mail or reproducing on a website. Persons wishing to copy or distribute information must obtain a licence from The Baltic Exchange Limited.

The Baltic Exchange would like to thank its panellists for their contributions. Names of the panellists are available from the Baltic Exchange website (www.balticexchange.com) and in the manual for the panellists.